## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | |
|---|---|
| **EXXON MOBIL CORPORATION,** | |
| **Plaintiff,** | Case No. _____ |
| **v.** | |
| **ROBERT ANDRES BONTA A.K.A. ROB BONTA, IN HIS INDIVIDUAL CAPACITY; SIERRA CLUB, INC.; SURFRIDER FOUNDATION, INC.; HEAL THE BAY, INC.; BAYKEEPER, INC.; AND INTERGENERATIONAL ENVIRONMENT JUSTICE FUND LTD.** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## <u>COMPLAINT</u>

Plaintiff Exxon Mobil Corporation ("**ExxonMobil**") files this complaint (the "**Complaint**") against defendants Robert Andres Bonta a.k.a. Rob Bonta ("**Bonta**"), Sierra Club, Inc. (the "**Sierra Club**"), Surfrider Foundation, Inc. ("**Surfrider**"), Heal the Bay, Inc. ("**Heal the Bay**"), Baykeeper, Inc. ("**Baykeeper**" and, collectively with the Sierra Club, Surfrider, and Heal the Bay, the "**US Proxies**"), and Intergenerational Environment Justice Fund Ltd. (the "**IEJF**" and, when including its affiliates, the "**Foreign Interests**").  In support of its Complaint, ExxonMobil sets forth as follows:

## I.    <u>INTRODUCTION</u>

1.    This is a suit about a state office holder's abuse of the public trust.  It is also a case about the corrupting influence of foreign money in the American legal system and about the sordid for-profit incentives and outright greed that tries to hide behind so-called public impact litigation.

It is about false statements by people who—while purporting outwardly to serve the public interest—instead serve private foreign interests.  This lawsuit demonstrates the harm to an American company and the injury to the public trust that inevitably occur when a state attorney general like Rob Bonta, the Foreign Interests, and the US Proxies use smear campaigns (and lawfare) for politics, publicity, and private gain.

2.      For decades, the State of California pioneered the promotion and encouragement of recycling.  As the California Department of Resources Recycling and Recovery ("**CalRecyle**") declares today, the "State's recycling and waste management systems move the state towards a circular economy that reduces waste and reuses all materials.  California works toward a society that uses less, recycles more, and takes resource conservation to higher and higher levels."

3.      The California legislature has enacted multiple statutes designed to encourage, improve, and even mandate recycling.  Current California Attorney General Rob Bonta has also long promoted and encouraged recycling.  Indeed, ten years ago, when Mr. Bonta served on the City Council of Alameda, California, the city began requiring residents to sort their waste for collection and recycling.  Mr. Bonta's position was no outlier, and Alameda is not unique in this respect, as several California municipalities currently require their residents to recycle (*see, e.g.*, Los Angeles Mun. Code § 66.03(i); Sacramento City Code § 13.10.340; San Diego Mun. Ordinance § 66.0705; San Francisco Env't Code § 1903).

4.      In a staggering reversal and in a coordinated effort, Mr. Bonta, the Sierra Club, and a collection of erstwhile recycling enthusiasts are now attacking a Texas corporation for its advanced recycling operations—operations that are part of the solution to plastic waste, not the problem.  Instead of coming alongside efforts to support a developing technology and an emerging business model designed to recycle otherwise difficult-to-recycle plastics, Defendants are

repeatedly and publicly attacking ExxonMobil with false accusations of being a "liar" and declarations that advanced recycling is a "myth" and a "sham."

5.     Such a stunning change in position begs the question . . . why?  Why would Mr. Bonta or anyone who claims to be serious about cleaning up the environment and helping solve the plastic waste issue take such extreme measures to shut down the emerging and developing advanced recycling industry?  The answer is foreign influence, personal ambition, and a murky source of financing rife with conflicting business interests.  With apparently no appreciation for the irony of their claim, Mr. Bonta and his cohorts are now engaging in reverse greenwashing; while posing under the banner of environmentalism, they do damage to genuine recycling programs and to meaningful innovation.

6.     The IEJF is an Australian charity founded by one of the largest shareholders of an Australian mining conglomerate that is presently competing with ExxonMobil in the Low Carbon Solutions and energy transition sector, all Foreign Interests.  The IEJF retained U.S. lawyers (Cotchett, Pitre & McCarthy, LLP ("**Cotchett**")) to engage in "political activities," including filing a lawsuit against ExxonMobil.  The IEJF did not want to sue in its own name; instead, the law firm's first task was to recruit and enlist willing plaintiffs to stand in for the Foreign Interests' agenda.  Cotchett signed up the US Proxies—Defendants Sierra Club, Surfrider, Heal the Bay, and Baykeeper—as nothing but local placeholders, acting for the foreign business interests competing in U.S. courts rather than the marketplace.  Based on their retention agreement, the scope of the representations, and this foreign involvement, the U.S. Department of Justice (the "**DOJ**") required Cotchett to register as a foreign agent.  Few, if any, plaintiff's law firms have been forced by a Department of Justice to register as agents of a foreign entity.

7.      Personal ambition and fundraising opportunism also motivated Defendants' about-face on recycling.  Bonta, specifically, has publicly and in his personal capacity attacked ExxonMobil's character to raise money for his political campaign.  While the lawyers at Cotchett have registered as foreign agents, they have also developed deep financial ties to Attorney General Bonta.  The Cotchett firm itself, the four partners who were forced to register as foreign agents, and multiple other members of the firm have donated tens of thousands to Mr. Bonta's political campaign at almost the exact same time as the firm received as much or more in fees for "legal services" from the Foreign Interests.

8.      This is also hardly Bonta's first experience with questionable methods of campaign finance delivered by outside influences seeking political favors.  Bonta has previously raised money from the owners of a California waste management company who are now embroiled in an FBI investigation involving "pay-for-play" and campaign contribution laundering.  After the investigation became public, Bonta returned the money.[1]

9.      Contrary to Defendants' statements, the truth is ExxonMobil continues to invest millions of dollars researching, developing, and deploying improved methods for recycling plastics.

10.      ExxonMobil is in the business of providing solutions to meet society's needs. ExxonMobil's innovative advanced recycling program gives new life and value to plastic waste that might otherwise go to a landfill.  It is a proven technology that allows numerous different, difficult-to-recycle plastics to be aggregated and converted into raw materials for making valuable new products, such as fuel, lubricants, chemicals, and plastic.  To date, ExxonMobil has recycled

---

[1] Dustin Gardiner & Lara Korte, "Rob Bonta gives back more fraught campaign funds," *Politico* (Oct. 25, 2024), https://www.politico.com/newsletters/california-playbook/2024/10/25/rob-bonta-gives-back-72k-in-fraught-campaign-funds-00185460 (last visited Jan. 3, 2025).

over 70 million pounds of plastic waste. That is 70 million pounds of waste that might otherwise have been sent to or remained in landfills. And ExxonMobil's capacity and capabilities are increasing at a rapid pace.

11.     Advanced recycling works, and as it is broadly adopted, it can greatly increase the recycling rate for plastics and promote a more circular economy. Decades of legislative and executive action at both the state and federal level have supported necessary, uniform policies to address plastic pollution. Half of the states in the nation have adopted laws supporting advanced recycling.

12.     Notwithstanding the efficacy of advanced recycling, Defendants have falsely disparaged ExxonMobil. Bonta said of ExxonMobil: "They are the largest producer of polymers and one of the biggest liars." He called advanced recycling "a false promise" and "a myth," and proclaimed that ExxonMobil "proposed sham solutions, and it's illegal." A representative of the Sierra Club stated in an interview, "Exxon perpetuated the myth of recyclability to keep consumers buying more and more," and posted on its website, "our environment and health were being sacrificed just to protect Exxon's bottom line," and ExxonMobil's "days of polluting with impunity are over." The Executive Director of the San Francisco Baykeeper went so far as to say, "Exxon's plastic polymers are poisoning waterways, wildlife and people," and "this stuff is killing us a little bit more every day."

13.     Defendants' blatant misstatements and attacks on ExxonMobil's character are targeted at ExxonMobil's operations in Texas and are actively harming ExxonMobil's reputation, as well as its contracts with existing and prospective customers. ExxonMobil has had customers refuse to jointly promote circular polymers because of Defendants' false statements. Potential

customers have also backed away from proposed transactions with ExxonMobil for the same reason.

14.     To be clear, Defendants are entitled to disagree with ExxonMobil's policy and practices, and to debate these issues of public importance.  As Attorney General, Mr. Bonta is entitled to file lawsuits on behalf of the State of California.  This case does not challenge that conduct.  Defendants are not entitled to engage in a false media campaign against ExxonMobil's reputation and character nor engage in tortious interference.  It is *that* conduct that is at issue in this lawsuit.

15.     ExxonMobil asserts causes of action for business disparagement, defamation, tortious interference with contract, tortious interference with prospective business relationships, civil conspiracy, and declaratory judgment and seeks, among other relief, an award of damages and an injunction requiring Defendants to retract their defamatory statements and to cease interfering with ExxonMobil's existing and prospective business relationships.

## II.     <u>THE PARTIES</u>

16.     ExxonMobil is a company incorporated under the laws of New Jersey with its principal place of business in Spring, Texas.  ExxonMobil has done business in Texas for over a century, and today more than 40,000 ExxonMobil employees and retirees call Texas home. ExxonMobil is the state's largest producer of oil and gas, and is also the state's top refiner and chemical manufacturer, led by integrated refining and chemical complexes in Baytown and Beaumont, Texas.  Pertinent to this lawsuit, in 2021 ExxonMobil began advanced recycling at its Baytown Complex, and in November of 2024, it announced plans to add advanced recycling to the Beaumont Complex, with startup in 2026.

17.    Bonta is the Attorney General of California and a resident of California.  Bonta is up for reelection in 2026, and has also been identified as a potential candidate to replace California Governor Gavin Newsom in that election cycle.[2]

18.    The Sierra Club is a California 501(c)(4) nonprofit organization headquartered in Oakland, California.  The Sierra Club's Lone Star Chapter has approximately 24,000 Texas members, including nearly 5,000 members in Harris County.  The Sierra Club and its Texas members have a history of taking in-state action against ExxonMobil's Baytown Refining Complex, which now houses ExxonMobil's advanced recycling operations.

19.    Surfrider is a California 501(c)(3) nonprofit organization headquartered in San Clemente, California.  Surfrider has three chapters organized along the Texas Gulf Coast. Surfrider, through its Texas chapters, engages in advocacy on environmental issues on the Texas Gulf Coast and has engaged in direct action against ExxonMobil's advanced recycling.

20.    Heal the Bay is a California 501(c)(3) nonprofit organization headquartered in Santa Monica, California.

21.    Baykeeper is a California 501(c)(3) nonprofit organization headquartered in Oakland, California.

22.    The IEJF is a non-profit Australian public company headquartered in Perth, Australia.  Minderoo Foundation Ltd. ("**Minderoo**") owns and controls the IEJF.  Minderoo is also a non-profit Australian public company headquartered in Perth, Australia.  Minderoo was established by the founder of Australian mining conglomerate Fortescue Metals Group Ltd. ("**Fortescue**"), and is one of Fortescue's largest shareholders, with nearly $9 billion in assets.

---

[2]  Phil Willon, "Who is running for California governor in 2026?  Meet the potential candidates," *Los Angeles Times* (Aug. 9, 2024), https://www.latimes.com/california/story/2024-08-09/california-governor-2026-candidates-newsom-atkins-kounalakis-thurmond-villaraigosa-yee (last visited Jan. 3, 2025).

III.    **JURISDICTION AND VENUE**

    A.    **Jurisdiction**

23.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367 because plaintiff ExxonMobil is a citizen of Texas; the defendant US Proxies are citizens of California; defendant IEJF is a citizen of Australia; and the amount in controversy exceeds $75,000.

24.    The Court has personal jurisdiction over Defendants because, as set forth below, Defendants have purposely directed their tortious conduct at Texas and its residents, have manifestly availed themselves of the privilege of doing business there, and should reasonably anticipate being haled into court there.  The Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution.  *Command-Aire Corp. v. Ont. Mech. Sales & Serv. Inc.*, 963 F.2d 90, 93 (5th Cir. 1992).  Therefore, the sole question for the Court is whether personal jurisdiction comports with federal constitutional guarantees.  *Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990).  The Due Process Clause permits the exercise of personal jurisdiction over a non-resident defendant where the defendant has established sufficient minimum contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Minimum contacts with a forum state are established by contacts that give rise to specific jurisdiction.  *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994).  Specific jurisdiction is proper when the plaintiff alleges a cause of action that arises out of or relates to a contact between the defendant and the forum state.  *Helicopteros Nacionales de Colum., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

25.    For this Court to exercise specific jurisdiction over Defendants, the Court must determine "(1) whether [Defendants] . . . ha[ve] purposely directed [their] activities toward the forum state or purposely availed [themselves] of the privileges of conducting activities there;

(2) whether [ExxonMobil's] cause of action arises out of or results from [Defendants'] forum related activities; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Texas's long-arm statute permits the exercise of specific jurisdiction over any defendant who "commit[s] a tort in whole or in part in th[e] state." *Defense Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020) (quoting Tex. Civ. Prac. & Rem. Code § 17.042).

26.     Defendants committed tortious acts in Texas by making Texas the focal point of their disparaging and defamatory conduct and by directing that conduct toward the people of Texas. *See Calder v. Jones*, 465 U.S. 783, 789 (1984) (holding that there was jurisdiction over nonresident defendants in a defamation case because the forum state was "the focal point both of the story and of the harm suffered").

27.     Defendants' attacks on ExxonMobil and advanced recycling—an operation ExxonMobil currently solely performs in Texas—"connect[] [them] to the forum in a meaningful way." *Walden v. Fiore*, 571 U.S. 277 289–90 (2014); *see also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984) (noting that the plaintiff's "residence may be the focus of the activities of the defendant out of which the suit arises").

28.     Certain of the Defendants have purposefully availed themselves of the privileges of the State of Texas by acting through their local Texas chapters for the purpose of promoting their campaign against ExxonMobil and its advanced recycling technology.

29.     Bonta's campaign sent self-promoting campaign materials—including defamatory materials—to Texas residents. In return, Bonta has received substantial campaign donations from Texas residents.

30.    Further, Defendants have made defamatory statements designed to undercut ExxonMobil's community partnerships in Texas, including taking direct aim at ExxonMobil's relationships with the Houston Recycling Consortium and Cyclyx International, LLC. Specifically, agents who on information and belief were acting in active concert with Defendants placed "Air Tags" in plastic waste and dropped it in consortium recycling bins to track it.[3]  After tracking the plastic to a storage yard, Bonta mischaracterized the storage as just piling up plastic, without recycling it.[4]

31.    The truth is, Cyclyx is in the process of constructing its first state-of-the-art circularity center in Houston, Texas, which will take this plastic waste, characterize it, process it, and provide feedstock to both mechanical and advanced recyclers, including ExxonMobil.  Cyclyx has also recently announced investment in a second circularity center in Fort Worth, Texas (funded in part by ExxonMobil) and is in the process of attempting to expand its portfolio of recycling customers for both facilities.  Rather than applaud these efforts to keep plastic waste from landfills, Defendants suggest Cyclyx and its vendors should not gather and store plastic feed for use in these facilities.  Defendants' disparaging and defamatory statements are having a chilling effect on Cyclyx's ability to build a portfolio of third-party customers, ultimately undermining ExxonMobil's investments.

32.    Finally, on information and belief, Defendants conspired with others to undermine ExxonMobil's permits for advanced recycling through false and defamatory statements regarding the efficacy and compliance of ExxonMobil's operations with applicable environmental law.

---

[3] James Bruggers, "Dumped, Not Recycled? Electronic Tracking Raises Questions About Houston's Drive to Repurpose a Full Range of Plastics," *Inside Climate News* (Nov. 1, 2023) https://insideclimatenews.org/news/01112023/electronic-tracking-questions-houstons-drive-to-repurpose-plastics/ (last visited Jan. 3, 2025).

[4] Exhibit ("**Ex.**") 1 (Transcript of Rob Bonta Interview with Valerie Volcovici, Reporter, Thomson Reuters (Oct. 7, 2024) ("**Reuters Interview Tr.**")) at 1-2.

B.    **Venue**

33.    Venue is proper in the United States District Court for the Eastern District of Texas pursuant to 28 U.S.C. § 1391 because, *inter alia*, a substantial part of the events or omissions giving rise to ExxonMobil's claims occurred in this judicial district and because Defendants are subject to this Court's personal jurisdiction with respect to this action.  Specifically, the Eastern District of Texas encompasses ExxonMobil's Beaumont Complex, where ExxonMobil is investing millions of dollars to add advanced recycling.  ExxonMobil has more than 2,000 direct employees in its Beaumont facilities.  The economic impact of those facilities is far greater, accounting for approximately one in every seven jobs in the region.  Defendants' tortious conduct attempts to undermine ExxonMobil's investments in Beaumont, Jefferson County, Texas, within the Eastern District of Texas.

IV.    **FACTS RELEVANT TO ALL CAUSES OF ACTION**

A.    **Defendants' About-Face on the Promise of Recycling**

34.    Given advanced recycling's promise, Defendants should be promoting it rather than interfering with its adoption.  Instead, Defendants have reversed course and now attack ExxonMobil for working to advance the very same priorities and achieve the very same objectives that California and its municipalities have been championing for decades.  Why?  Foreign influence, on the one hand, and political ambition, on the other.

1.    **The Influence of the Foreign Interests**

35.    The IEJF is a subsidiary of Minderoo, a philanthropic organization founded and chaired by Andrew Forrest, the billionaire founder of Fortescue.  In 2019, Minderoo announced a campaign, led by Forrest, called "Sea the Future" to end plastic waste through what he styled a "levy" on virgin plastic.  His idea was that plastic resin manufacturers should jointly agree to artificially inflate the price of virgin plastic resin derived from fossil fuels through a self-imposed

levy.  Funds raised by the levy would then be managed by Forrest's charity to address plastic pollution.  The inflated price of virgin plastic would, in his view, create enough margin for recycled plastic—unburdened by the levy—to compete for market share and encourage chemical (advanced) recycling.[5]  Forrest traveled the world promoting this idea, including a visit to ExxonMobil's campus in Texas in 2019.[6]

36.    During that visit, representatives of ExxonMobil explained that, while perhaps well intended, a voluntary agreement among industry competitors to inflate the price of their goods would be a clear violation of U.S. antitrust law.  Undeterred, Forrest continued to promote his campaign to other industry participants, culminating in another meeting among plastic resin manufacturers and major retail brands.  At this meeting, ExxonMobil representatives again explained why Forrest's scheme was unlawful, and those present refused to participate in Minderoo's plan.

37.    Undeterred, Forrest publicly launched this campaign at a United Nations sponsored TED Talk in New York in September 2019.[7]  Interestingly, at that event, he stated, "There isn't a plastic we can't treat—it's not technical, it's economical."  Once the weight is shifted to make cost higher to produce fossil-fuel derived plastic, "the world turns to polymers from waste instead of polymers from fossil fuel . . . ."  In fact, Forrest highlighted the importance of supporting chemical

---

[5] Bloomberg, "Australian Billionaire Forrest Wants to End Worldwide Plastic Waste" (Sept. 26, 2019), https://www.bloomberg.com/news/videos/2019-09-27/australian-billionaire-forrest-wants-to-end-worldwide-plastic-waste-video (last visited Jan. 3, 2025).

[6] As a solutions provider, ExxonMobil regularly meets with people and organizations to better understand their policy views for addressing plastic waste in the environment.  Representatives of Fortescue requested a meeting for Forrest to talk with ExxonMobil about plastic waste in the environment, and ExxonMobil was willing to be introduced to Forrest.  ExxonMobil had no notice of what Forrest's proposal would be prior to the meeting.  During the meeting, ExxonMobil invited Forrest and his affiliated companies to join the Alliance  To End Plastic Waste, which Forrest ultimately rejected.

[7] TED Talk, "A Radical Plan to End Plastic Waste," Andrew Forrest (Nov. 1, 2019), https://youtu.be/I5g9-4fx60A (last visited Jan. 3, 2025).

(advanced) recycling by the fund: "We need hundreds of millions of tons of plastic each year.  We can't get that out of mechanical recycling.  But you can certainly get that out of chemical recycling."

38.    Having failed to persuade the industry to adopt his collusive proposal, Forrest, Fortescue, and Minderoo have become strident critics of the plastics industry in general, and ExxonMobil in particular.  In 2021, Minderoo authored and published its first "Plastic Waste Makers Index," which purports to identify the source of global plastic waste by correlating that to market share of plastic resin manufacturers.[8]  Incidentally, it alleges ExxonMobil is the largest producer of plastic polymers which are then turned into single-use plastics.[9]  However, ExxonMobil does not make single-use plastics.  It makes plastic resin, which its customers can then use to make a variety of products.  Minderoo has since published a new index in 2023, along with various other plastic-focused reports.

39.    In these reports, Minderoo has made several false and deceptive statements concerning ExxonMobil, plastics waste, and advanced recycling.  For example, Minderoo (i) stated that advanced recycling "will fail to meaningfully displace fossil fuel plastic production and address its continued growth;[10] (ii) graded ExxonMobil a "D" for Overall Circularity, "E" for Strategy, and an "E" in Outcomes, ranking it as one of the worst companies for single-use plastics circularity;[11] and (iii) commented that "while there may be some policies or commitments to

---

[8]    Minderoo, *The Plastic Waste Makers Index: 2021*, available at https://cdn.minderoo.org/content/uploads/2021/05/27094234/20211105-Plastic-Waste-Makers-Index.pdf.

[9] *Id.* at 14.

[10]    Minderoo, *Plastic Waste Makers Index: 2023* at 39, available at https://cdn.minderoo.org/content/uploads/2023/02/04205527/Plastic-Waste-Makers-Index-2023.pdf.

[11] *Id.* at 46.

reduce fossil-fuel derived plastics, there are no clear targets or timelines – no evidence that [ExxonMobil] has actioned the commitments."[12]  Each of these assertions is false and misleading.

40.    In 2021, ExxonMobil had acted on its commitments by spending millions of dollars to implement advanced recycling at its Baytown facility and prove that the technology works at scale.  Conspicuously, Minderoo's follow-up 2023 report makes no mention of these efforts. Furthering its commitment to advanced recycling, in November 2024, ExxonMobil announced an additional $200 million in investments to double the capacity at Baytown, and then add advanced recycling to its Beaumont, Texas facility as well.[13]  The company has also announced its ambition to deploy one billion pounds per year of advanced recycling capacity globally by 2027.

41.    Why would a philanthropic organization conspire with the US Proxies to defame and interfere with ExxonMobil—attacking the same technologies (advanced recycling) that they themselves recognized were essential to solving the issue of plastic waste only five years earlier? There is more to the story.

### 2.    The Economic Interests Driving the IEJF: Fortescue's Competition with ExxonMobil in Low Carbon Energy

42.    Minderoo formed IEJF, its subsidiary, in March 2022 as an entity focused on climate change and environmental justice related to single-use plastics.[14]  The majority of the wealth used by Minderoo comes directly from its holdings in Fortescue (Minderoo is identified as a substantial shareholder in Fortescue's Annual Report, with nearly $9 billion in assets).  The IEJF

---

[12] Minderoo, *supra* note 8 at 36.

[13] ExxonMobil, "ExxonMobil to expand advanced recycling capacity" (Nov. 21, 2024), https://corporate.exxonmobil.com/news/news-releases/2024/1121_exxonmobil-invests-200m-to-expand-advanced-recycling-in-texas (last visited Jan. 3, 2025).

[14] ExxonMobil publicly announced its entry into the Low Carbon Solutions business as a major division of its business in January 2022.

and Minderoo share executives with Fortescue.  All of which lead to the conclusion that the IEJF's interests are directly tied to those of Fortescue.

43.    Fortescue is the fourth-largest iron ore producer in the world, with holdings of more than 33,500 mi$^2$ in Western Australia.  In or around 2020, however, Fortescue pledged it would decarbonize by 2030 and transform itself into a green energy powerhouse.[15]  Fortescue promised to produce five times more renewable energy than the Australian power grid and sell "green hydrogen" to the world's factories and mills, pitting Fortescue against American oil-and-gas companies like ExxonMobil.  In 2020 and 2021, a team of Fortescue representatives traveled the globe in search of renewable energy projects to manifest Forrest's dream of building Fortescue into a green hydrogen powerhouse.  The team considered, among other projects, damming the Congo and developing hydropower in Afghanistan—all with the objective of creating enough renewable energy to make affordable hydrogen.[16]  But Fortescue's so-called "world tour" ultimately ended in failure.

44.    In 2024, Forrest was forced to downsize his hydrogen dream.  On July 17, 2024, Fortescue announced that it was cutting 700 jobs from its global operations as it slowed its pursuit of green hydrogen.  Forrest disclaimed the target for Fortescue to produce 15 million tons of green hydrogen by 2030.  And Fortescue paused projects around the world because of the high cost of its renewable power.  As one expert stated, "What we see with the projects [that have been paused] is that either the electricity is too expensive or the customers are not there for the hydrogen, but they're both symptoms of the same thing because the hydrogen that's produced is way too

---

[15] Damien Cave, "Can a Carbon-Emitting Iron Ore Tycoon Save the Planet?," *N.Y. Times* (Oct. 21, 2021), https://www.nytimes.com/2021/10/16/business/energy-environment/green-energy-fortescue-andrew-forrest.html (last visited Jan. 3, 2025).

[16] Primrose Riordan, "Inside the unending chaos at Andrew Forrest's Fortescue," *Financial Review* (Dec. 12, 2024), https://www.afr.com/companies/energy/inside-the-unending-chaos-at-andrew-forrest-s-fortescue-20241008-p5kgrn (last visited Jan. 3, 2025).

expensive for it to be viable . . . .  Diverting valuable resources to applications of hydrogen that are clearly unsuitable [because of the laws of thermodynamics] is a tragic mistake."[17]

45.    In the midst of these failures, Fortescue appears to have adopted a novel strategy for competing against American oil-and-gas producers like ExxonMobil.  Having failed to successfully compete against ExxonMobil in the marketplace, Fortescue has, on information and belief, orchestrated a campaign to compete by turning the wheels of American justice to the company's self-interested purposes.  More specifically, Fortescue funds Minderoo, which owns and controls the IEJF, which hired an American law firm to bring claims against ExxonMobil on behalf of the US Proxies.

46.    In December 2023, as Forrest's dream of upending the American oil-and-gas industry teetered on the brink of failure, the IEJF engaged the Cotchett law firm to "provide legal services in California lawsuit."  Beginning in March 2024, IEJF began funding those services, culminating with the filing of the US Proxies' plastics lawsuit against ExxonMobil in late September 2024.  According to the legal services agreement between Cotchett and the IEJF, the "IEJF will continue funding [the plastics] litigation as long as it deems appropriate."

47.    In November 2023, Cotchett sent a letter to the DOJ requesting an advisory opinion with respect to whether the law firm should register as a foreign agent under the Foreign Agents Registration Act ("**FARA**").  In December 2023, the FARA Unit Chief identified foreign litigation funding as an enforcement priority, raising the concern that foreign litigation funders "may fund litigation on divisive issues to try to inflame tensions and sow division among the U.S. public."  In January and April 2024, Cotchett sent follow-up letters to the DOJ's FARA Unit.  Finally, in June 2024, the Unit issued an advisory opinion advising Cotchett to register for its work on behalf of

---

[17] *Id.* (quoting Cambridge University professor of mechanical engineering David Cebon).

the IEJF, in part because Cotchett would be engaging in "political activities."  In October 2024, Cotchett registered as a foreign agent under FARA.  Since March 2024, the IEJF has paid Cotchett hundreds of thousands of dollars in consideration for legal services provided in connection with the US Proxies' plastics lawsuit.

48.    Cotchett and its members are also directly tied to Bonta, having donated tens of thousands of dollars to Bonta's political campaigns.

49.    Indeed, there can be no question that Cotchett, through its NGO lawsuit, and Bonta, through his lawsuit (both of which attack advanced recycling), are working together.  The two lawsuits were filed on the same day, within hours of each other.  Moreover, Bonta and the US Proxies then announced their lawsuits against ExxonMobil in a joint press conference.  Bonta stated that he was "[p]roud to do this announcement together and uh, be in *partnership and collaboration* with some incredible leaders" and then proceeded to list representatives of the US Proxies.[18]  Bonta concluded his announcement by proclaiming "[w]e're proud to file ours and— side-by-side with you, and . . . looking forward to holding ExxonMobil accountable with all of you."[19]

**B.    California's Decades-Long Leadership of the Recycling Movement**

50.    California and its municipalities have played an integral part in shifting societal norms surrounding waste management.  Indeed, for more than half a century, California and its municipalities have been in the vanguard of the recycling movement, devising and implementing solid-waste management legislation and regulations that enable, promote, and, in some cases,

---

[18] Cal. Dep't of Justice, "Attorney General Bonta, Environmental NGOs Discuss Plastics Deception Lawsuit Against ExxonMobil" (Sept. 23, 2024), https://www.youtube.com/watch?v=OR24jmO_uNY (last visited Jan. 3, 2025) (emphasis added) at 00:00:09–00:00:33 and 00:24:51–00:24:59.

[19] *Id.*

mandate the reuse or recycling of solid waste.  As a result, California has the nation's most comprehensive recycled-content laws for glass, plastic trash bags, and plastic container manufacturers.

51.     By way of example, in 1972, the Solid Waste Management and Resource Recovery Act (SB 5) incorporated legislative declarations and findings that,

> due to the increasing volume and variety of solid wastes being generated throughout the state, and the often inadequate management which may not meet future requirements for eliminating environmental pollution and conserving natural resources, it is in the public interest to establish a comprehensive state solid waste management and resource recovery policy to protect the public health, safety, and well-being, to preserve the environment, and to provide for the maximum reutilization and conversion to other uses of the resources contained therein.[20]

The act established, among other things, a Solid Waste Management Board and a State Solid Waste Management and Resource Recovery Advisory Council.  The act required the Board to formulate and adopt state policy for solid waste management, required each county to prepare a comprehensive, coordinated solid-waste management plan for all waste disposal within the county, and required the Council to submit to the Board a state solid waste resource recovery program, which would include, among other things, "guidelines for a major state-directed research and development program to develop technologically and economically feasible methods for the collection, reduction, separation, recovery, conversion, and recycling of all solid wastes" and "special studies and demonstration projects on the recovery of useful energy and resources from solid wastes."[21]

52.     In 1986, California's Beverage Container Recycling and Litter Reduction Act (AB 2020) (the "**Bottle Bill**"), established an 80% recycling rate goal for all aluminum, glass, and

---

[20] CalRecycle, *History of California Solid Waste Law*, https://calrecycle.ca.gov/laws/legislation/calhist/ (last visited Jan. 3, 2025).

[21] *Id.*

plastic beverage containers sold in California.[22]  Under the Bottle Bill, consumers pay a California Redemption Value ("**CRV**") fee when purchasing CRV beverages and receive CRV refunds when redeeming containers at a recycling center or retailer.[23]  CalRecycle—the well-funded agency that oversees all aspects of waste management in the state—reported a 71% beverage-container recycling rate for 2023 with more than 18.8 billion bottles and cans recycled.[24]  The program produces some of the nation's cleanest streams of materials for recycling.[25]

53.    In 1989, the Integrated Waste Management Act (AB 939) established an integrated waste-management hierarchy to guide a newly established California Integrated Waste Management Board ("**CIWMB**")—CalRecycle's predecessor—and local agencies in implementing, among other priorities, source reduction and recycling.[26]  In addition to establishing the CIWMB, the act required each county to prepare, adopt, and submit to the CIWMB an integrated waste management plan, which would include waste characterization, source reduction, recycling, composting, solid waste facility capacity, education and public information, funding, special waste, and household hazardous waste.  The act also imposed waste diversion mandates, which required each city or county to include an implementation schedule showing the diversion of 25% of all solid waste from landfills by 1995 and 50% of all such waste by 2000.  Finally, the act established a comprehensive statewide system of permitting, inspections, enforcement, and

---

[22] CalRecycle, *Baseline Report for the Zero Waste Plan: Report to the California Legislature* at 11 (July 1, 2024), available at https://www2.calrecycle.ca.gov/Publications/Details/1741 (last visited Dec. 17, 2024).

[23] *Id.*  California is one of only a handful of states—including Oregon, Vermont, Connecticut, Massachusetts, Maine, Michigan, Iowa, Delaware, New York, and Hawaii—to have enacted such legislation.

[24] *Id.*  Several grant and payment programs support California's beverage container recycling program. Between 2012 and 2024, those grant programs provided almost $150 million in awarded funds and contributed to recycling nearly 4.9 million pounds of recycled beverage containers.

[25] *Id.*

[26] CalRecycle, *supra* note 20.

maintenance for solid waste facilities and authorized local jurisdictions to impose fees based on the types or amounts of solid waste generated to be used to pay actual costs incurred in preparing, adopting, and implementing integrated waste management plans.

54.    Later that year, California enacted SB 1322 as a supplement to AB 939 to form the California Integrated Waste Management Act of 1989.[27]  The act bolstered AB 939 in significant ways, including by (i) creating a "Market Development Zone Program," which oversees a statewide initiative in which loans, technical assistance, and product marketing are provided to businesses that use materials from the waste stream to manufacture their products within any of forty separate areas of the state, each with its own "zone administrator;" (ii) requiring the CIWMB to conduct a statewide public information and education program to encourage participation by the general public, business, government, and industry in all phases of integrated waste management and, specifically, to encourage reduced packaging, eliminate; (iii) implementing a "Buy Recycled" campaign to encourage business, industrial, and residential consumers to purchase products manufactured with, or packaged in, recycled materials; and (iv) establishing a research and development program to develop and refine processes and technologies to assist state and local governments and private industries to implement innovative resource management and waste reduction programs.

55.    And, in 2001, the CIWMB became the first government agency in the country to adopt "Zero Waste" as a strategic goal.  California's Zero Waste initiative involves "implementing policy and legislative changes that drive the state toward zero waste, including by reducing, reusing, and recycling resources."[28]  In July 2024, CalRecycle proclaimed that California, as "an

---

[27] *Id.*

[28] CalRecycle, *supra* note 22 at 1.

environmental leader and policy innovator," should "champion effective and innovative strategies" for moving the state to a "new circular economy" and that, "[i]f successful," California would "shift the norm so that waste is viewed as a resource that remains within the supply chain rather than having a linear path to disposal or pollution in the environment."[29]

56.    California's cities and counties have their own well-developed and progressive waste-management programs.   For example, Alameda County—where Bonta served as an Alameda City Council member between 2010 and 2012—proclaims that "recycling and waste reduction are front and center in all of [the county's] initiatives" and touts the county's efforts to "buy recycled-content products to close the loop by creating a market for recycling."[30]   In 2012, the county enacted a "Mandatory Recycling Ordinance" that requires certain individuals and entities to, among other things, subscribe to a recycling collection service and sort recyclables from their trash.   Failure to comply with the ordinance subjects one to, among other potential enforcement actions, fines of up to $1,000 (for repeat violations) and actions for injunctive relief.

### C.    Advanced Recycling Is An Innovative Technology That Makes Recycling More Effective

57.    Advanced recycling is a technology that supplements traditional mechanical recycling by breaking down plastics into the usable raw materials to manufacture fuels, lubricants, new plastics, and other products.   Advanced recycling begins with the collection of plastics.   Those plastics are then typically diverted from the landfill to plastic recovery facilities.   Once diverted from the landfill, the plastics are sorted, shredded, and processed to meet the physical and chemical specifications for advanced recycling.   At an advanced recycling facility, the plastics are converted

---

[29] *Id.* at 17.

[30] Alameda County, Cal., *Sustainability*, https://www.acgov.org/sustain/what/recycling/ (last visited Jan. 2, 2025).  The "closed-loop approach" to recycling refers to a process by which products or materials can be used and then turned into new products or materials (or converted back to raw material) indefinitely without losing their properties.

into liquid and gas molecules through a technique called "pyrolysis"—subjecting the plastics to intense heat in an oxygen-starved environment until their molecules break down at the molecular level—yielding raw materials identical to those derived from fossil-based feedstocks. The raw material can then be used to produce a wide range of new products from fuels and lubricants to high performance chemicals and plastics, leading to more circularity in the manufacturing supply chain.[31]

58.     Advanced recycling allows a wider variety of plastics to be recycled, including hard-to-recycle chip bags, motor oil bottles, and artificial turf. It is a solution that can help improve recycling rates for plastic waste and support a more circular economy. And it can be scaled and replicated around the world to increase the amount of plastic waste that is made into new products.

59.     ExxonMobil operates a pyrolysis facility in Baytown, Texas that has 80 million pounds of annual processing capacity. This facility is the only one of its kind: it leverages existing infrastructure by being fully integrated into a petrochemical complex. It is one of the first and only truly scalable advanced recycling solutions. It has already processed over 70 million pounds of discarded plastic.

60.     ExxonMobil is committed to increasing its advanced recycling capacity so that it can continue to take what might otherwise be discarded plastic and turn it into products essential to our modern way of life. Most recently, ExxonMobil has pledged an additional $200 million to expand the capacity of its advanced recycling operations. By 2026, this expansion will provide ExxonMobil with an additional 350 million pounds of advanced recycling capacity per year,

---

[31] ExxonMobil follows the United States Environmental Protection Agency's definition of a circular economy as a model that "reduces material use, redesigns materials and products to be less resource intensive, and recaptures 'waste' as a resource to manufacture new materials and products." U.S. EPA, "What Is a Circular Economy?," https://www.epa.gov/circulareconomy/what-circular-economy (last visited Jan. 2, 2025).

bringing the company's total advanced recycling capacity in Texas to approximately 500 million pounds per year.

61.    ExxonMobil's advanced recycling facilities and processes are certified through an independent, third-party certification system called International Sustainability and Carbon Certification ("**ISCC**") PLUS.

### D.    ExxonMobil Has Numerous Existing and Prospective Contracts Dependent on Advanced Recycling

62.    ExxonMobil has entered into numerous contracts to support the burgeoning advanced recycling initiative.

63.    For example, ExxonMobil partners with local Texas cities and counties to take some of their hard-to-recycle plastics and—through its innovative advanced recycling approach—turn what would otherwise be wasted into valuable and useful products.

64.    ExxonMobil also has multiple memoranda of understanding with popular international brands to explore future business opportunities for the employment of ExxonMobil's certified-circular polymers to meet their targets for circular content in their product packaging.[32]

65.    These contracts exist because advanced recycling works.  Without advanced recycling, these difficult-to-recycle plastics would likely end up in landfills.  And because these contracts for advanced recycling are becoming more common, Defendants know that advanced recycling works and that Texas companies are recycling what would otherwise be plastic waste. Indeed, contracts for advanced recycling are becoming more common in California, including in connection with the regulatory implementation of the Plastic Pollution Prevention and Packaging

---

[32] Certified-circular polymers are virgin quality plastics that are accompanied by an ISCC PLUS "Sustainability Declaration" that matches the mass of virgin quality plastics that ExxonMobil sells to a corresponding amount of plastic waste that it transformed back into usable raw materials through advanced recycling.

Producer Responsibility Act (SB 54), which aims to address the impacts of single-use packaging and plastic food service ware by, among other things, establishing an "extended producer responsibility" program that gives the primary responsibility for managing products after their useful life to producers.[33]

66.    Finally, ExxonMobil has entered into contracts with Texas Gulf Coast cities and counties to provide the destination for their community recycling efforts that aim to broaden the types of plastics they can recycle.  In the absence of ExxonMobil's advanced recycling, these communities would have much less effective plastic recycling programs.

67.    ExxonMobil's advanced recycling contracts help create jobs in and around Baytown and Beaumont, including construction jobs for the new advanced recycling facilities as well as jobs to build and operate new sorting and aggregation centers such as those recently announced by Cyclyx.

**E.    Defendants' Coordinated Smear Campaign Against ExxonMobil**

68.    Together, Bonta and the US Proxies—the former for political gain and the latter pawns for the Foreign Interests—have engaged in a deliberate smear campaign against ExxonMobil, falsely claiming that ExxonMobil's effective and innovative advanced recycling technology is a "false promise" and "not based on truth."

**1.    Bonta Attacked ExxonMobil's Character and Advanced Recycling Practices**

69.    Although Bonta is entitled to disagree with ExxonMobil's policy and practices, and to debate them in the public square, he decided to take a different approach and undertake a personal campaign against ExxonMobil's business reputation.  In a series of interviews with the

---

[33] CalRecycle, "Plastic Pollution Prevention and Packaging Producer Responsibility Act: SB 54," https://calrecycle.ca.gov/packaging/packaging-epr/ (last visited Jan. 2, 2025).

press, Bonta directly attacked ExxonMobil's character, claiming that ExxonMobil "lied" and "deceived," and threatening that ExxonMobil "deserve[s] and need[s] a judgment day . . . . And we are going to bring it to them."[34]  Bonta also took clear aim at ExxonMobil's advanced recycling practices, declaring that ExxonMobil "has proposed sham solutions, and it's illegal . . . .  So we are here to hold them accountable."[35]

70.     On October 7, 2024, as part of an interview with Reuters, Bonta said that "[ExxonMobil is] the largest producer of polymers and one of the biggest liars."[36]  In that same interview, Bonta proclaimed that advanced recycling is "a false promise," "not based on truth," and "an over promise."[37]  Bonta further stated that "[w]e want [ExxonMobil] to tell the truth.  Stop lying, stop deceiving, and stop manipulating the public.  Stop lying to consumers, stop propping up channel solutions."[38]

71.     Bonta then promoted this defamatory interview on his personal "X" and Instagram accounts, posting a picture of himself being interviewed while claiming that his office was going after "ExxonMobil for promoting the myth of plastic recycling."[39]

---

[34]    Rob Bonta Interview with Ross Palombo, Reporter, CBS News (Sept. 16, 2024), https://www.cbsnews.com/losangeles/video/ca-attorney-general-rob-bonta-speaks-on-states-lawsuit-against-big-oil-companies (last visited Dec. 30, 2024) at 00:00:24; Rob Bonta Announcement at Reuters Climate Week NYC (Sept. 23, 2024), https://www.youtube.com/watch?v=Nsy8exWEcxw (last visited Jan. 2, 2025) at 00:00:57–00:01:02..

[35]    Rob Bonta Interview at Reuters Climate Week NYC (Sept. 23, 2024), https://www.youtube.com/watch?v=XOGn_nFZ3Q8 (last visited Jan. 2, 2025) at 00:00:30–00:00:35.

[36]    Ex. 1 (Reuters Interview Tr.) at 4.

[37]    *Id.* at 3.

[38]    *Id.* at 2.

[39]    Ex. 2 (Bonta October 7, 2024 X.com Post (https://x.com /RobBonta/status/1843339613722816700); Ex. 3 (Bonta Oct. 7, 2024 Instagram Post (https://www.instagram.com/robbonta/p/DA1NAbVxQcc/).

72.     On September 24, 2024, Bonta accused ExxonMobil—on national television—of engaging in "a campaign of deception" regarding the sustainability of recycling.  He said, "[Advanced recycling is] based on a lie."[40]

73.     Further, Bonta used his personal "X" account to denigrate ExxonMobil's image by blaming ExxonMobil for engaging in "a decades-long campaign of deception to convince the public that recycling makes plastic, including single-use plastic, sustainable."[41]  That post also defames ExxonMobil by stating that "ExxonMobil knew.  And ExxonMobil lied."[42]

74.     In yet another post from his personal "X" account, Bonta posted a quotation from an article stating that "[t]he plastics industry has spent decades selling and marketing single-use products while falsely promising that we can recycle our way out of the problem . . . .  California Attorney General Rob Bonta is now suing ExxonMobil . . . for its role in deceiving the public."[43]

### 2.     Bonta Defamed ExxonMobil in His Personal Capacity to Drive Up Donations and Publicity for His Political Campaign

75.     None of Bonta's statements were made in connection with Bonta's core responsibilities or official duties as Attorney General of California.  Rather, he made them in his personal capacity as self-promoting materials to support his election campaign.

76.     For instance, Bonta's campaign sent out an email advertising a lawsuit against ExxonMobil to potential donors and supporters with the subject line: "They deceived us for decades."  This email was "paid for by Rob Bonta for California Attorney General."[44]

---

[40] Rob Bonta Interview with Rebecca Quick, Reporter, Squawk Box, CNBC (Sept. 24, 2024), https://www.cnbc.com/video/2024/09/24/california-ag-rob-bonta-on-exxon-mobil-lawsuit-they-lied-to-the-world.html ("**Sept. 24, 2024 Squawk Box Interview**") (last visited Jan. 2, 2025) at 00:00:23–00:01:08.

[41] Ex. 4 (Bonta Sept. 24, 2024 X.com Post, https://x.com/ RobBonta/status/1838571540079583720).

[42] *Id.*

[43] Ex. 5 (Bonta Oct. 25, 2024 X.com Post, https://x.com/RobBonta/status/ 1849702218087178428).

[44] Ex. 6 (Email from Rob Bonta for Attorney General 2026) at 4.

77.     The campaign email repeatedly states that ExxonMobil engaged in "lies and deception," that ExxonMobil "created . . . the global plastics crisis," and that ExxonMobil convinced the public of falsities.[45]  The campaign email then encouraged recipients to click links to donate to Bonta's election campaign.[46]

78.     Despite his unwarranted and baseless attacks on ExxonMobil, Bonta acknowledged that, for a national political candidate, "[t]here are many considerations, many factors, many different states with different interests.  These are not always black and white questions.  There's nuance."[47]  But he went on to explain that for a state politician raising funds, like himself, there is no need to "balance all the different issues."[48]  Bonta intentionally ignored the truth—what he calls "nuance"—to score easy points with potential donors at ExxonMobil's expense, by dragging ExxonMobil's name and business practices through the mud.

79.     These cavalier statements demonstrate that Bonta knew he was ignoring material facts when he called ExxonMobil liars.  At the very least, he acted with reckless disregard for the truth because he decided that as a political candidate raising funds, he was free to ignore the "nuances," "considerations," "factors," and "different interests."[49]  Instead, Bonta made statements he knew were "aggressive and ambitious" to attack ExxonMobil for his personal gain.[50]

80.     Campaign finance records show that Bonta was successful and, in fact, obtained over $100,000 in donations from Texas residents.

---

[45] *Id.* at 2.

[46] *Id.* at 2-3.

[47] Ex. 1 (Reuters Interview Tr.) at 4.

[48] *Id.*

[49] *Id.*

[50] *Id.* at 5.

81.    Rob Bonta knew that his statements were false or he acted with reckless disregard as to that falsity when he made them.

### 3.    Bonta's Statements Target Texas

82.    Bonta's comments about the efficacy of advanced recycling and ExxonMobil are directly targeted at Texas.

83.    Not only is ExxonMobil headquartered in Texas, but ExxonMobil's only advanced recycling facility is in Baytown, where it recycles millions of tons of plastic per year.

84.    At this time, the only state where ExxonMobil engages in advanced recycling is in Texas.

85.    Bonta said during a national television interview about ExxonMobil's advanced recycling facility, "Advanced Recycling is neither advanced nor recycling."  "Their plant that you referenced?  Here's what the plant does.  It doesn't recycle.  It's an old technology."[51]

86.    In fact, Bonta explicitly refers to Texas in the Reuters interview: "And look at Houston, . . . [t]hese are Advanced Recycling projects that are supposed to be the new solution, and what is happening is post-consumer plastic waste is just piling up.  It is not being recycled."[52]

87.    Bonta's statement intentionally mischaracterized information obtained from an organization's unlawful use of tracking devices installed in motor vehicles.  The truth was that an organization secreted AirTags in plastic bags and merely showed that post-use plastics were being stored and stockpiled to be used in ExxonMobil's advanced recycling Facility.  Bonta then made sensational, false statements about waste "piling up" and "not being recycled."

---

[51] Sept. 24, 2024 Squawk Box Interview at 00:03:38–00:04:42.
[52] Ex. 1 (Reuters Interview Tr.) at 2.

88.    The false claims by Bonta have interfered with contracts and business relationships between Texas entities.

89.    Bonta knew of the Texas contracts and intended to harm those contracts, specifically, stating his intent to cause "behavioral change" that would primarily take place in Texas.[53]

### 4.    The US Proxies Attack ExxonMobil's Character and Business Practices

90.    Like Bonta, the US Proxies have elected not to debate any disagreements, but to instead attack and defame ExxonMobil's integrity and reputation.  They have done this in concert with themselves and the Foreign Interests.

91.    For example, Allison Chin, President of the Sierra Club's Board of Directors, proclaimed that "our environment and health were being sacrificed just to protect ExxonMobil's bottom line" and that ExxonMobil's "days of polluting with impunity are over."[54]  Another Sierra Club representative, Martha Kreeger, declared that "ExxonMobil perpetuated the myth of recyclability to keep consumers buying more and more."[55]

92.    Some of the US Proxies effectively accuse ExxonMobil of homicide: Executive Director of San Francisco Baykeeper, Sejal Choksi-Chugh, stated that "ExxonMobil brainwashed everyone into thinking that plastic recycling works and that it's good for the planet," when in

---

[53] *Id.* at 3.

[54] Ex. 7 (The Sierra Club Santa Barbara-Ventura Chapter, "Coalition Sues Exxon for Plastic Pollution" (Oct. 11, 2024), https://www.sierraclub.org/santa-barbara-ventura/blog/2024/10/coalition-sues-exxon-plastic-pollution (last visited Jan. 2, 2025)) at 1.

[55] Ex. 8 (Jose Fabian, "Bay Area continues to focus on plastic pollution as Exxon hit with lawsuit," *CBSNews.com* (Sept. 23, 2024), https://www.cbsnews.com/sanfrancisco/news/bay-area-continues-to-focus-on-plastic-pollution-as-exxon-hit-with-lawsuit/) (last visited Jan. 2, 2025)) at 4.

reality "ExxonMobil's plastic polymers are poisoning waterways, wildlife, and people," and that "[t]his stuff is killing us a little bit more every day."[56]

93.    And Heal the Bay proclaims that, "[i]nstead of cleaning up the wreckage created by [ExxonMobil]," it is "moving aggressively to stop the harm at its source"—i.e., in Texas—both falsely accusing ExxonMobil of causing the plastics pollution crisis and further demonstrating the US Proxies' intent to attack ExxonMobil in Texas.[57]  Upon information and belief, at least some of the US Proxies solicited residents in Texas and received donations from residents in Texas.

### 5.    Defendants Knew ExxonMobil Did Not Lie and That Advanced Recycling Works

94.    Defendants either knew that their statements (as alleged herein) concerning ExxonMobil and advanced recycling were false or acted with reckless disregard as to that falsity.

95.    The State of California—as just one salient example—has published studies on recycling that advocate for expansion of recycling practices, including advanced (chemical) recycling.

96.    Statements from these studies include:

a.    "A new form of plastics recycling that holds significant potential is "feedstock recycling" or "chemical recycling." This process is often referred to as "conversion technology." Conversion technology (CT) refers to the processing of solid waste through non-combustive thermal, chemical, or biological processes, other than composting, to produce products such as electricity, fuels, or chemicals that meet quality

---

[56] Ex. 9 (Surfrider Foundation, "Profit Over Planet: Surfrider Foundation, the Sierra Club, Heal the Bay, and San Francisco Baykeeper Sue Exxon for Hiding the Truth About Plastic Harms" (Sept. 23, 2024), https://www.surfrider.org/media/press-releases/exxon-press-release (last visited Jan. 2, 2025)) at 3.

[57] *See* Heal the Bay, "Heal the Bay Sues Big Plastic" (Sept. 23, 2024), https://healthebay.org/heal-the-bay-sues-big-plastic/ (last visited Jan. 1, 2025).

standards in the marketplace. CT includes, but is not limited to, catalytic cracking, gasification, and pyrolysis."[58]

b.    "Basically, plastic is processed through one of the methods to produce a marketable product, such as fuel or gas. These products can be used to fuel vehicles or power generators as a form of "green," or renewable, energy. Some methods can also produce the original polymer or resin."[59]

c.    "Chemical recycling technologies are arousing intense interest because of their potential to overcome several barriers faced by mechanical plastics recycling. The conventional reclamation technologies have many economic, technologic, and marketing limitations. Collection and processing costs are high, separation methods are still underdeveloped, and the market for recycled plastics is poor. Chemical reclamation opens the possibility to recover plastic materials thought to be difficult or impossible to recycle."[60]

d.    "Chemical reclamation is becoming one of the most attractive recycling technologies for plastic wastes. By using advanced chemical processes, many more plastics might be recovered, and more markets might be created for the recycled resins."[61]

e.    "Recent developments in chemical recycling of plastics are broadening the possibilities for using recycled resins in applications dominated by virgin resins, such as food-contact products; however, chemical recycling requires costly equipment that may

---

[58] Ex. 10 (CalRecycle, "Use and Disposal of Polystyrene in California: A Report to the California Legislature, Integrated Waste Management Board" (2004)) at 18.

[59] *Id.*

[60] Ex. 11 (CIWMB, *Plastics: Waste Management Alternatives* (May 1992) ("**Plastics: WMA**")) at 40.

[61] *Id.* at 42.

limit its use to large chemical and resin manufacturers. Currently PET is the only resin being chemically recycled on a commercial scale."[62]

     f.    "The biggest obstacles to plastics recycling are technical (because of the variety of plastic types), economic (which include the cost of collecting and buying sophisticated machinery, as well as the problem of inconsistent supplies and undeveloped markets), informational (including the perception that plastics are largely unrecyclable), and regulatory barriers (including laws that promote landfilling or incineration, and taxes and zoning that make recycling unprofitable or impractical)."[63]

     g.    "Grants should be considered for providing research and development of automated resin separation and chemical recycling technologies.  This is important to reduce the costs of conventional recycling and increase the marketability of the corresponding recycled resins."[64]

97.    These statements from a report published on behalf the State of California are far from the only examples of California's promotion of plastic recycling.[65]

---

[62] *Id.* at 3.

[63] *Id.* at 6.

[64] *Id.* at 42.

[65] *See, e.g.*, CIWMB, *Recycling: Good For The Environment, Good For The Economy* 8 (2004); Ex. 11 (Plastics: WMA) at 51; *see also, e.g.*, CIWMB, *1992 Annual Report for the California Integrated Waste Management Board* 37 (1992) (establishing Plastics Recycling Information Clearinghouse to "develop public interest for recycling plastics"); Cal. Dep't of Conservation, Div. of Recycling, *Recycling Facts, Games & Crafts* 19 (Dec. 12, 2005), available at https://web.archive.org/web/20051223110234 /http://www.consrv.ca.gov/DOR/rre/kids/Ed_Images/images/FactsGamesCrafts02.pdf ("PET plastic can be recycled into clothing, fiberfill for sleeping bags, stuffed animals, toys, rulers, and more!"); CalRecycle, *It's in Your Hands*, https://calrecycle.ca.gov/BevContainer/Consumers/ (last visited Jan. 2, 2025); Cal. Dep't of Conservation, Div. of Recycling, *Recycling 101 Refresher Course*, available at https://web.archive.org/web/20230320115957/https://calrecycle.ca.gov/bevcontainer/consumers/recycle10 1 (last visited Jan. 2, 2025) ("Plainly, recycling is more important than ever. Fortunately, doing the right thing is easy–and it can make you money.").

98.     Studies and literature reviews addressing the promise of plastics recycling and advanced recycling like those listed above underscore Defendants' political and anti-competitive agenda.  They show that Defendants are even willing to impede environmental solutions to further their political and economic gain.  The studies and reviews also make inescapably clear that Defendants either knew, or recklessly disregarded, that their disparaging and defamatory statements about ExxonMobil and advanced recycling were false.  Advanced recycling—as pioneered by ExxonMobil—is a game-changing technology that will play an essential role in the creation of a circular economy in America.

**F.      ExxonMobil Has Suffered Harm as a Result of Bonta and the US Proxies' Coordinated Smear Campaign Against ExxonMobil and Advanced Recycling**

99.     These false statements that advanced recycling does not work, and that ExxonMobil has lied to consumers about the efficacy of its recycling practices for decades have caused monetary and reputational harm to ExxonMobil.

100.     Unsurprisingly—and as Defendants intended—their statements have caused significant concerns and uncertainty among existing and prospective customers.  Defendants' statements are impeding a growing industry that is poised to revolutionize plastic recycling.

101.     Further, Bonta and the US Proxies' false statements have chilled efforts to curb international plastic waste, by causing other non-governmental organizations to avoid advocating for chemical recycling, like ExxonMobil's advanced recycling, as a potential destination for plastic waste.

102.     As a result of Defendants' false statements, major international brands have refused to jointly promote advanced recycling with ExxonMobil.  Potential customers have expressed concern and hesitancy to work with ExxonMobil and explicitly referenced statements by Bonta

and the US Proxies as the cause of that concern.  And, a number of companies have backed out of proposed transactions with ExxonMobil for advanced recycling.

103.　　ExxonMobil's existing and prospective contracts are being harmed by Defendants' attacks on advanced recycling.  These attacks hinder ExxonMobil's ability to fulfill its contractual obligations and Defendants are intentionally impeding the growth of this market and causing great uncertainty for existing and prospective customers.  These attacks further threaten to derail advanced recycling by preventing it from achieving the scale necessary to ensure effective and efficient recycling.

## V.　CAUSES OF ACTION

### COUNT I – BUSINESS DISPARAGEMENT

104.　　ExxonMobil realleges paragraphs 1 through 103 and incorporates them by reference, as though fully set forth herein.

105.　　The statements by Bonta—in his personal capacity, as a candidate for public office—and by the US Proxies in service of the Foreign Interests are false.  Advanced recycling is not a "farce" or "myth," and ExxonMobil has not engaged in a decades-long secret mission to brainwash or deceive the public.

106.　　Defendants made these statements knowing that they were false—or with reckless disregard for their falsity.

107.　　These knowingly false statements damaged ExxonMobil's economic interests in Texas.

108.　　ExxonMobil seeks nominal and compensatory damages, as well as consequential and exemplary (punitive) damages.  In addition, ExxonMobil seeks equitable relief, including an injunction requiring (at a minimum) that Defendants take down and retract all defamatory statements.

## COUNT II – DEFAMATION

109.    ExxonMobil realleges paragraphs 1 through 108 and incorporates them by reference, as though fully set forth herein.

110.    The statements by Bonta—in his personal capacity as a candidate for public office—and by the US Proxies in service of the Foreign Interests are false.  Advanced recycling is not a "farce" or "myth," and ExxonMobil has not engaged in a decades-long secret mission to brainwash or deceive the public.

111.    Defendants made these statements knowing that they were false—or with reckless disregard for their falsity.

112.    In particular, the repeated statements that ExxonMobil lied and deceived are defamatory per se and on their face result in reputational harm to ExxonMobil, its brand, and its public image.

113.    These false statements by Defendants caused reputational damage to ExxonMobil. Despite its efforts to develop and improve techniques for recycling, ExxonMobil has been disparaged by statements that it ignored and purposefully acted contrary to sound environmental practices.

114.    ExxonMobil seeks nominal and compensatory damages, as well as consequential and punitive damages.  In addition, ExxonMobil seeks equitable relief, including an injunction requiring (at a minimum) that Defendants take down and retract all defamatory statements.

## COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT

115.    ExxonMobil realleges paragraphs 1 through 114 and incorporates them by reference, as though fully set forth herein.

116.    ExxonMobil has contracts with numerous entities and municipalities to recycle their used plastics.

117.    Defendants knew of ExxonMobil's contracts to recycle plastics for various municipalities.

118.    Defendants knew, understood, or believed that their comments would damage these contractual relationships, hinder the ability of ExxonMobil to execute these contracts and cause the municipalities to second-guess their agreements.

119.    The false statements by Defendants did cause damage to ExxonMobil under these contracts and hindered ExxonMobil's ability to uphold its contractual obligations.

120.    These false statements have also directly harmed ExxonMobil by causing a number of entities to back out of memoranda of understanding for advanced recycling with ExxonMobil and have harmed the advanced recycling enterprise more broadly by preventing or at least obstructing it from achieving the scale necessary to make the maximum impact on the global pollution crisis and facilitate improvements.

121.    ExxonMobil seeks nominal and compensatory damages, as well as consequential and exemplary (punitive) damages.  In addition, ExxonMobil seeks equitable relief, including an injunction requiring (at a minimum) that Defendants cease to interfere with ExxonMobil's advanced recycling contracts.

### COUNT IV – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS

122.    ExxonMobil realleges paragraphs 1 through 121 and incorporates them by reference, as though fully set forth herein.

123.    ExxonMobil had the reasonable probability of contracts with numerous additional entities and municipalities to recycle their used plastics.

124.    ExxonMobil also had the reasonable probability of entering into contracts with entities for the sale of plastic resins created from advanced recycling.

125.    Defendants defamed ExxonMobil by accusing it of lying and deceiving the public and claiming that advanced recycling is a farce.

126.    The false statements by Defendants resulted in these prospective business arrangements falling through.

127.    The loss of these business opportunities causes economic damage to ExxonMobil and made it more difficult for ExxonMobil to reach agreements others.

128.    ExxonMobil seeks nominal and compensatory damages, as well as consequential and exemplary (punitive) damages.  In addition, ExxonMobil seeks equitable relief, including an injunction requiring (at a minimum) that Defendants cease to interfere with ExxonMobil's prospective advanced recycling contracts.

## COUNT V – CIVIL CONSPIRACY

129.    ExxonMobil realleges paragraphs 1 through 128 and incorporates them by reference, as though fully set forth herein.

130.    Bonta and the US Proxies worked together and in concert with the Foreign Interests to launch this coordinated campaign of defamation.

131.    The purpose of Defendants' defamatory campaign was to harm ExxonMobil's business, disparage the oil and gas industry, and increase their own donations.

132.    To effectuate this purpose, Bonta and the US Proxies made statements online, in articles, and in-person appearances at NGO forums, and directly to reporters, and on television.

133.    As a result of Defendants' scheme, ExxonMobil suffered economic harm to its business reputation, its public image, and its contractual agreements.

## COUNT VI – DECLARATORY JUDGMENT

134.    ExxonMobil realleges paragraphs 1 through 133 and incorporates them by reference, as though fully set forth herein.

135.    Twenty-five states (including Texas, where ExxonMobil is domiciled) have recognized the efficacy of advanced recycling and have passed legislation to implement advanced recycling facilities in their waste management programs.  *See, e.g.*, Tex. Health & Safety Code Ann. § 361.003(1).

136.    There is a definite, concrete, and ongoing controversy between the parties as to the legality of ExxonMobil's conduct.  Defendants have made several unjustified public attacks on ExxonMobil and advanced recycling by claiming that ExxonMobil is engaging in false, deceptive and misleading business practices by promoting advanced recycling.

137.    ExxonMobil is also currently involved in legal matters in various jurisdictions, including matters brought by the Defendants, alleging that ExxonMobil has falsely promoted advanced recycling to the public.  However, none of these matters addresses the issue of whether advanced recycling is permitted by law and whether ExxonMobil may rely on the legality and widespread acceptance of the practice in promoting advanced recycling.

138.    Upon information and belief, ExxonMobil is likely to become involved in additional legal matters bringing similar allegations against ExxonMobil in the near future.

139.    A declaratory judgment would therefore avoid a multiplicity of suits in various forums throughout the country, which could result in differing and conflicting decisions and the inefficient use of judicial resources.

140.    Accordingly, ExxonMobil seeks a declaration that (i) advanced recycling is recognized and permitted by law in multiple states, including Texas, and that (ii) ExxonMobil is lawfully permitted to engage in and promote advanced recycling at its Texas facility.

## VI.    PRAYER FOR RELIEF

For these reasons, ExxonMobil respectfully prays for relief as follows:

a.    That the Court find Defendants liable for business disparagement;

b.    That the Court find Defendants liable for defamation;

c.    That the Court find Defendants liable for tortious interference with contract;

d.    That the Court find Defendants liable for tortious interference with prospective business; and

e.    An award of damages for any and all claims, losses, costs, and damages, whether direct, indirect, consequential, general or special, in an amount sufficient to compensate ExxonMobil for its reputational harm, economic harm to its business, loss of prospective business interests, loss of profit and harm under its contracts;

f.    Equitable relief, including injunctions requiring Defendants to take down and retract defamatory statements and to cease interfering with existing and prospective business relationships;

g.    A declaration that (i) advanced recycling is recognized and permitted by law in multiple states, including Texas, and that (ii) ExxonMobil is lawfully permitted to engage in and promote advanced recycling at its Texas facility;

h.    Court costs; and

i.    Any such other and further relief to which ExxonMobil may be entitled.

January 6, 2025                                Respectfully submitted,

                                              **LISKOW & LEWIS**

                                              By: _____
                                              Michael P. Cash
                                              mcash@liskow.com
                                              State Bar No.03965500
                                              Federal Bar No. 5472
                                              Wade T. Howard
                                              wthoward@liskow.com
                                              State Bar No. 00787725
                                              Federal Bar No. 17514
                                              First City Tower
                                              1001 Fannin Street, Suite 1800
                                              Houston, Texas 77002
                                              713.651.2900 – Telephone
                                              713.651.2908 – Facsimile

                                              **ATTORNEYS FOR PLAINTIFF**
                                              **EXXON MOBIL CORPORATION**