THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

* * * * *

EXXON MOBILE CORPORATION,   *   NO. 1:25-CV-11-MJT
ET AL                       *   Beaumont, Texas
                            *
vs.                         *   10:24 a.m. - 11:57 a.m.
                            *   1:24 p.m. - 4:32 p.m.
ROBERT ANDRES BONTA, et al  *   August 20, 2025

* * * * *

**MOTION HEARING**

BEFORE THE HONORABLE MICHAEL J. TRUNCALE
UNITED STATES DISTRICT JUDGE

* * * * *

Proceedings recorded by computer stenography
Produced by computer-aided transcription

*Edward L. Reed*
EdReedCR@aol.com
409-330-1605

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3        MR. MICHAEL P. CASH
          MS. KATHRYN Z. GONSKI
 4        Liskow & Lewis, PLC
          1001 Fannin Street
 5        Suite 1800
          Beaumont, TX 77720-6005
 6
     For the Intervenors:
 7
          MR. TRAVIS C. BARTON
 8        McGinnis Lochridge, LLP
          600 Congress Avenue
 9        Suite 2100
          Austin, TX 78701
10
     For Defendant Bonta:
11
          MR. R. WILLIAM "WILL" SETRAKIAN (L.A. Office)
12        MR. R. MATTHEW WISE (Sacramento Office)
          California Attorney General's Office
13        300 S. Spring Street
          Los Angeles, CA 90027
14
     For Defendant Sierra Club, Inc.:
15
          MR. SCOTT E. GANT
16        Boies Schiller Flexner, LLP
          1401 New York Ave. NW
17        Washington, DC 20005

18   For Defendant Surfrider Foundation, Inc.:

19        MR. JAMES A. HEMPHILL
          Graves Dougherty Hearon & Moody, P.C.
20        401 Congress Avenue
          Suite 2700
21        Austin, TX 78701

22   For Defendant Heal the Bay, Inc.:

23        MS. FALLIN SCHWARTZ
          MS. DEBORAH GREENLEAF
24        Tribble & Ross
          6371 Richmond Avenue
25        Houston, TX 77057
```

1    **APPEARANCES (Continued):**

2    For Defendant Heal the Bay, Inc.:

3         MR. TOMMY L. YEATES
          **Moore Landrey, LLP**
4         905 Orleans Street
          Beaumont, TX 77701

5    For Defendant Baykeeper, Inc.:

6
          MR. JOHN H. BARR
7         MR. M. FOREST NELSON
          **Burt Barr & Associates, LLP**
8         P.O. Box 223667
          Dallas, TX 75222-3667

9         MR. BRYAN A. TERRELL
10        **Weller Green Toups & Terrell, LLP**
          2615 Calder, Suite 400
11        Beaumont, TX 77704

12   For Defendant Environment Justice Fund, Ltd.:

13        MR. JOSHUA A. MATZ *(Washington DC Office)*
          MR. MATTHEW J. CRAIG *(L.A. Office)*
14        MR. JOAQUIN GONZALEZ *(San Antonio Office)*
          **Hecker Fink, LLP**
15        1050 K Street NW
          Suite 1040
16        Washington DC 20001

17   Case Manager:

18        KIMBERLY RACE

19   Court Reporter:

20        EDWARD L. REED

21

22

23

24

25

1        **P R O C E E D I N G S**

2         **10:24 A.M. - AUGUST 20, 2025**

3              THE COURT:  Thank you, and please be seated.

4              Good morning, everyone.

5              ALL COUNSEL:  Good morning, Your Honor.

6              THE COURT:  The Court calls the case of

7    ExxonMobil Corporation vs. Robert Andres Bonta, also

8    known as Rob Bonta in his Individual Capacity; Sierra

9    Club, Inc.; Surfrider Foundation, Inc.; Heal the Bay,

10   Inc.; Baykeeper, Inc.; and Intergenerational

11   Environmental Justice Fund Ltd.  This is in Civil

12   Action 1:25-CV-11.

13              We're here on a number of motions.

14   Mainly, we're here on Defendant Attorney General Rob

15   Bonta's Motion to Dismiss, which is Document 44.

16   We're here on the Defendants Sierra Club, Surfrider

17   Foundation, Heal the Bay, and Baykeeper's Joint Motion

18   to Transfer to the Northern District of California,

19   which is Document 46.  We're here on Heal the Bay's

20   12(b)(2), 12(b)(3), and 12(b)(6) Motion to Dismiss,

21   which is Document 47.  We're here on Defendant

22   Surfrider Foundation's Rule 12(b)(6) Motion to Dismiss,

23   which is Document 48.   We're here on Baykeeper's Rule

24   12(b)(2), 12(b)(3), 12(b)(6) Motion to Dismiss, which

25   is Document 49; Sierra Club's Motion to Dismiss,

1  Document 50; and Defendant Intergenerational

2  Environmental Justice Fund Ltd.'s Motion to Dismiss for

3  Lack of Personal Jurisdiction and for Failure to State

4  a Claim, which is Document 51.

5           Let me ask if the attorneys are all ready

6  to proceed.

7           MR. CASH:  Plaintiffs are ready, Your Honor.

8           THE COURT:  All right.

9           ALL DEFENSE COUNSEL:  Yes, Your Honor.

10           THE COURT:  It sounds like everybody is ready

11  to go.

12           I had a thought about the order of the

13  proceedings, but I'm certainly open to hearing the

14  order that you would think would be the best way to

15  proceed on these.  Maybe you've all kind of prepared

16  your comments in a certain order, and that might be the

17  way to do it.

18           Let me hear from you first.

19           MR. GANT:  Thank you, Your Honor.

20           For the defendants', movants, we propose

21  the following.  But of course --

22           THE COURT:  Let me first of all remind

23  everybody that every time you speak, because you all

24  are not frequent flyers in my court and my court

25  reporter may not recognize you, and to make sure the

6

1   record is clear, we need to have your name every time

2   you come to the podium to speak so that, in fairness

3   to our court reporter, he knows who you're here for.

4           Go ahead.  I'm sorry.

5           MR. GANT:  I apologize, Your Honor.  I

6   apologize in advance, because I'll probably forget

7   later.  Scott Gant from the law firm, Boies Schiller

8   Flexner, counsel for Sierra Club, and for the moment

9   I'll be speaking for all the defendants with respect

10  to a proposal for how to proceed.

11          THE COURT:  Okay.

12          MR. GANT:  And then when we address the

13  transfer motion, I'll be speaking on behalf of the

14  four California nonprofit movants with respect to the

15  transfer motion.

16          THE COURT:  I was actually thinking about

17  doing the transfer motion first, but maybe --

18          MR. GANT:  That was exactly our proposal,

19  Your Honor.

20          THE COURT:  Oh, well okay.  Great minds think

21  alike, then.

22          MR. GANT:  But Mr. Cash is up, so I --

23          MR. CASH:  We would agree with that, Your

24  Honor.  Our idea was to do the Motion to Transfer

25  first, then Mr. Bonta's motion, then the jurisdictional

1    motions, and then finish with the 12(b)(6).

2           THE COURT:  Okay, so let me be specific now.

3    Mr. Gant, you're wanting to do basically Document 46,

4    that's the Motion to Transfer Venue to the Northern

5    District of California, do that first; correct?

6           MR. GANT:  Yes, Your Honor, and hear from

7    everyone until you're satisfied that it's been

8    exhausted.  And then our proposal, again, on behalf of

9    all defendants, was to address personal jurisdiction

10   rather than doing individual motions.  So do personal

11   jurisdiction --

12          THE COURT:  Okay, so that would be the

13   Intergenerational Environmental Justice Fund first, or

14   second?

15          MR. GANT:  Every defendant, all six, have

16   moved on lack of personal jurisdiction.  So our

17   proposal was to tackle all personal jurisdiction for

18   all six movants with respect to that issue, hear from

19   counsel for Exxon any rebuttal you're interested in

20   hearing, again answer all your questions on that issue;

21   and then, after that, turn to any remaining Rule 12

22   issues in whatever order seemed appropriate.

23          THE COURT:  Okay.

24          MR. CASH:  We would agree with that, Your

25   Honor.  We have prepared ours that way to kind of do

1    jurisdiction as a block with everybody and then do the
2    12(b)(6s) as last.
3                THE COURT:  Okay.
4                MR. CASH:  So we're fine with that.
5                THE COURT:  And then the Attorney General has
6    his own specific issues that -- he raises certain
7    immunity issues and what have you.  So when would we
8    hear those?  Last or --
9                MR. GANT:  We're open to doing the remaining
10   Rule 12 issues in whatever order --
11               THE COURT:  Okay.
12               MR. GANT:  And, of course, anything will --
13   we're going to go in whatever order you think is best.
14               THE COURT:  There is some overlap between a
15   lot of this, I understand.
16               MR. GANT:  Even with respect to the Rule 12
17   issues, other than personal jurisdiction, there are
18   some differences.  Some defendants make arguments that
19   others don't.  So, obviously, Attorney General Bonta
20   has his own immunity issues that no one also has, but
21   there are other arguments that are either common to one
22   or fewer than all of the defendants, so --
23               THE COURT:  Okay.
24               MR. GANT:  I figure we could see where we are
25   later, however you thought was best to proceed at that

1   point in time.

2         THE COURT:  All right, then.  Well, then why

3   don't we then proceed, and we will take up the Motion

4   to Transfer to the Northern District of California.

5   Are you going to start off the arguments on behalf of

6   the defendants?

7         MR. GANT:  I will with your permission, Your

8   Honor.

9         THE COURT:  Yes, of course, you may proceed.

10        MR. GANT:  Thank you.

11            One further housekeeping issue, if I may.

12        THE COURT:  Yes.

13        MR. GANT:  We noticed that Mr. Barton is here,

14   counsel for the proposed interveners.

15        THE COURT:  Yes.

16        MR. GANT:  If you recall, he was here at our

17   off-the-record conference in June.  The defendants had

18   no objection to him participating in that conference.

19   We didn't raise any issue with that.  He identified

20   himself as a potential speaker today to your staff.

21   The defendants -- and here I again speak for all the

22   defendants -- we would object to a counsel for the

23   proposed interveners participating as speakers with

24   respect to these motions.  Your Honor, as you know,

25   you have not ruled on the proposed intervention motion

 1   which is fully briefed.  They're not parties to the

 2   case.  And our request would be that they not be

 3   permitted to argue today.

 4          THE COURT:  Well, I see you want to respond to

 5   that, or do you want to wait until you want to make a

 6   comment?

 7          MR. BARTON:  Your Honor, my role is to be

 8   available for the Court as a resource if the Court has

 9   questions about what Baytown, Beaumont, Chambers

10   County, Mont Belvieu might think, especially on the

11   location of the few witnesses in the case.

12          THE COURT:  Yes.

13          MR. BARTON:  But if you have questions --

14          THE COURT:  Well, I appreciate that, and I

15   wish that we would have been able to rule on the Motion

16   to Intervene.  The Court's docket has been extremely

17   heavy this summer here, Lufkin, and in the Sherman

18   Division, and we're working on it.  But if there is

19   something that comes to my mind, I might ask you, even

20   though technically you're not in it yet, but almost as

21   a resource, I would think most of the arguments that

22   you would probably want to make will be made by Exxon's

23   attorney.  Is that fair?

24          MR. BARTON:  Absolutely, yes, Your Honor.

25          THE COURT:  Okay.  So it may almost be a moot

1  point of sorts, but your objection is noted.

2         MR. GANT:  Thank you.  And what I was going to

3  say is I didn't want you to have to rule unnecessarily.

4  Obviously, if you want to hear from them, we're not

5  going to object if that's the case.

6         THE COURT:  Almost a friend of the Court

7  comment more than official comment, I suppose.

8         MR. GANT:  Okay, thank you.  I think that

9  issue is resolved.  I appreciate that, Your Honor.

10  Thank you.

11         THE COURT:  Thank you.

12            Okay, Mr. Gant, go ahead.

13         MR. GANT:  Okay, thank you.

14            Exxon filed this lawsuit complaining about

15  statements made by four California based non-profits

16  and by the Attorney General of California.  Those

17  statements were made announcing and describing lawsuits

18  that those parties filed, two lawsuits, one by the

19  Attorney General and one by the four California

20  non-profits.  But they filed in the Northern District

21  of California.  The statements were made at a press

22  conference conducted in person in the Northern District

23  of California and also at a companion video press

24  conference the same day initiated from California, in

25  which the California Attorney General and the four

1    California-based non-profits participated.

2              Regarding the individual speakers who

3    made statements about which Exxon complains in their

4    lawsuit, all of those speakers were based in

5    California, none of them lived or work in Texas, none

6    of their statements were made in Texas, and none of

7    their statements refer to Texas.

8              Now, the lawsuit that was filed by the

9    Attorney General of California and then a second suit

10   filed by the four California non-profits was filed in

11   September 2024, and those statements were made the same

12   day.  Those two conferences, any video statements were

13   made the same day, and then press releases issued the

14   same day or shortly thereafter.  The last statements

15   complained about by Exxon in its Complaint were made, I

16   believe, on October 11, if my memory serves me.  And

17   they filed their lawsuit in early January.  So they

18   are not complaining about any statements that were

19   made  that were unrelated to the filing of the lawsuit

20   in California and the statements made very soon

21   thereafter.

22              Now, even if suddenly somehow the

23   California lawsuit -- and I'm going to refer to the

24   two cases there as one and refer to them to either the

25   California lawsuit or the California litigation.  Even

1  if the California litigation suddenly disappeared

2  magically, there would still be ample grounds to

3  transfer this case to the Northern District of

4  California.  But the fact is that that case exists.

5  Exxon has acknowledged in its opposition papers,

6  Document 98 at page 11, that there is some overlap

7  between the California litigation and this case

8  initiated by Exxon, and reading the Complaints makes

9  that evident.  And we have included excerpts from the

10  California litigation and from Exxon's lawsuit to show

11  the overlap.

12           Now, I'm not going to argue, because it

13  would be unfounded, that the cases are identical.  They

14  are clearly not.  They are a different cause of action

15  and other differences between the cases.  But if we

16  take Exxon's own account of what this case is about,

17  which is about the statements that are supposedly about

18  advanced recycling and whether Exxon's statements about

19  recycling and plastics have been truthful, there is

20  substantial overlap, as Exxon said itself, it's own

21  words, some overlap between the cases.

22           THE COURT:  Let me ask you, there was a

23  proceeding in the Sierra Club vs. Exxon case out in

24  California, I believe it was filed in San Francisco,

25  where there was a conversation between the judge in

1    that case and the lawyer for Exxon, and I'm referring

2    to page 20 and 21 of the transcript that has been

3    provided to me from that hearing.  That seems to be --

4    this was filed, I think, last night or something.

5            MR. GANT:  Yes, Your Honor.

6            THE COURT:  So I haven't fully absorbed every

7    word of that transcript.  But I think this may be the

8    only reference that the judge in San Francisco made to

9    the Texas litigation.  If I miss something, let me

10   know.  What is your understanding of the meaning and

11   context of that conversation that Exxon's attorney had

12   with the judge in San Francisco?

13           MR. GANT:  I appreciate you are looking at the

14   transcript.  Yes, it was filed last night.  As I was

15   preparing on the plane coming, I realized that I would

16   want to refer to the transcript, so I wanted to make

17   sure that I provided it as soon as possible.  So

18   apologies that we didn't provide --

19           THE COURT:  No, no, no.

20           MR. GANT:  So there are several things about

21   this transcript that are noteworthy, and I was going

22   to come to that, so I appreciate the question.  Just

23   to  make sure we're all on the same page, Exxon in its

24   opposition brief had noted this hearing was scheduled

25   for July 17 on two motions filed by Exxon in the

1  California digitation.  One was a Motion to Dismiss and

2  one was a Motion to Strike under California's

3  Anti-Slapp Law --

4         THE COURT:  Okay.

5         MR. GANT:  -- arguing that, in essence, this

6  was a free speech matter, Exxon was free to speak

7  about the matters that it was speaking about, and it

8  couldn't be subject to liability for those statements

9  under the Slapp Law and the First Amendment.

10         Now, I'm not sure which part of those

11  statements you're focusing on, but one thing that I was

12  going to bring your attention to, Your Honor, was the

13  observation by District Judge Seeborg in the Northern

14  District of California, who noted what he called the

15  ironic position of Exxon that it was claiming in his

16  court that the Anti-Slapp Laws and the First Amendment

17  provided a wide berth for Exxon to be able to say what

18  it wanted to say about plastics and recycling, and

19  therefore the lawsuit should be thrown out on those

20  grounds in addition to their separate Motion to Dismiss

21  under Rule 12.  And Judge Seeborg's own words were that

22  it was an ironic position given what was going on here.

23         Now, there was nothing before the Court on

24  those two motions, the Motion to Dismiss and the Motion

25  to Strike, that asked Judge Seeborg to make any

1  observations about the relationships between the two

2  cases, that I'm aware of.  He obviously had some

3  familiarity with the issues here enough to know that

4  there seemed to be some, in his word, ironic tension.

5              Now, I think one of the things I was

6  going to get to, why this transcript is relevant, is

7  because -- and I'm not casting aspersions on Exxon,

8  but there are statements that they have made to Judge

9  Seeborg in that case that differ from or are in tension

10  with things that they are saying here.  And the reason

11  why that's significant, and I'm going to give you a few

12  examples in a moment, is because it further illustrates

13  the -- that it makes sense for these cases to be

14  litigated in the same court.  It's not only going to

15  be exponentially more efficient and aid judicial

16  administration and be a better use of judicial

17  resources and the resources of the parties because

18  there is overlap in the cases.

19              And, of course, I had to meet and confer

20  with Mr. Cash before we filed this motion.  And when we

21  were talking, I asked him, do you acknowledge that

22  there is going to need to be some level of coordination

23  between the cases in order to avoid duplication and

24  then avoid inefficiency?  And he'll correct me if I

25  misunderstood him, but I understood him to acknowledge

1    that was the case.

2                And then I said, well, if you acknowledge

3    that, then why not just have them in the same court?

4          THE COURT:  Let me ask this question:  I

5    assume, though, to some extent, the scope of the

6    California litigation is different than the scope of

7    this Texas litigation.  Would you agree with that?

8          MR. GANT:  Yes, for sure.

9          THE COURT:  And from your perspective -- and I

10   think we have -- of course, there's slander, there's

11   conspiracy and tortious interference, perhaps some

12   other things here that are perhaps not in the

13   California court.  Am I correct in that understanding?

14         MR. GANT:  You are.  The causes of action in

15   the California litigation are public nuisance under

16   California law and California's unfair competition law,

17   what's often referred to as the UCL.  Here we have

18   business disparagement, defamation, tortious

19   interference, two species, conspiracy and declaratory

20   judgment causes of action.  So I meant to be clear

21   about that before.  There are clearly different causes

22   of action.  But when you go underneath and you look at

23   who's going to need to be deposed, what kind of expert

24   testimony may there be, I don't think there can be any

25   serious question that there is going to be -- as in

1   Exxon's own words, there is overlap.

2           THE COURT:  For example, you represent Sierra

3   Club.  I assume, if there is a request for a deposition

4   of a Sierra Club representative in the California

5   litigation, that same person may have information

6   that's somehow or other relevant, and so you would only

7   want to produce the witness one time.  And granted,

8   some of the questions may be more directed for the

9   cause of action in the California case, but they may

10  ask some other questions that are more germane to the

11  causes of action pled here.  And just as a matter of

12  efficiency, which I applaud the attorneys for thinking

13  like this, you would do that in one deposition, one

14  expense, and you certainly would want to put your

15  witnesses up for Exxon to have a second bite at the

16  apple --

17          MR. GANT:  That's right, we would want to

18  find -- I'm sorry if I cut you off.

19          THE COURT:  No, that' all right, I understand.

20          MR. GANT:  We would want to find every

21  opportunity to harmonize the cases and create as many

22  efficiencies as possible.

23          THE COURT:  But that doesn't mean that the

24  scope of the two cases --

25          MR. GANT:  No, if fact, I'm speaking only for

*Edward L. Reed*
EdReedCR@aol.com
409-330-1605

1  my own client right now.

2        THE COURT:  Of course.

3        MR. GANT:  But I would imagine that the

4  trials would be separate, not consolidated, that you

5  would  have some kind of coordination or consolidation

6  of discovery.  And Exxon has made a big point in its

7  papers, well, we can't be sure that they would even end

8  up in front of the same judge.  That's true, I cannot

9  guarantee that.  But we identified the local rule in

10 California, in the Northern District of California,

11 which is Local Rule 3-12, which has a very specific set

12 of procedures for contending the cases are related.

13 And as I understand how it would operate, based on

14 reading the rule, it would be up to Judge Seeborg

15 because that was the earlier filed case to decide

16 whether they were sufficiently related, that he would

17 want to coordinate.  And I would hope he would conclude

18 that.  I think that's the sensible thing and the sound

19 use of judicial resources.  But, of course, we cannot

20 stand here and tell you a hundred percent certain that

21 they would end up in front of the same judge.  But

22 based on my experience, I think that's a likely

23 outcome.  And even if it didn't happen, having him in

24 the same court would still have some efficiencies.

25            Now, returning to this transcript, I

1  observed that Exxon seems to be saying some things in

2  one court that differ from the other.  Again, I'm not

3  casting aspersions or saying they are doing anything

4  wrong, but it is a fact that they are saying different

5  things.  So I don't know whether you brought out your

6  copy, Your Honor, but --

7          THE COURT:  I have it.

8          MR. GANT:  -- at page 7, lines 9 and 10,

9  Ms. [SUSTIDO], who's counsel for Exxon, was in a

10 colloquy with Judge Seeborg, and she says, starting on

11 7, "But you have to find something that falls within

12 the rubric of public nuisance."  And it's the next

13 sentence which is the one I'd like to draw your

14 attention to.  "I do want to say that while ExxonMobil

15 is a polymer manufacturer, they're not a recycler."

16 Now, the polymers are the raw materials that go into

17 making the plastics.

18          THE COURT:  Right.

19         MR. GANT:  We all agree that Exxon is one of

20 the largest polymer manufacturers.  That's true.  But

21 they told Judge Seeborg they are not a recycler.  The

22 premise of this entire case before Your Honor is that

23 we have supposedly damaged the recycling business of

24 Exxon.

25              Now, later at page 38, counsel for the

1  California nonprofits stood up and remarked on this
2  statement, drawing it to the Court's attention.  And
3  then there was a rebuttal from counsel for Exxon and
4  they didn't say anything about it.  And frankly, I'm
5  perplexed.  I don't even understand what the thinking
6  was there.  But it doesn't matter for my point.  My
7  point is that things are being said in one court that
8  differ from another.

9           Another example, Your Honor, is page 19,
10 but it appears throughout.  Counsel for Exxon argued in
11 the Northern District of California that you really
12 have to focus in on the particular statements that are
13 being made by Exxon in this case over time and look at
14 them and see what they are specifically referring to,
15 what kind of plastic, what particular recycling,
16 because so-called advanced recycling which is sometimes
17 called chemical recycling is different from other types
18 of recycling.

19          So they say, "These statements" -- and
20 this is a quote from Exxon's counsel -- these different
21 statements they made are "not closely related."  Well,
22 part of the arguments we're making here are that you
23 have to look at the statements.  Exxon has
24 characterized this case as us criticizing, saying
25 advanced recycling doesn't work or it's a fraud.  But

1  taking for example my clients, there are three
2  statements attributed to Sierra Club.  They're all in
3  paragraph 91.  There are two people who made those
4  statements.  None of those statements refer to advanced
5  recycling.  And we make that observation our papers.
6  So this matters because, again, Exxon seems to be
7  saying one thing in one court and another thing in
8  another.
9          And then if you look at their briefings,
10 which I did not expect to you do, Your Honor, but if
11 you look at the Motion to Dismiss and also the
12 transcript, you probably saw repeated references to
13 plausibility of the allegations.  Well, we're making
14 the same arguments here in our motions.  With respect
15 to personal jurisdiction in the California litigation,
16 ECF No. 32 was Exxon's Motion to Dismiss for Lack of
17 Personal Jurisdiction.  They told Judge Seeborg in
18 that on page 24, "This Court cannot exercise personal
19 jurisdiction over ExxonMobil based on statements
20 ExxonMobil did not purposely direct at California."
21 That's the standard we're urging based on established
22 Supreme Court and Fifth Circuit law in our motion, and
23 Exxon seems to be taking a different view about what
24 the standard for personal jurisdiction is.
25          So, again, I'm not saying that Exxon is

1    doing anything wrong, but it just reinforces the point

2    that what is sensible is to have these overlapping

3    cases to be in the same court and ideally in front of

4    the same judge.  Because if they make these statements,

5    say A on one day and not A on another, we can come back

6    and refer to it or we could argue judicial estoppel if

7    they successfully made motions based on an argument and

8    then want to change.  That's a lot more difficult to do

9    if we're in two entirely different courts and if we're

10   on different schedules.

11           So, that's why I filed this transcript,

12   and I appreciate Your Honor having looked at it and I

13   would encourage you to take a look at it as you are

14   deciding these motions.

15           I'll proceed unless you have further

16   questions at this point.

17       THE COURT:  I do, but I'm going to wait.  I

18   think some of my questions may actually overlap more

19   into some of the 12(b)(6).  Because what I heard you

20   say also was regarding the sufficiency of the

21   pleadings, and there are some 12(b)(6) implications

22   there as well.

23       MR. GANT:  But again, the point that I was

24   trying to make there is the challenges that are created

25   by having two overlapping cases proceeding in different

1    courts, where in that particular illustration they were

2    saying one thing about the standard for personal

3    jurisdiction adjudication there and seemingly saying

4    something different here.

5         THE COURT:  I guess I'll just go ahead and

6    state it.  One thing that -- and this is not -- my

7    comment here is not a comment about this case, but it's

8    just kind of a comment about all cases, because I see

9    so many affecting virtually every case.  There are

10   Motions to Dismiss and always complaints about the

11   level of pleading.  And I understand, especially

12   having been a litigator myself, judges have different

13   perspectives on just how much is enough.  And, you

14   know, if we required pleading at such a high level,

15   one, there would be very few cases that would ever

16   survive.  And then perhaps even the Sierra Club, when

17   they are plaintiffs in a case, their cases might get

18   dismissed and never see the light of day, never get in

19   front of a jury.  Your right to a trial by jury with

20   Seventh Amendment right would be extinguished because

21   of a paper game.  And I don't mean to make light of

22   pleadings as a paper game, I'm not saying that.  But

23   the precision is not enough.

24        And then, frankly, let's be candid.  There

25   is a certain level, when we set forth pleadings, to

1    kind of set some of the parameters of the case, the

2    various claims and the defenses that are alleged.  We

3    all know that discovery is necessary to fill in some

4    of the facts, because the facts are not all known by

5    either the plaintiff or by the defendant.  And in fact,

6    that's why we allow, sometimes with leave of court and

7    sometimes without, Amended Complaints and Amended

8    Answers, because the discovery has changed what the

9    perceptions were of the facts by the lawyers who were

10   crafting.

11            In other words, do we set high system of

12   justice based upon the clarity and cleverness of the

13   lawyers crafting the pleadings without looking beyond

14   that to the facts of the case?  And that's kind of an

15   overriding concern that the Court has when evaluating

16   any Motion to Dismiss.  To prematurely abort a case,

17   now, there may be a time when, in fact, it's just not

18   there.  The discovery hasn't fulfilled the declarations

19   of the various pleadings for either the plaintiff or

20   the defendant.  And so, you know, it doesn't warrant

21   going to a jury.  It needs to be dismissed, and there

22   is a proper role for dismissal in a case, there is no

23   question about that.  The question is when does that

24   happen and without depriving a litigant.  And I'm not

25   thinking just about Exxon here.  I'm thinking about a

1  case that Sierra Club may want to file in my court or

2  some other court?

3         Do you see the balance I'm trying to deal

4  with here.

5         MR. GANT:  I certainly do, and I appreciate

6  your sharing that perspective, and I also appreciate

7  the predicament.  And I think I'm in the beneficial

8  position of representing plaintiffs and defendants in

9  many different cases.

10        THE COURT:  Sure.

11        MR. GANT:  I know some lawyers are generally

12 always on one side, and that can cause some sort of

13 tunnel vision in my view.  So I think about this

14 question from both sides.

15        THE COURT:  And I have to think about it, too,

16 because if I cut short a claim in this case, what's to

17 say for the case that Sierra Club files and the next

18 one.  I have to cut them and throw them out of court.

19 They don't get their day in court.

20        Do you see the --

21        MR. GANT:  I do.  So if I may offer a few

22 different thoughts in response?

23        THE COURT:  Please.

24        MR. GANT:  The first is particular to this

25 case, and it doesn't resolve the general dilemma that

```
 1   Your Honor faces with Motions to Dismiss and evaluating
 2   pleadings.  But here you're only going to get to the
 3   Rule 12(b)(6) issues and the pleading question if you
 4   decide not to transfer and you decide there is personal
 5   jurisdiction.
 6             THE COURT:  Okay.
 7             MR. GANT:  And this is one of the points I was
 8   going to make.  It was at the end of my presentation,
 9   but let me move it up because I think --
10             THE COURT:  Well, no --
11             MR. GANT:  No, no, because this is directly
12   responsive to your point and I think it's important.
13   We'll have our discussion, full discussion, with Exxon
14   as well and answer all your questions about transfer,
15   and we hope you'll conclude there is good cause to
16   transfer, which would obviate the need to address this.
17             THE COURT:  Great.
18             MR. GANT:  And we a cite case in footnote 3 of
19   our motion, which cites very clear Supreme Court and
20   Fifth Circuit law that you can transfer a case either
21   under 1406(a) for venue deficiency or 1404(a) for
22   general transfer permission even without deciding
23   personal jurisdiction and even if you conclude there is
24   no personal jurisdiction.  So we hope the first thing
25   and the only thing you will need to do is decide
```

1   transfer.  But if you decide against transfer, then we

2   get to personal jurisdiction.  And, of course, if you

3   decide there is no personal jurisdiction, you're not

4   going to have to tackle these pleading questions.  If

5   you get to those, if you will allow me, we'll get into

6   more of the weeds about those later, and I also don't

7   want to steal the thunder of my colleagues, so I know

8   we'll want to address it.

9            But I can tell you, at least for Sierra

10  Club, two things:  One is we never argued that there

11  should be no need to amend if you dismiss on 12(b)(6)

12  grounds on the basis of insufficient pleadings.  I have

13  think you should allow an amendment.  I think that's

14  the right judicial administration, if you will allow me

15  to offer my own opinions.  That's exactly the reasons

16  that you've said.  It shouldn't be one and done.  So,

17  if they are being bounced on a pleading deficiency,

18  that's something that can be cured.  They should have

19  an opportunity to do that, and I would not, for my own

20  clients, ever suggest otherwise.

21            THE COURT:  Sure.

22            MR. GANT:  But the other thing is, we were

23  judicious in the arguments that we made about pleading

24  defects.  Like it or not, the Supreme Court changed the

25  pleading standards with *Twombly* and *Iqbal* and created a

1   plausibility standard that did not previously exist.

2   We're bound by it, and I assume -- I believe you are,

3   too.

4            So that's the framework within which we

5   are operating.  And on the basis of very clear

6   standards set up by the Supreme Court, we believe --

7   Sierra Club believes that Exxon crossed some lines.

8            THE COURT:  Let me ask this question, because

9   I do follow *Iqbal* and *Twombly*.  And I have thrown out

10  cases for insufficient pleadings.  On the other hand, I

11  find, in applying *Iqbal* and *Twombly*, there is a great

12  deal of discretion.

13           MR. GANT:  No doubt.

14           THE COURT:  And sometimes a case may be so

15  very close to the edge of being pushed off the cliff,

16  but maybe one word keeps it alive, barely.  Barely.

17  And maybe some other judge -- wise judge, good judge --

18  exercising proper discretion, may not feel that one

19  word in that pleading and may just allow that claimant

20  to go off the cliff, the case to be dismissed.

21           You mentioned plausibility.

22  Plausibility, at one point, is that for the judge to

23  decide, without interfering with a right that we have

24  under the Seventh Amendment for a jury to decide that.

25           MR. GANT:  It is difficult, no doubt, and I

1  agree with you that very good, capable, experienced

2  judges have looked at the same exact case and come to

3  different conclusions.  And that's why the Courts  of

4  Appeals have wisely adopted the Abuse of Discretion

5  standard and not reviewing de novo.

6          THE COURT:  Okay.

7          MR. GANT:  But then again, I don't want to

8  jump ahead.  Let me give you one example from Sierra

9  Club's Motion to Dismiss where we contend Exxon has

10 failed the plausibility test.

11         THE COURT:  All right.

12         MR. GANT:  And it's a really critical issue,

13 and it dovetails with what we've been discussing about

14 the fact that there are these two cases, the one

15 California litigation and here.

16         THE COURT:  Right.

17         MR. GANT:  Now, the statements certainly

18 attributed to Sierra Club, but I think also to other

19 defendants, that Exxon is complaining about here are

20 substantially similar to statements that are made by

21 General Bonta and the four California non-profits in

22 their litigation in California, their offensive

23 litigation.  Substantially same statements, whether

24 it's in the Complaint or briefs or oral argument.

25 Those, no one I assume will argue, are anything other

 1  than immune.

 2          THE COURT:  Did Sierra Club refer to Exxon as

 3  a liar?

 4          MR. GANT:  No, I think -- no, never, that I'm

 5  aware of, and they don't allege that.  There, Exxon

 6  says that in a brief, and the way I read that was they

 7  were attributing to Sierra Club a statement, I believe,

 8  that was made my general Bonta.  Maybe I'm wrong and my

 9  friends who represents General Bonta will get up.  But

10  I thought that that statement was attributed to Bonta,

11  and then Exxon contended by some theory that that was

12  therefore attributed to us.  I'm not aware of any

13  statement.

14          But, in the California litigation,

15  substantially similar statements to the ones complained

16  about -- again, paragraph 91, the ones they identified

17  for Sierra Club, we make in an immune context.  Of

18  course, anything that's said in a judicial proceeding,

19  in writing or orally cannot be the basis for liability.

20  But Exxon is complaining that that we made virtually

21  identical statements at these press conferences on

22  press releases, and that's the basis for liability

23  here.

24          And here it's kind of like a causation

25  problem, which is, if the statements cause the injury

 1   that's alleged and the statements in California in the

 2   litigation are immune, and then later in time there are

 3   substantially similar statements made, what harm is

 4   attributable to the supposedly non-protected

 5   statements?

 6           THE COURT:  The statements made in court, that

 7   might be tortious in nature or at least accusatory in

 8   nature, but protected because it's a court.

 9           MR. GANT:  Indeed.

10           THE COURT:  And so we're in a court right now.

11   But then, to maybe make the very same statements that

12   were made in court outside in front of a television

13   camera or something like that, a press conference, do

14   you lose some protection or does that court immunity

15   extend outside of the walls of the courthouse?

16           MR. GANT:  The point I'm making now is we do

17   have an immunity argument, as do some of my colleagues.

18   But this is a different point.

19           THE COURT:  Right, okay.

20           MR. GANT:  It's not that that's immune.  It's

21   the question of what is the harm.  You have to allege --

22   to have a plausible allegation of impact, injury and

23   damages, you have to explain how those out-of-court

24   statements that were substantially similar to the ones

25   made in court that are immune, that were made later in

1  time, caused the harm.  As I understand Exxon's theory

2  and the theory of Mr. Barton's proposed intervenor

3  clients is that the statements made by the defendants

4  are causing people not to want to do business with

5  Exxon, not to participate in their advanced recycling

6  programs.

7           But what is it about the non-immune --

8  supposedly non-immune, and let's assume for the moment

9  for argument they are not immune.  What is the impact

10 of those later in time non-immune statements that are

11 virtually identical to the ones that are made in court?

12 I would argue, and we say in this paper, it's the

13 in-court statements that are actually more influential

14 because those are made under Rule 11 standards and

15 rules of ethics.  So there is actually some teeth to

16 misstatements that are made in judicial proceedings.

17 When you're out of court, you don't have those same

18 safeguards.  So I would argue the in-court statements

19 are even more impactful.

20           But, even if they are the same impact,

21 what is the incremental effect of these additional

22 statements?  We made this arguments and Exxon didn't

23 respond to it, as I understand it.  Mr. Cash can

24 address it if he thinks he did and I missed it.  So

25 here, our conclusion is their allegations of harm

34

1   impact injury from these out-of-court statements when
2   you already have substantially similar statements made
3   in court and immune, that there's no theory about how
4   there is some incremental harm or any harm at all.
5   And without that, there's a lack of plausibility.
6          THE COURT:  Let me ask you this:  Could it be
7   that the audience is a little bit bigger and we need
8   to do a press conference and perhaps their business
9   contacts are not in the courtroom.  They never -- I
10  mean, I would not have known what the judge in San
11  Francisco said had you not provided me the transcript.
12  Get on television or write an article in the New York
13  Times or something like that, the public reads it and
14  you know it's there.  And someone might say, "Ooh,
15  Exxon is lying to the people of California.  If they
16  are lying to the people of California, they might lie
17  to the people of Texas."
18         MR. GANT:  I mean, that is a theory.  A, it's
19  not in the Complaint.
20         THE COURT:  Okay.
21         MR. GANT:  And B, I'm not sure what they are
22  factually, because in this case there were press
23  coverage of the filing of the lawsuits in California.
24  I think we even cited them in discussion of the eight
25  factors for transfer.  So there was press conference

1    coverage of the initiation of the lawsuits and their

2    allegations.  I don't have any reason to think that it

3    was less than the coverage of the statements of the

4    press conference.  Remember, they were made the same

5    day.

6            So that's not in there.  But if they got

7    dismissed and they got leave to amend, which we would

8    not oppose with respect to this issue, maybe Mr. Cash

9    would try at that allegation, but it's just not there

10   right now.

11           THE COURT:  I understand.

12           MR. GANT:  So I wanted to address some of

13   those questions about 12(b)(6) and plausibility, but

14   if I may --

15           THE COURT:  I'm sorry, I've gotten you off --

16   you've done an excellent job in answering the questions

17   that come to me and things that have been on my mind in

18   kind of preparation for this, and maybe I've jumped the

19   gun, but let me let you go back to your arguments.

20   I'll try not to interrupt you as much.

21           MR. GANT:  I was just telling one of my

22   colleagues, I love questions from judges.  I would much

23   rather have non-stop questions from you rather than me

24   doing a monologue, so I appreciate all the questions,

25   Your Honor.

```
 1                    Okay.  So returning to the venue issue,
 2   and I'll try and wrap up those as expeditiously as I
 3   can.
 4                    So, returning to the 1404(a) standard,
 5   first, I would observe, as a house keeping matter, the
 6   four California non-profits are the movants, but the
 7   two defendant non-movants, the Justice Fund and
 8   Attorney General Bonta do not oppose the transfer
 9   motion.  We note that and it's also included in the
10   certificate of conference.  So the only one opposing
11   transfer is Exxon.
12                    Now, the first criteria in our question,
13   of course, under 1404(a), as you have observed in prior
14   decisions you've written on the issue, is could the
15   case have been filed in the Northern District of
16   California?  Exxon, as I understand it, has not
17   questioned or disputed that it could have.
18                    So then we turn to --
19              THE COURT:  Does the plaintiff's choice of
20   venue matter?
21              MR. GANT:  What the Fifth Circuit has said
22   about this is that is taken -- it's entitled to some
23   consideration, but that it's taken into account under
24   the Good Cause Standard.  That's been stated explicitly
25   by the Fifth Circuit.  I apologize.  I don't remember
```

1    which case it's in.  It's in one of the recent cases or
2    probably several of the cases, but what the Fifth
3    Circuit said in considering that very question is, "Our
4    Good Cause Standard takes that into account."  So it's
5    not just you're one millimeter ahead on balancing
6    which court it should be in, and therefore it gets
7    transferred.  You need to do better than that.  Exxon
8    made big point of this in their briefs, a point we
9    weren't disputing.  There's no question the Good Cause
10   is the standard we believe that's met here.  And it's
11   that standard that takes into account, the decision by
12   the plaintiff about where to file.
13            But the Court has also said, the reason
14   why 1404(a) exists is so that that choice is
15   counter-remanded when appropriate, so that the
16   plaintiff just doesn't have complete control.  And you
17   have to take into account the factors that are in
18   1404(a) are the considerations of justice and the
19   convenience of the parties and the witnesses.
20            So, to that end, the Fifth Circuit as you
21   know, has developed an eight-factor test for private and
22   for public interest factors.  We'll rely principally on
23   our briefing on this issue where we laid it out.  But
24   again, I want to bring -- point out two things.
25            For the private factors are the ease of

```
1   access to sources of proof and the availability of
2   compulsory process.  It's important to keep in mind a
3   couple of things.  One, here, as we said, other than
4   the Australian fund which is not anywhere in the
5   United States, the other five defendants are all
6   California-based.  Attorney General Bonta is obviously
7   the Attorney General of California, but he also lives
8   and has his principal office in the Northern District
9   of California.  So, even if you focus on his individual
10  capacity rather than his official capacity, he's in the
11  Northern District of California.  My client and another
12  non-profit are based in the Northern District and the
13  other two are close by in the Central District of
14  California.  So our witnesses, our documents are
15  obviously going to be concentrated there.
16            And also, Exxon has made a big point
17  about the role of the Cotchett Firm, the law firm that
18  represents the four California non-profits in the
19  California litigation.  They say that there is
20  essentially -- because they say there is a conspiracy
21  among all the defendants and that part of the
22  conspiracy was that the justice fund was funding the
23  litigation prosecuted by the Cotchett Firm on behalf of
24  the four California nonprofits.  To the extent that the
25  Cotchett Firm is going to be witnesses in the case,
```

1  which I assume Exxon would acknowledge that they plan
2  to have them be, the Cotchett Firm is not in Texas,
3  they're only in California and they're based in the
4  Northern District of California.  So that's another
5  factor.

6          Exxon has also talked about the California
7  recycling program and made points about its history and
8  operation.  And they are not going to be subject to the
9  subpoena power of this Court.  Obviously, General Bonta
10 has to respond as an individual defendant or as an
11 official defendant.  But other agencies or entities in
12 California, whether they are public or private,
13 participating in recycling, are not going to be subject
14 to the subpoena power of this Court.

15         And then there is another important point
16 about the non-profits, which are -- and let me focus
17 here, for example, on my own clients.  As I said,
18 paragraph 91 contains the only three statements Exxon
19 complains about that are specifically attributable to
20 Sierra Club.  They were made by two individuals,
21 Martha Kreeger and Allison Chin.  Martha Kreeger is a
22 volunteer.  She's not employed by the Sierra Club.  We
23 can't control her, we can't make her come to court.
24 She's not subject to the subpoena power of this court.
25 Allison Chin was, at the time of the Complaint and the

 1  briefing, the chair of the board in Sierra Club, but

 2  she rotated out of that in the normal course earlier

 3  this summer, and she's also just a volunteer.  So we

 4  can't make any of them come and they're not within the

 5  subpoena power of the Court.

 6          And I think there are probably a lot of

 7  volunteers at the non-profits.  I think that's the

 8  nature of the non-profits, to try and have as few

 9  employees as possible to keep your expenses down, and

10  you rely on an enormous number of volunteers.  And

11  none of those people are under our control as a general

12  matter, and they are not within the subpoena power of

13  this Court.  So that's another important thing to keep

14  in mind.

15          Now, with respect to the factors and the

16  existence of the California litigation against Exxon,

17  again, I made the point earlier, when we were talking

18  about the transcript, Exxon's acknowledgement of the

19  overlap of the cases.  Three of the factors are

20  practical problems related to trial, the avoidance and

21  unnecessary problems, the conflicts of law.  We've

22  briefed these, but they again sort of become extremely

23  clear, the implications of keeping these cases separate

24  rather than bringing them together.  If we bring them

25  together, we're going to have a much more efficient

 1   management of discovery and the excess of the expert
 2   process, and there is a risk of inconsistent rulings.
 3   And not just inconsistent rulings, but just
 4   inconsistent application of law generally.
 5             So we talked about the Anti-Slapp case,
 6   that Exxon has sought to dismiss the California
 7   non-profits case in California.  We can't bring an
 8   Anti-Slapp action here, because the Fifth Circuit has
 9   said, because these are state laws, there is a
10   disagreement, a split amongst the circuits on this
11   question.  Are Anti-Slapp laws procedural or
12   substantive?  And in diversity cases, can you bring
13   them?  The Fifth Circuit says we can't.  So we could
14   not, under existing Fifth Circuit law, have filed an
15   Anti-Slapp motion here.  But Exxon gets to do it there.
16             So it's not just inconsistent rulings in
17   the particular active cases, but we also have Ninth
18   Circuit and Fifth Circuit law which may differ on
19   various questions.  For example, there are going to be
20   significant questions about attorney client privilege.
21   Exxon is going to make efforts to find out information
22   from the Cotchett Firm, counsel for the California
23   non-profits.  There are going to have to be rulings in
24   both courts on important questions of privilege and
25   other important issues.  So, given the overlap in the

```
 1   cases, there is a real significant risk of diverse
 2   rulings.
 3           THE COURT:  Is there any difference between
 4   California and Texas law on attorney/client privilege?
 5           MR. GANT:  We have noted some, yes, we have,
 6   on various issues.  Without giving away privileged
 7   information, we have looked at -- if you'll permit me
 8   to be a little bit withholding, Your Honor, we have
 9   looked at numerous questions of privilege, different
10   privileges or related privileges.  And yes, there are
11   differences.
12           THE COURT:  Okay.  Well, that's beyond the
13   scope of this hearing, I suppose.
14           MR. GANT:  So I think those are the principal
15   points.
16               The final thing I would say, Your Honor,
17   and I appreciate your patience, is a matter we raised
18   in our reply.  It's not a new argument, and it was also
19   based on a Supreme Court's decision that recently came
20   down.  We mentioned the Fuld case, which I think is on
21   page -- in our reply at the end of the personal
22   jurisdiction section.  The Fifth Circuit has already
23   observed that personal jurisdiction is animated in
24   substantial part by federalism concerns, and said that
25   these are significant.
```

43

1            And the Supreme Court in this case called
2  *Fuld,* decided on I think June 24th of this year, made
3  the exact same point.  And what they were saying in
4  both the Fifth Circuit and the Supreme Court in *Fuld*,
5  is that when you are talking about diversity cases,
6  what you are doing when one court exercises
7  jurisdiction, since there is personal jurisdiction
8  here, they are necessarily depriving another with what
9  the Supreme Court said is co-equal sovereign of
10  jurisdiction over the case.  If you keep this case
11  here, the California Federal Court isn't going to have
12  it.  So what I understood them to be saying is courts,
13  in thinking through this personal jurisdiction
14  question, also have to think about federalism.  Which
15  co-equal sovereign has a greater interest in that
16  particular matter?
17            And for the reasons that we've been
18  discussing this morning, the California centeredness of
19  the conduct that is alleged here and put at issue by
20  Exxon is to us abundantly clear.  It's a California
21  matter.  And if you have to weigh, is it more
22  California or more Texas, which co-equal sovereign
23  should have jurisdiction over the case, we think that
24  the answer is clear.
25            THE COURT:  Among those lines, let me just ask

 1  this question.  I can understand what you are saying
 2  certainly from Sierra's perspective, which it's
 3  understandable that you would so articulately indicate
 4  that to the Court.  But does Exxon have a more Texas
 5  interest here, and if what they are saying is true, and
 6  it's what they're alleging, it's their damage to --
 7  they have been damaged here, the relationships with
 8  people, companies, contracts, whatever here.  And of
 9  course, we have -- I haven't wrote on the intervention
10  yet where there are some cities that are attempting to
11  intervene saying they are harmed.  Those are concerns
12  that might not have much value or interest to the
13  people of California.  Fair?
14          MR. GANT:  That's fair.  I wouldn't say that
15  it's of no interest, but it is of interest.  But here
16  we have the benefit of decades of Supreme Court
17  jurisprudence that tells us how to apply these
18  federalism principals in the context of the personal
19  jurisdiction jurisprudence.  And what it tells us is
20  what Exxon told Judge Seeborg in California, the Court
21  cannot exercise personal jurisdiction over blank based
22  on statements blank did not purposefully direct at
23  here, California.
24          All of our briefs, because we all filed
25  our own Motions to Dismiss on lack of personal

1  jurisdiction, made clear that the defendant needs to

2  have purposely availed itself and directed itself at

3  the forum state.  That isn't what happened here.  So

4  Exxon is principally relying on the notion that the

5  impact and injury is here, but that's not what the

6  Supreme Court is focused on.  They may make some other

7  arguments about how we supposedly purposely availed

8  ourselves because Sierra Club has a chapter which we

9  explained in our briefing isn't relevant and so on.

10  You actually look at what's alleged and the evidence

11  that's been put in.  There is no purposeful availment

12  under decades of Supreme Court jurisdiction, including

13  the most recent cases, crystallizing the standard.  The

14  federalism principles get applied focusing on what the

15  plaintiff -- what the defendant did, the accused did

16  and whether it directed themselves or at the forum

17  state, and that didn't happen here.

18          THE COURT:  All right, thank you very much.

19          MR. GANT:  Thank you, Your Honor.  I

20  appreciate the patience.

21          THE COURT:  Certainly.  I want to give the

22  other defendants an opportunity to add anything they

23  wish to add.  Actually, Mr. Gant was -- of course, he

24  was there for Sierra Club, but there may be something

25  specific that the other defendants care to add at this

1    juncture.

2              Mr. Hemphill, is that correct?

3         MR. HEMPHILL:  Yes, Your Honor.  Jim Hemphill

4    for Defendant, The Surfrider Foundation.  We join and

5    adopt the Sierra Club's arguments on transfer of venue

6    and we have nothing to add.

7         THE COURT:  All right, thank you very

8    much, Mr. Hemphill.  Anyone else?  Does Heal the Bay,

9    care to add anything?

10             Ms. Schwartz, correct?

11        MS. SCHWARTZ:  Yes, Your Honor.

12             Heal the Bay doesn't have anything other.

13   We adopt the arguments of Mr. Gant.

14        THE COURT:  All right, thank you very much.

15             Baykeeper?

16        MR. NELSON:  For the court reporter, my name

17   is Forest Nelson.  I'm with Burt Barr & Associates.

18   And just like the other NGOs, Your Honor, we have

19   nothing to add to the argument.

20        THE COURT:  Okay, very fine.

21             Would Exxon care to respond?

22        MR. CASH:  Oh, yes, Your Honor.

23        THE COURT:  Okay.

24        *[Pause]*

25        MR. CASH:  Good morning, Your Honor.  Michael

```
 1  Cash for Exxon.

 2              Judge, each of these cases is exactly

 3  where it belongs, and I think what you heard from my

 4  colleague on the other side is a misunderstanding of

 5  our case.  The California case is about California

 6  pollution, and they are going to talk about pollution

 7  and misleading Californians.  But the statements that

 8  have been made by the NGOs are not limited to

 9  California.  And when we get to jurisdiction, I'm going

10  take you through a list of statements they've made.

11  And what's interesting is they talk about, well, that

12  statement wasn't in your pleadings.  Your Honor, we

13  gave examples of statements in our pleadings.  I don't

14  have to plead each and every statement they made that

15  came after us; okay?

16              So let's talk about their Motion to

17  Transfer.  One of the things the Court will notice,

18  under 1406(a), they can transfer it if it's not -- if

19  venue wouldn't be proper here.  You didn't hear a word

20  about that, that venue's not proper here.  And of

21  course it's proper here.  This is where the business

22  is, this is where the attack was, this is where our

23  customers are.  So, certainly, venue is proper here.

24  And I can't wait to get to jurisdiction, but that's a

25  whole different argument and we'll get there later.
```

1   So let's go to 1404 which is where they wanted to spend
2   their time.
3            Now, Your Honor, the first thing I'm
4   going to tell you is I did not have a chance to study
5   the transcript from a hearing a month ago because it
6   got filed at 6:00 last night.  So I didn't have a
7   chance to go through it.  It could have been filed --
8   the hearing was July 17th.  It got filed last night at
9   6:00.
10           All right, so let's talk about 1404.
11  Oh, I'm sorry, this already tells us why 1406 doesn't
12  apply.  Judicial district in which a substantial part
13  of the events or omissions giving rise to a claim
14  occurred, or a substantial part of the property that
15  is the subject of the action is situated.  Well,
16  substantial part of events occurred for a defamation
17  case, which is one of our causes of action the Court
18  may consider, where the defamation occurred and where
19  the harms were felt.  Our whole case is about our harms
20  here.  So venue is proper here.
21           Defendant's tortious conduct was targeted
22  at Texas.  They said, "We didn't do anything in Texas."
23  Oh, yeah, they did.  Everything that they talked about
24  is about our recycling, about our advanced recycling,
25  about our plastics.  Our plastics in Texas.  Our

1 advanced recycling in Texas.

2          And by the way, one of the things I do

3 know when I did look at the transcript, the lawyer for

4 Exxon in California said:  We're not a recycler.  We

5 are not a recycler.  We don't go collect the bins.  We

6 don't sort the bins.  What we do is we do our advanced

7 recycling and we do recycle the products.

8          So, to take a misstatement or basically a

9 statement that was ambiguous and try to use it and say

10 that there are these opposites, one of the things

11 that's interesting about that, Your Honor, is they say

12 we might have inconsistent rulings.  They've got two

13 different cases in two different courts in California.

14 Mr. Bonta's case is in state court.  Vice versa, the

15 NGOs are in federal court.  So you have cases in

16 different places.  They can get inconsistent rulings

17 down the block.

18          THE COURT:  All right.  Let me ask you a

19 question.

20          MR. CASH:  Yes, Your Honor.

21          THE COURT:  Let's go back to 1-Ls again.

22          MR. CASH:  I'm sorry, what, Your Honor?

23          THE COURT:  1-Ls.

24          MR. CASH:  Okay.

25          THE COURT:  Do you remember that time?

1          MR. CASH:  It is a long time ago for me, Your

2     Honor.

3          THE COURT:  Okay.  If someone on one side of

4     the street fires a gun, either intentionally or

5     negligently, and hits somebody on the other side, what

6     do we call that?

7          MR. CASH:  A tort?

8          THE COURT:  A tort.

9          MR. CASH:  Yes, Your Honor.

10          THE COURT:  Okay, what happens if somebody on

11     one side of the street says a bunch of mean things to

12     the person across the street so that all his neighbors

13     can hear it, "You're a liar, you're a cheat," so and so

14     forth.  What do we call that?

15          MR. CASH:  We call that intentional tort.

16     They're word bullets instead of real bullets.  Same

17     thing.

18          THE COURT:  All right.  Now, we're 30 miles

19     from the Louisiana coast.  What if -- let's take the

20     bullet business first.

21          MR. CASH:  Okay.

22          THE COURT:  Somebody in Louisiana fires a gun

23     and hits somebody in Texas.  Where did the tort occur?

24          MR. CASH:  I think the tort occurred either

25     place, Your Honor, where the bullet ended up and where

1  the injury was felt, or where the gun was fired.  I

2  think either state would have jurisdiction.

3          THE COURT:  Well, if he missed, then there

4  wouldn't be a tort; right?

5          MR. CASH:  Well, it could still be -- my

6  wife's a prosecutor, ironically, Your Honor, in

7  Louisiana.  So she would tell me, don't say that's not

8  a tort.  She would tell me that that would still be an

9  assault, if  it wasn't a battery.

10          THE COURT:  All right.  But you are at least

11  in part saying the tort occurred in Texas.

12          MR. CASH:  Yes, Your Honor.

13          THE COURT:  Maybe in Louisiana, too, where the

14  bullet was fired?

15          MR. CASH:  Correct, Your Honor.

16          THE COURT:  But the injury occurred in Texas?

17          MR. CASH:  Correct, Your Honor.

18          THE COURT:  Now, let's go back to the other

19  hypothetical.  Someone -- obviously, it can't be heard

20  across the Sabine River, but they hook up some sort of

21  a microphone or something like that so that the

22  individual on the Texas side and all of his friends

23  and neighbors hear these comments.  And after those

24  comments are made, this person in Texas no longer has

25  friends.  His neighbors don't want to associate with

1  him anymore.

2              Where did the tort occur?

3          MR. CASH:  That's an excellent question, Your

4  Honor.  Ironically, my wife and I have a home in

5  Sabine Parish, Louisiana, which is right on Toledo Bend

6  Reservoir.  So we have both sides.  There's businesses

7  on both sides.  If a business on the Louisiana side

8  basically hooks up that loud speaker you are talking

9  about to ruin the business of one of its competitors

10  across the lake, that tort occurred in Louisiana when

11  they made it and it occurred in Texas where it was

12  felt.  And the harm occurs in Texas because what they

13  did is they targeted a Texas business to try to drive

14  them out of business in hopes that maybe they'd get

15  more folks to drive across the bridge to their place.

16  So that is absolutely a tort that someone could bring

17  in Texas against that Louisiana entity, and the Texas

18  court where it was brought should have jurisdiction.

19          THE COURT:  Okay.  All right, I just thought

20  I'd ask that.  Let me go back to your comments.  I

21  didn't mean to interrupt you.

22          MR. CASH:  No, no, no, I'm happy for the

23  interruptions, Your Honor.  But, basically, what you

24  were just talking about is what this shows.  So let me

25  go to the next one.  1404(a), this is the discretionary

1    one.

2              All right.  So we look at the test.  But

3    first, let's look at the burden.  Movants must clearly

4    establish good cause.  A mere preponderance of the

5    evidence is not sufficient.  It is a high evidentiary

6    burden.  And what evidence have you been presented with

7    at all, Your Honor, actual evidence?  There are some

8    affidavits that don't get you anywhere on these

9    burdens.  To establish good cause, the movant must show

10   the marginal gain will be significant, and that the

11   evidence makes it plainly obvious, clearly demonstrated

12   that the marginal gains will actually materialize in

13   the transferee venue.  Let's talk about it.

14              First one, relative ease of access to

15   proof.  Now, they want to talk about their folks are in

16   Cali, their folks are out there.  I don't need their

17   folks, really.  I've got all their statements.  I've

18   got transcripts of their statement.  I've got websites

19   of their statements.  What I'm going to need to prove

20   in my cases are harm with our potential customers and

21   our good customers who are here.  I'm going to want to

22   have our experts look at and have people look at what

23   our recycling is, what is our advanced recycling.  That

24   happens here in Texas.

25              THE COURT:  They essentially said that that

 1   part of your Complaint is a little bit thin.

 2           MR. CASH:  Which part, Your Honor?

 3           THE COURT:  That is the harm part, that there

 4   is not sufficient evidence set forth in the Complaint

 5   that Exxon has lost customers, that people are not

 6   wanting to deal with them.

 7               What is your answer to that?

 8           MR. CASH:  I think my answer is that I think

 9   we have pled enough, Your Honor.  But I think if we

10   needed to replead, I would.  But I think the proof is

11   in the pudding, that I've got four people knocking on

12   the door saying it affected us, we're potential

13   customers and we want to intervene because it impacts

14   us.  So, if I need to plead that more thoroughly, I

15   will.  But I think it is pled sufficient enough

16   certainly to pass a 12(b)(6).  And to the extent as we

17   do more discovery and we're able to get more facts, we

18   can always bolster that with the Court's permission.

19           THE COURT:  Go ahead.

20           MR. CASH:  Okay.  So our proof is in Texas.

21   The people who work in advanced recycling are in Texas.

22   The people who are impacted are in Texas.  That

23   business is in Texas.  So there is relative ease to

24   the access to proof.  He said the documents.  Documents

25   are electronic nowadays.  I'm not saying we got an

1  advantage or they got an advantage.  But the folks who

2  need to be talked to in our case, not the California

3  case about pollution, but in our case about tortious

4  interference, are here.  So relative ease of access to

5  proof, that doesn't help.  They don't make that one.

6            Let's look at the next factor.  The

7  availability of compulsory process to secure the

8  attendance of witnesses.  Again, their witnesses are

9  on the record.  They are on their TV shows, they're on

10  their websites.  They've got list after list of all the

11  things they've said about this.  And when we get to

12  jurisdiction, Your Honor, I'll show you a bunch of

13  them.  I don't need that.  I don't need that to have

14  you make them come here.  If I have to go take their

15  deposition out there and they don't want to show up,

16  I'm fine with that.  But the folks who work here, the

17  folks, the executives at Exxon, the folks who know

18  about the Exxon recycling and the Exxon plastic

19  production, they're either here or they are down the

20  road, or there are headquarters in Spring.  That is

21  88.3 miles away, so that is within your compulsory

22  process.  So that doesn't help them.

23            What about the cost of attendance for a

24  willing witness?  You know, this one is just -- it

25  really just looks at the witness and where it's going

1  to cost them more.  Southwest flies that way and

2  Southwest flies this way, and it's the same price

3  either way.  Now, I will say, if a witness from Texas

4  has to go stay in San Francisco, I put Beaumont hotel

5  prices against San Francisco hotel prices all day long,

6  and I'll do the same with restaurants.  So I think it's

7  going to cost a little more to go out to San Fran than

8  it's going to cost them to come to Houston.  So that

9  doesn't help them.

10              And finally, all other practical problems

11  to make the trial of the case easy, expeditious, and

12  inexpensive, this is where they like to say, well, they

13  overlap, the overlap.  Your Honor, there is not overlap

14  between our case and their case, except to a small

15  amount.  What they really want to do is make us go out

16  to California.  IEJF isn't a party in that case, so

17  they'd have to brought in.  Mr. Bonta individually

18  isn't a party out there, so he'd have to be brought in.

19              Then in addition to all of that, they are

20  trying a pollution case.  They're going to need experts

21  to talk about plastic pollution and how bad it is and

22  what it's going to cost to clean it up.  I do a lot of

23  contamination cases, Your Honor, so I can tell you,

24  that's a week of experts talking about clean-up costs

25  and all of those things that have nothing to do with my

 1  case, nothing to do with my case at all.  So it's way
 2  more expensive for Exxon and intervenors if the Court
 3  let's them in, to have to go out to Cali to try that
 4  case --
 5        THE COURT:  What's the central scope of the
 6  case for the California litigation?
 7        MR. CASH:  The central scope, as I understand
 8  the California litigation, is they are saying that our
 9  plastic production is causing a nuisance, that it is
10  ruining the California beaches, that it's going to
11  cost, I think Bonta said, billions of dollar to clean
12  it up, and that we helped exacerbate it because we
13  lied.  That's what their case is about.
14              Our case is about, we have advanced
15  recycling down here, we make plastics down here, we do
16  a good job of it, and you're messing with our customers
17  and you're messing with their livelihood in Texas by
18  lying about us.  That's our position.
19        THE COURT:  Okay.
20        MR. CASH:  All right.
21              So I'll give this one a neutral.  The
22  other practical considerations, there's some overlap
23  versus the great expense that we're going to have of us
24  having to sit through a one-month or six-week trial in
25  California to try our case.

1           But then let's go to the public interest
2  factors, Your Honor.  Administrative difficult flowing
3  from court congestion.  I think all of y'all are busy.
4  I think all the federal judges are busy.  I think
5  that's -- I'm not going to say that it's easier one
6  place than the other.  I think that's a neutral.
7           And finally, the local interest in having
8  localized interest --
9           THE COURT:  I noted in an order I issued in a
10 previous case that at that particular time of that
11 order, I think it was -- I'm doing this by memory of
12 my own order.  I think the time in the Eastern -- the
13 average time to trial in the Eastern District of Texas
14 was -- I think it was like 16.7 months or something
15 like that.  Which these were figures that came from the
16 Federal Government that monitors courts.  And I don't
17 remember what it was in California, specifically.  But
18 the point of that footnote in that order was that the
19 Eastern District is one of the fastest courts in the
20 nation.  And it's not that we don't have anything to
21 do.  Our judges -- and you can ask my colleagues.  I
22 had plenty to do, but they roll up their sleeves and
23 they work real hard and --
24           MR. CASH:  Sure.
25           THE COURT:  And we set cases for trial and

1  call your first witness.  I mean, we move forward.

2  And I will say that for the Eastern District.

3             But anyway, go ahead.

4        MR. CASH:  That's what we're counting on, Your

5  Honor.

6             And finally, the local interest in having

7  localized interests decided at home.  I think for their

8  case that's filed in California, the interest out there

9  is probably huge on the pollution, and I give them that

10 out there.  But that's not the case we're talking

11 about.  We're talking about our case here.  And between

12 all the people that Exxon employs, all the revenue

13 Exxon generates, Exxon being attacked in its own

14 backyard, Exxon being accused of lying, not just to

15 California people.  In fact, I'll show you a quote when

16 we get to jurisdiction where they say we're lying to

17 all our customers.  The localized interest of making

18 sure that this technology, which we will show works,

19 this technology is available at the various places we

20 have it here.  That localized interest is huge.

21        THE COURT:  The defendants make the point that

22 those statements were made either in court or shortly

23 after court or they were directed toward Californians,

24 not Texans.  How do you respond to that?

25        MR. CASH:  I mean, you can say that, Your

60

1  Honor.  But when you go on TV and you broadcast it

2  all -- Mr. Bonta made those accusations from London,

3  from New York, from Connecticut.  I mean, he went on a

4  defamation tour.  So I can show you what the statements

5  are.  I will show you when we get to jurisdiction.

6  They are absolutely not limited to California.  And

7  every one of them says, our job and what we are going

8  to do is we are going to stop this plastics pollution

9  at its source.  The source is right here Texas.  This

10  is where we do it.  So, if you're going to stop it at

11  its source, you're coming to us.  So they very much

12  aimed at us.  And when we get to jurisdiction, I'll

13  talk about that more.

14          THE COURT:  All right.

15          MR. CASH:  But as far as the factors to

16  transfer, Your Honor, they don't come close, from an

17  evidentiary perspective, to meeting that high, high  bar

18  that we talked about.

19              So, unless the Court has any questions, I

20  know we've got a long day ahead of us.  I won't take

21  any more of your time.

22          THE COURT:  Okay, very fine.  Thank you.

23          MR. CASH:  Thank you, Your Honor.

24          THE COURT:  I'm going to allow the defendant

25  to do a quick response.  I'm sure you have a response.

```
1              MR. GANT:  Thank you, Your Honor.  I'll try
2    and move quickly.  The points respond in order.
3              Mr. Cash said that we misunderstand his
4    case -- we're mischaracterizing the California case
5    and maybe misunderstand his case.  He said that the
6    California litigation initiated by the four California
7    non-profits is a California pollution case.  Yes, it
8    is two claims under California law, but it's about
9    practices that are broader.  It wasn't -- so, if you
10   will, taking the distinction, focus on impact.  That
11   case is about the impact in California, but it's about
12   practices that were undertaken by Exxon more broadly.
13              Now, I think Mr. Cash is --
14              THE COURT:  I didn't fully follow you.
15              MR. GANT:  I'm sorry.
16              THE COURT:  Practices that put the pollution,
17   the plastic, on the beaches of California, or is it
18   something else?
19              MR. GANT:  The conduct isn't limited to
20   California.  And I'm going to sort of generalize about
21   what the allegations are and not do them their full
22   justice.  But, essentially, the argument in California
23   is, as I understand it, that Exxon was telling -- and
24   this is reflected in the transcript.  You can see Judge
25   Seeborg repeatedly redirecting Exxon's counsel because
```

1  they are mischaracterizing the Complaint.  You can

2  judge for yourself, whether I have accurately portrayed

3  that.

4          But what the allegation is against Exxon

5  in the California action is that Exxon, for an extended

6  period of time, systematically made misrepresentations

7  about how recyclable plastic was in order to sell more

8  polymers for the creation of plastic, essentially

9  trying to get the public to say, well, yes, plastic is

10 fine because we can recycle it, when the truth was

11 different according to the Complaint.  And then the

12 result that's being litigated is focused on California.

13 But the conduct underlying it that caused the impact in

14 California had the same effect elsewhere.

15         THE COURT:  And that conduct is what?  That

16 the plastic, the polymer, doesn't recycle properly, or

17 is it that -- I'm trying --

18         MR. GANT:  That single-use plastics, in

19 particular, were not recyclable.  And that's what

20 Exxon -- and I hope they are right.  I hope it does

21 work.  That would be great for everybody.  But what

22 they are saying is that advanced recycling can

23 revolutionize the recyclability of single-use plastics,

24 so that plastic that heretofore was not recyclable will

25 be able to be recycled.  And that's why these cases are

1   overlapping.

2           Because Mr. Cash says, well, we were

3   impuning Exxon here because some of their recycling

4   facilities are in this district.  But then that seems

5   in tension with what he was saying was, he says the

6   California offensive case against Exxon was about

7   California.  The statements they complained about were

8   press conferences and press releases about that case.

9   So, if it's true that that was a California case -- and

10  this goes to one of your questions -- why would anyone

11  conclude that they were directing their comments to

12  Texas.  Not only were the statements not made in Texas,

13  not only did they not mention Texas.  But now he's

14  saying, well, it was a California pollution case.  So,

15  if you're standing up and talking at a press conference

16  or at a press release about your California pollution

17  case, what does it have to do with Texas?

18          The theory, I guess, is, well, we have the

19  physical facilities to doing some of the recycling are

20  in this district, therefore it was directed here.  I

21  don't think that makes any sense, but it's also

22  inconsistent with the case law.

23          Mr. Cash says he didn't hear about venue.

24  I'm trying to be respectful of the Court's time.  I

25  did mention venue.  I'm resting on our papers and

1   explaining.  But let me just make the point that the
2   provision of -- the venue provision in 1391(b)(2) that
3   we rely on talks about where the conduct giving rise to
4   the cause of action occurred.  You just asked Mr. Cash
5   a bunch of questions, you know, law school
6   hypotheticals, which are important, about where a tort
7   occurs.
8           THE COURT:  Where do you think the tort
9   occurred?
10          MR. GANT:  We think --
11          THE COURT:  In my hypotheticals?
12          MR. GANT:  Well, I'm going to fall back on the
13   language of 1391(b)(2).
14          THE COURT:  No, I asked you a question.  Where
15   do you think -- if someone shoots a gun on the
16   Louisiana side of the Sabine River and hits someone in
17   Texas who gets his, where is the tort?  Where the
18   injury occurs?
19          MR. GANT:  I'm going to borrow the language
20   of 1392 to answer that.  With respect to figuring out
21   venue, where the tort occurred is where the shots were
22   fired, because that's -- the language of 1391(b)(2) is,
23   "where the conduct giving rise to the cause of action
24   occurred."  There --
25          THE COURT:  But outside of the venue context,

1    where did the tort occur?

2           MR. GANT:  I'm being candid.  I'm really not

3    trying to be coy.  I don't know and I think it depends

4    on the context in which the question's being asked,

5    which is why I was trying to anchor it to venue.

6    Because I think I need to know more about what the

7    exact question was, and then I would want to consult

8    the authorities.  But with respect to venue, we know

9    what the language is.  But Congress enacted the

10   specific language, and it says where the conduct was

11   giving rise.  So there I would say, for purposes of

12   venue, it's where the shots were fired.  And applying

13   that here, it's where the words were spoken.

14          THE COURT:  Maybe Mr. XX has a few opinions

15   about that.

16          MR. GANT:  I'm sure he does.

17          THE COURT:  I'll investigate that later.

18          MR. GANT:  Mr. Cash made the point, true,

19   because of some remand proceedings, Bonta's action in

20   California got remanded to state court.  And because

21   there is diversity jurisdiction, the four non-profits

22   case did not.  So it is true, there's a state court,

23   California case for Bonta, and then the four

24   non-profits, the federal case.  But that's not the

25   same problem as what we have here.  The source -- for

 1  example, there the source of law is the same.  They
 2  are both California law.  They'll both be guided by
 3  California Supreme Court jurisprudence and Ninth
 4  Circuit jurisprudence.  Here, you have potential clash
 5  between the Fifth Circuit and Ninth Circuit law, we
 6  have questions about choice of law.  So it's not the
 7  same.  And also, if you already have a problem of two
 8  venues, why make it worse by having three.  That
 9  doesn't make sense to me.
10            Mr. Cash was making some points about the
11  witnesses and saying, "We don't need the California
12  witnesses.  We've got their statements, we're fine."
13  But what about us?  We might need them.  We have due
14  process rights.  When we spoke, I know our discussion
15  was off the record, but I appreciated how many times
16  you talked about the importance of due process.  So I
17  assume you won't mind me saying that in open court.  So
18  we're grateful for that.  But we have rights, too, so
19  we may need these witnesses.  And as I said, we don't
20  control them, and if we can't subpoena them, that may
21  create a challenge due process problem for the
22  defendant.
23            Also, Mr. Cash kept saying, well, it's
24  here, it's here where the impact is.  And we made this
25  point in our briefing.  There are definitely recycling

1    facilities in this district, but we made this point in

2    our opening brief, Document 46.  It's very unlikely

3    that the people who were operating plants and engaged

4    in physical activities of the recycling plants are

5    going to be the witnesses.  It's the people at the

6    headquarters in Spring or maybe elsewhere, and they are

7    not in this district, and that's important because,

8    although personal jurisdiction is evaluated on the

9    basis of the state lines, that's not true for 1404(a).

10   It's a district vs. district determination.  And there

11   is little that Exxon's going to have in the way of

12   witnesses or documents that are actually here.

13            And then finally -- let me see if I can

14   read my notes.

15            Oh, the local interests.  In our brief we

16   think that it's slightly in our favor about the local

17   interest.  But just so it's clear, the interest is not

18   of the parties.  It's of non-parties in the

19   communities.  And we think that in both jurisdictions

20   people will be interested in both cases.  And we know

21   we have media from outside Texas in the courtroom

22   today, too.  So I think that doesn't weigh in anyone's

23   particular favor.

24            THE COURT:  Thank you.

25            MR. GANT:  Thank you, Your Honor.

1          THE COURT:  I know I haven't ruled yet on the

2    intervention, but I got from our case management

3    conference that the cities feel like they would be

4    impacted adversely by this.  I'm going to go ahead and

5    let the attorney for the intervenors make a brief

6    statement.  Obviously, if I decide that they should not

7    be a part of this lawsuit, I'll just not rely on it and

8    I won't base any decision on what you are saying.  On

9    the other hand, you clearly have something.  I'm seeing

10   you just want to stand up the whole time we've been

11   here and I don't want to deprive you of an opportunity

12   to at least say a few words.  So, without a whole lot,

13   if you can make it succinct, I'll listen to you.

14          MR. BARTON:  Thank you, Your Honor.  Travis

15   Barton on behalf of the Intervenors, the City of

16   Beaumont, City of Baytown, the City of Mont Belvieu,

17   and Chambers County.  And yes, you have correctly

18   perceived that sitting on the bench is sometimes a

19   little frustrating when you want to get in the game.

20          THE COURT:  I know that feeling.

21          MR. BARTON:  Yes, sir, so --

22          THE COURT:  I remember the feeling from that

23   very chair, as well as that chair.

24              So, anyway, go ahead.

25          MR. BARTON:  Absolutely, my clients have a

1  direct and significant interest in the outcome of this

2  case.  And one thing that my worthy opponents have

3  glossed over is the very important declaratory judgment

4  issue that's going to arise on the question of, is

5  indeed advanced recycling a lie, a myth, a sham, or

6  illegal.  Or is it, as we suggest, a valid and legal

7  ineffective process.  Because advanced recycling is

8  taking place in Baytown, Texas.  They've got two units

9  that, through May of this year, have already done 100

10  million pounds of recycling.  Projections are Exxon's

11  going to add a third and fourth unit.  Beaumont's going

12  to have a unit.  And when all that's done, projections

13  are that 500 million pounds of this plastic will be

14  recycled with this new system.  That's a real process.

15  That's a valid process.  These recycling collaborations

16  have been formed with multiple companies throughout

17  Southeast Texas because it's a real valid process.

18          So, in short now, Your Honor, to your

19  question, what is the harm for the intervenors?  The

20  primary harm is the loss, potential loss of their

21  recycling programs.  Most of these communities in

22  Southeast Texas have had either small fairly

23  ineffective recycling programs or they've had none,

24  and this is our chance to finally have robust healthy

25  recycling programs.  If we get to participate and if my

1  opponents' fail on their efforts to shut down this

2  entire industry of advanced recycling, then there we'll

3  have a significant economic impact and job impact on the

4  Beaumont community, the Baytown community, where these

5  advanced recycling units are present, as well as Mont

6  Belvieu, frankly, with a lot of the plastic pellet

7  manufacturing.  So a economic damage.

8           Second is pollution, the harm to the

9  environment.  Like our friends in California, we too

10  are concerned about plastic pollution and what can we

11  do to get our communities to have a higher percentage

12  participation and to do that, and what are the benefits

13  of advanced recycling and the collaborations that are

14  being formed, as we believe and certainly desperately

15  hope the participation and recycling will greatly go up

16  and we'll do a good job of cleaning up our bayous and

17  our creeks and our lakes of plastic pollution.  And so

18  that's a major, major issue for the city of Beaumont

19  when I talk to my clients.  So that's the harm.

20           And lastly, of all the factors that

21  Mr. Cash went through, the one that sticks out to me,

22  with respect to my client's interest, is I just can't

23  imagine having the city officials from Mont Belvieu

24  have to go spend weeks in San Francisco to address this

25  issue if they're a party there, or representatives from

1   Beaumont or Baytown or Chambers County.  And so we have

2   a very significant, pointed interest in the outcome of

3   this case, and so we certainly support Exxon's Mobil's

4   position on the 1404 motion.

5           THE COURT:  All right, thank you very much.

6               I assume that you disagree with what's

7   been said, but is there anything specific you care to

8   add?

9           MR. GANT:  Two quick points.

10              Again, Scott Gant, Your Honor.  I forgot

11  the second time.  Apologies.  Two points.

12              One, putting at issue the legality of

13  advanced recycling only reinforces the overlap between

14  these cases.  The California litigation says advanced

15  recycling procedures, including recycling, have been

16  deficient.  They are bringing a legal challenge to it.

17  So that only reinforces the overlap.

18              Second thing is there is nothing to

19  prevent these proposed intervenors from seeking to

20  intervene if you transfer, or you can grant the

21  intervention and then transfer it after that.  If Your

22  Honor sees fit, or Judge Seeborg if this is transferred

23  and the case that's before him sees fit and they want

24  to participate, then we'll engage them.  The standard

25  isn't -- they're not only permitted to intervene if the

1   case is here.

2          THE COURT:  This is a question that just came

3   to my mind that is not really relevant to any of the

4   motions.  But if recycling, advanced recycling ended in

5   California, what would happen to all that plastic?

6          MR. GANT:  Well, as I understand the case,

7   that's not a remedy that's being pursued.  Now, if it

8   turns out that it's deemed a nuisance, that Exxon is

9   deemed to have engaged in a nuisance or unfair

10  competition in the past, depending on the contours of

11  that ruling, that might affect their behavior going

12  forward.

13         THE COURT:  Is there some better technology

14  out there?  I don't know enough about it.  I'm just

15  asking.

16         MR. GANT:  As we discussed, this is going to

17  be an expert-heavy case, Your Honor, if it proceeds.

18  But as I understand it, advanced recycling is an

19  umbrella term that encompasses different types of

20  recycling undertaken by different companies.  Exxon is

21  not the only company that purports to be engaged in

22  advanced recycling.  So I don't think that there's --

23         THE COURT:  There were negative comments made

24  about Exxon's program.  Would that then benefit Exxon's

25  competitors in the recycling business?

1          MR. GANT:  Well, as I said, Sierra Club didn't

2   mention advanced recycling, certainly not in the

3   paragraph 91 statement.  If the "disparagement" of

4   advanced recycling had been specifically directed to

5   Exxon, the suggestion was other companies can do it,

6   but Exxon can't.  I assume that would help the

7   competitors.

8          THE COURT:  All right.  Thank you all very

9   much.  Very well argued and briefed, I might add.  I've

10  come to expect in this case high quality, and you all

11  have certainly not disappointed the Court.  But this

12  took a lot of time and we've been going for a while, we

13  need to take a break, and we have so much left to do.

14  Instead of just forging ahead, like we used to do in

15  the old days where we would take depositions until

16  4 a.m. and order a pizza at midnight.  Some of you know

17  what I'm talking about.  Others grew up in a kinder,

18  more gentler environment don't know that.  But I always

19  felt sorry for the court reporters.  The pizza was being

20  passed and the poor court reporter wouldn't get any at

21  midnight.  But I'm adopting a bit kinder and gentler

22  demeanor now, and I think maybe you all might want to

23  take a quick lunch break and then come back right after

24  lunch and knock out the rest of this.  Is that what --

25  I see heads shaking, so some people must be hungry.

 1          Okay.  We're in recess until about 1:15.
 2  Thank you.
 3          **[Recess]**
 4          All right.  The next order, I think, do we
 5  want to do Attorney General Bonta's Motion to Dismiss.
 6  Is that what everybody thinks is going to be next?
 7          MR. SETRAKIAN:  It's Will Setrakian for A.G.
 8  Bonta.  I thought we'd talk about personal jurisdiction
 9  if that's okay with Your Honor.
10          THE COURT:  Okay.
11          MR. SETRAKIAN:  Which is one of the grounds in
12  A.G. Bonta's Motion to Dismiss, of course.
13          THE COURT:  Yeah.  Well, then we also would
14  want to hear from Intergenerational Environmental
15  Justice, too; correct?
16          MR. SETRAKIAN:  That's right.  As I had
17  understood our plan with defendants, we would each
18  discuss personal jurisdiction, if they would offer some
19  arguments.  Then my friends on the other side would
20  rise to rebut it, if that's okay with Your Honor.
21          THE COURT:  That's fine, that's fine.  You may
22  proceed.
23          MR. SETRAKIAN:  Thank you, Your Honor.  Will
24  Setrakian for A.G. Bonta.
25              The Court lacks specific personal

1  jurisdiction over A.G. Bonta because he did not form

2  minimum contact with this judicial district.  Now, the

3  minimum contact inquiry focuses on a defendant's link

4  with the forum state, not the plaintiff's residence or

5  alleged harm.  And it's not enough for a defendant's

6  conduct to strike a plaintiff who is based in a given

7  forum.  Instead, the defendant must have specifically

8  targeted that judicial district.  Now, here A.G. Bonta

9  did not purposely direct his activities towards Texas,

10 such that this Court can take jurisdiction over him.

11 And there are two reasons why:

12         First, it's undisputed that the

13 statements identified in the Complaint were not made in

14 Texas.  And second, the statements were not directed

15 towards a Texas audience.  They discussed ExxonMobil's

16 allegedly false comments made in California to

17 Californians concerning advanced recycling.  And they

18 explained why A.G. Bonta had sued on those

19 Californians' behalf in California.  Now, to the extent

20 those statements did not target just Californians, they

21 targeted all Americans.  And in this circuit, to target

22 all Americans targets no specific place at all for

23 purposes of specific jurisdiction.  And it does not

24 matter that the statements had some effect felt by a

25 Texas firm, allegedly.  The Fifth Circuit has rejected

1  this as a basis for specific jurisdiction.

2           So, in *Revell v. Lidov,* a Government

3  agency sent mail into Texas allegedly causing effects

4  there.  The Fifth Circuit explained this was not

5  enough.  Just because the action was based entirely on

6  conduct that occurred in Texas, that did not establish

7  Texas contact because the defendant was asserting

8  nationwide jurisdiction.

9           And in *Sangha v. Navig8 ShipManagement,*

10 the defendant was alleged to know it would affect the

11 plaintiff in Texas, but that connection was deemed

12 "nothing more than fortuitous" because it was based on

13 only the fact of plaintiff's Texas residence.

14          It also does not matter under Fifth

15 Circuit law that the statements reached some persons

16 in Texas.  In *Revell v. Lidov,* a Texas-based plaintiff

17 sought jurisdiction in Texas because an out-of-state

18 defendant's internet posts, accessible in Texas,

19 allegedly defamed him.  The Fifth Circuit held that

20 Texas was not the focus of the relevant statements

21 because they concern the plaintiff's conduct outside of

22 the state, just like here.  The Court explained the

23 statements were directed at the whole world and thus

24 not Texas specifically.  ExxonMobil's counsel

25 acknowledged that earlier today when he said that A.G.

1  Bonta and the rest of the defendants spoke to the whole

2  world.  That is not enough for specific jurisdiction

3  under this circuit's law.

4          And, of course, in *Walden v. Fiore,* the

5  U.S. Supreme Court held it irrelevant that a defendant

6  knew his conduct would affect the plaintiff in Nevada

7  because defendant did not target Nevada as a forum.

8          Now, ExxonMobil in its briefing does not

9  distinguish any of these cases or counter with

10  published Fifth Circuit precedent of it's own.  And

11  those arguments ExxonMobil does advance are unavailing,

12  mostly cites the alleged effects of A.G. Bonta's

13  remarks on its Texas operations.  But, as I just

14  explained, that is not enough.

15          It also argues that A.G. Bonta e-mailed

16  "individuals across the country, including Texas

17  residents."  But per this circuits opinion in *Johnson v.*

18  *The Huffington Post,* targeting all Americans targets

19  none of them for specific personal jurisdiction

20  purposes.

21          Now, I expect when you hear from my friend

22  on the other side, you'll hear a quote A.G. Bonta made

23  that referenced Houston.  And if you looked at the full

24  context, that quote's important to show why A.G. Bonta

25  was not targeting Texas with that phrase.  The full

1  "Look at Houston, look at Idaho, look at Salt Lake

2  City."  That quote, fairly read, was submitted

3  describing nationwide conduct, not establishing

4  specific jurisdiction in all three of those states.

5          And second, the reference to "piece of

6  evidence," again read in conduct, in the State of

7  California's lawsuit alleging misstatements by

8  ExxonMobil in California.  ExxonMobil's briefing also

9  leans on the Supreme Court's opinion in *Calder v.*

10 *Jones,* but *Calder* does not counsel jurisdiction.

11 *Calder* found specific jurisdiction where comments

12 concerned the in-state activities of a state resident.

13 A.G. Bonta's comment did not focus on ExxonMobil's

14 conduct in Texas.  Instead, it concerned ExxonMobil's

15 conduct in California, allegedly misrepresenting the

16 efficacy of advanced recycling.  ExxonMobil's comment

17 was not limited to its home state, like Shirley Jones'

18 supposed in-state alcohol abuse was in the facts of

19 *Calder*.  Instead, it took the form of ads runs in

20 California newspapers and on California airways.

21 *Calder* does not apply.  I'll note, as our reply brief

22 demonstrates, four of our cited published Fifth Circuit

23 precedents distinguished *Calder* on these grounds.

24 That's in ECF 109, at pages 8 to 9, holding a defendant

25 still must have directed his conduct at the forum state.

```
 1              ExxonMobil also heavily cites a case
 2    called X Corp v. Media Matters, a non-binding case from
 3    another judicial district, but that case is
 4    distinguishable on its fact.  There, the Court ruled
 5    that the allegedly defamatory statements targeted
 6    non-party Texan firms' headquarters.  Here, the
 7    relevant statements targeted, again, ExxonMobil's
 8    conduct of allegedly misrepresenting advanced
 9    recycling's efficacy, conduct that occurred in
10    California and nationwide.
11              To conclude now after a couple of
12    observations from what we heard this morning, personal
13    jurisdiction is a due process protection for
14    non-resident descendents.  I heard the Court this
15    morning mention the Seventh Amendment right to jury
16    trial, which of course is a portion of our Bill of
17    Rights.  The Supreme Court in Walden v. Fiore and in
18    several other personal jurisdiction cases has grounded
19    personal jurisdiction also in the constitution, in the
20    14th Amendment, as again a protection afforded to a
21    non-resident defendant.
22              I'm just reviewing my notes to see from
23    what we heard this morning.  I'm inclined to leave it
24    there unless the Court has any questions it would like
25    me to answer on personal jurisdiction, and I can
```

1    address anything else in rebuttal.

2            THE COURT:  No, it tracks what the briefing

3    indicated, and I appreciate your summarizing that for

4    me.

5            Are there any other defendants who want

6    to get in on the specific personal jurisdiction issue?

7    And then I'll let the plaintiff respond.

8            MR. HEMPHILL:  Thank you, Your Honor.  Jim

9    Hemphill from the Graves Dougherty Firm for Defendant,

10   The Surfrider Foundation.

11           First, I wanted to clarify something.

12   When the Court read this morning the matters that are

13   set for hearing before the Court, the Court referenced

14   Document 48, which is Surfrider's Rule 12(b) Motion to

15   Dismiss, but I think the Court also characterized that

16   as a 12(b)(6) Motion to Dismiss.  Just wanted to make

17   clear we also have 12(b)(1) subject matter jurisdiction

18   and 12(b)(2) personal jurisdiction grounds in that

19   motion as well in Document 48.

20           THE COURT:  Okay.  Let me just check and make

21   sure I'm not overlooking anything.

22           Yes, because I see where ExxonMobil

23   responded to your 12(b)(1), 12(b)(2) and 12(b)(3)

24   Complaint, so those are apparently a part of your

25   Document 48.  I can double-check that real fast.

1          MR. HEMPHILL:  And on the venue provision,

2   Your Honor, we did join in --

3          THE COURT:  I think I understand what the

4   confusion is.  The title only made -- oh, okay.  The

5   title says 12(b) Motions to Dismiss, but the body says

6   12(b)(1), 12(b)(2), 12(b)(6), and not 12(b)(3), but --

7          MR. HEMPHILL:  We joined via the venue

8   transfer --

9          THE COURT:  That's okay, I've got you.  Keep

10  going.  We're good.

11         MR. HEMPHILL:  I just wanted to clarify.

12  Thank you, Your Honor.  I'd like to talk about the

13  facts about The Surfrider Foundation, specifically.

14              One of the things that we heard this

15  morning was Mr. Cash said that they didn't need to

16  plead every statement that's at issue in this case,

17  but I think ExxonMobil's burden is to plead facts'

18  sufficient to establish personal jurisdiction over each

19  defendant.  So one of the things that we did in our

20  initial motion was said we've scoured this Complaint

21  that ExxonMobil has filed and we see scant mention of

22  Surfrider and no mention of any speech on Surfrider's

23  part.

24              What ExxonMobil said in response, as we

25  read it, is that the claim against Surfrider is based

 1  on a single statement in a press release that is
 2  attributed to Baykeeper.  So Surfrider's press release
 3  is Exhibit 9 to the Complaint, and it includes quotes
 4  from other of the non-profits.  And as we read
 5  ExxonMobil's Complaint and their briefing, they are
 6  alleging that Surfrider is responsible for republishing
 7  a statement by Baykeeper that's on the third page of
 8  Exhibit 9.  So I want to talk about that statement.
 9          That statement is about claims made in
10  the California lawsuit.  That statement begins, "The
11  Complaints allege," so Baykeeper is talking about the
12  allegations in the Complaint in the California case.
13  I think that's beyond question.
14          Mr. Setrakian did an excellent job in
15  surveying the Fifth Circuit's law on personal
16  jurisdiction.  This, from our perspective, is a case
17  about speech.  ExxonMobil seeks to hold the Surfrider
18  Foundation liable for its speech, and there are many
19  Fifth Circuit cases that talk about personal
20  jurisdiction over out-of-state defendants when a claim
21  is based on speech.
22          One of them is *Fielding v. Hubert Burda*
23  *Media,* a 2005 case that we cite in our brief.  And what
24  the Court says, what the Fifth Circuit says there, is
25  the analysis has to focus on the subject matter and the

1  sources of the speech.  So that's kind of what I'd like

2  to talk about very briefly.

3               As Mr. Bonta's counsel said, it's not

4  enough to allege there is harm to the plaintiff in the

5  jurisdiction.  There has to be an allegation of minimum

6  contacts established by the defendant's contact with

7  the forum state, and we say they are absent here.  That

8  connection has to be sufficiently -- it has to be

9  sufficient for the defendant to reasonably anticipate

10  being hailed into court in Texas to answer for that

11  particular speech that's at issue in the case.  That's

12  the subject prong of the analysis.  Was the focal point

13  of the speech Texas?  That's the *Revell v. Lidov* case

14  that cited *Calder v. Jones.*

15               The Fifth Circuit also said in the *Johnson

16  v. Huffington Post* case the speech must "target Texas

17  specifically and knowingly" for the defendant to be

18  subject to personal jurisdiction in Texas.

19               So, when we apply the facts to this law,

20  Baykeeper quote in the press release, the Surfrider

21  press release, does not mention Texas at all.  As a

22  matter of fact the press release doesn't mention Texas

23  at all.

24               Furthermore, Surfrider didn't send this

25  press release to anyone in Texas.  There is a

 1   declaration from Surfrider's CEO to that effect.  And

 2   we have also responded to Exxon's Mobil's discovery

 3   request and produced all of the e-mails by which this

 4   press release was distributed.  None went to any Texas

 5   outlets.  It's a quote from Baykeeper about a

 6   California lawsuit alleging that ExxonMobil violated

 7   California law.  It (?) has nothing to do with

 8   Texas, and Surfrider formed no contact with Texas such

 9   that it could reasonably be expected or anticipate

10   being haled into court here.  So the subject prong of

11   the Fifth Circuit test points toward no personal

12   jurisdiction.

13            Now, I want to talk just a little bit

14   about the idea of this advanced --

15        THE COURT:  Let me ask you, essentially what

16   you're saying is your people didn't make the

17   statements.  They may have republished something that

18   someone else said that was about a specific case that's

19   on file in California.  Does that distinguish you and

20   your client from the other defendants in this case?

21        MR. HEMPHILL:  I believe it does, but I

22   shouldn't be heard to argue that Baykeeper's statement

23   that was republished by Surfrider is somehow actionable

24   or supports --

25        THE COURT:  I'm not suggesting that it is.

1  I'm just saying -- and I'm not asking you to throw

2  stones at your fellow co-defendants or anything.  But

3  you consider you have a client and you're here to

4  represent your client, and your client's interest and

5  position may be somewhat different than the other

6  defendants.  Is that your position?

7           MR. HEMPHILL:  I think that's accurate, Your

8  Honor, because the speech that forms the basis of

9  ExxonMobil's claims against Surfrider, the nature of

10  that speech is, as I understand it, somewhat different

11  than the speech against the other defendants.

12           THE COURT:  Okay.

13           MR. HEMPHILL:  And again, I obviously have

14  read the pleadings.  I don't believe that any of the

15  defendants are subject to personal jurisdiction, but I

16  want to concentrate on Surfrider, my client.

17           THE COURT:  Sure.

18           MR. HEMPHILL:  And I wanted to --

19           THE COURT:  It's your obligation to do that.

20           MR. HEMPHILL:  And I wanted to focus for a

21  minute on this idea of advanced recycling because, as I

22  understand ExxonMobil's claim, their claim is, well,

23  the speech of the defendants targeted this process they

24  call advanced recycling and ExxonMobil does advanced

25  recycling in Texas, and therefore the speech targeted

1    Texas.  But when it comes again to the Surfrider
2    Foundation, I don't think that's accurate.  Again, I go
3    back to the press release, which is the foundation for
4    ExxonMobil's claims against Surfrider.  The press
5    release never mentions advanced recycling one way or
6    the other.  It says nothing about advanced recycling's
7    efficacy or legality.  What it says is, number 1, very
8    little plastic is recycled; and number 2, recycled
9    plastics stay in the environment for a very long time.
10   But it doesn't say anything about advanced recycling.
11   So the press release in general and the single
12   statement that ExxonMobil seeks to hold Surfrider
13   responsible for has nothing to do with advanced
14   recycling.  When it comes to the claims against
15   Surfrider, I think the whole idea of advanced recycling
16   taking place in Texas is a red herring, because we
17   didn't say anything about advanced recycling.
18              That's the subject prong.  When we look at
19   the subject prong of the Fifth Circuit's test for
20   out-of-state jurisdiction based on speech, the subject
21   of the speech did not directly and knowingly target
22   Texas.
23              Then we look at the other prong, which is
24   the sources.  You look at the sources for the
25   statement.  What sources did the defendant use?  For

1    example, in the *Calder v. Jones* case, which ExxonMobil

2    relies upon, the sources for that article in the

3    National Inquirer were California sources.  The

4    National Inquirer called and talked to people in

5    California.  That was part of the targeting of the

6    speech.  Let's look at this speech.  Did either

7    Surfrider or Baykeeper have any Texas sources for the

8    statement?  No, none.  The source in the press release,

9    in Surfrider's press release, is explicitly attributed

10   to Baykeeper, a California non-profit, part of the

11   California coalition bringing the California lawsuit

12   seeking to hold ExxonMobil liable for violations of

13   California law.

14           Surfrider simply didn't reach into Texas

15   and didn't target Texas.  So, under both the subject

16   matter prong and the sources prong, those both point to

17   no personal jurisdiction over the Surfrider Foundation,

18   so dismissal for lack of personal jurisdiction is

19   appropriate.  Now, we have joined the Motion to

20   Transfer venue and we think that result would be proper

21   and appropriate as well.  But we believe that

22   ExxonMobil had sued the Surfrider Foundation without

23   any facts to support exercise of personal jurisdiction

24   in this Court over the --

25           THE COURT:  If I don's -- if you want this

1  case removed, transferred to California, shouldn't the

2  California judge make the decision on your issue, or

3  does this issue become moot.

4         MR. HEMPHILL:  I think personal jurisdiction

5  becomes moot because Surfrider is based in California

6  and would not contest personal jurisdiction, as I

7  understand it in California.

8              So, absolutely, as we discussed this

9  morning, we think transfer of venue is absolutely

10 appropriate.

11        THE COURT:  But if it stays here, do you want

12 me to look at your Motion to Dismiss based upon personal

13 jurisdiction?

14        MR. HEMPHILL:  Absolutely, Your Honor.

15        THE COURT:  Okay, got it.

16        MR. HEMPHILL:  Thank you.

17        THE COURT:  Uh-huh.

18        MR. NELSON:  Forrest Nelson for Baykeeper,

19 Inc, Your Honor.

20        THE COURT:  All right.

21        MR. NELSON:  I'm going to skip around

22        THE COURT:  I believe you're probably familiar

23 with the Surfrider Group, then, fairly well.

24        MR. NELSON:  And with Heal the Bay.

25        THE COURT:  All right, great, go ahead.

1          MR. NELSON:  But I'm going to skip around a

2    little, Your Honor, because I think some of the points

3    have already been covered and I don't want to beat a

4    horse to death.  Although, as attorneys we often do, I

5    prefer not to.

6          THE COURT:  Everything has already been said

7    that needs to be said, but not everybody said it, huh?

8          MR. NELSON:  Justifying my existence by asking

9    one question at a deposition.

10              I think when it comes to the factual

11   standpoint, Your Honor, the first thing that comes to

12   mind is Docket 49-1.  We filed a declaration where we

13   set forth we have absolutely no privileges associated

14   with the State of Texas and we have no activities with

15   the State of Texas.  We're a single non-profit

16   organization that leases a space out of Oakland, and

17   all we do is take care of San Francisco Bay and we try

18   to do clean water acts to keep the bay clean.  That's

19   what we are trying to do.  That's it.  We're not trying

20   to do anything beyond that.  So, if you're trying to get

21   us on minimum contacts, there was no town or affidavit

22   or counter-declaration filed by Exxon refuting anything

23   that we put in our declaration as to the lack of

24   minimum contacts.  We have no property, we have no

25   banking account, we have no agents here, we don't come

1  to Texas.  We, don't have any licenses in Texas, we are

2  not authorized to do business in Texas.  Nothing that

3  comes into minimum contacts.

4          So the only thing that they've asserted

5  was we directed it at Texas.  Now the problem with

6  that, if you're talking about directing things at

7  Texas, is what did we do to direct to Texas?  The only

8  thing we did is we participated -- and you can see it

9  in our declaration -- we participated in a news

10  conference in San Francisco in which we made statements

11  associated with the litigation not long after the

12  litigation was filed.  That went on the Internet.  And

13  that's what distinguishes this case from a lot of the

14  cases you see here.  It's what happens on the internet.

15          And what we're trying to, I guess,

16  explain to the Court is if we're going to have personal

17  jurisdiction, there has to be some limit to what you

18  can and cannot do.  And if you don't place a limit on

19  it, then what is the sense of having personal

20  jurisdiction?  Nothing, it becomes academic.  You might

21  as well write it out as a text.  But if you're talking

22  about the internet, and particularly if it's passive,

23  Judge Jerry Williams in the *Johnson* case pretty much

24  set forth what it was like.  If it's a passive internet

25  site --

```
 1              THE COURT:  A passive internet site?

 2              MR. NELSON:  Yes.

 3              THE COURT:  What does that mean?

 4              MR. NELSON:  If I can explain to you.  My

 5  wife's Polish.  I bought tickets to send her to

 6  Poland.  We get on the internet for Lufthansa.  It's

 7  interactive.  I can tell Lufthansa, "I want a ticket

 8  for my wife and daughter to go to Poland.  We want her

 9  to sit in these seats and we want this."  People can

10  interact, they can respond, they can change things,

11  and they can order stuff.  But if it's truly passive,

12  we just -- we were just there and we talked at the

13  conference and that's it, we made some statements at

14  the conference.  But nobody can call in, nobody can ask

15  us questions.  We just made a statement, that's it.  We

16  didn't respond to any questions, we didn't do anything

17  outside of the conference itself.  That's it.  All

18  passive.  It's like watching YouTube, one of those

19  do-it-yourself things.  You can't talk to those people.

20  They just tell you, this is how you fix this thing in

21  your car.  Well, they hopefully tell you how to fix it

22  in your car.  But that's what you're doing, it's

23  passive.

24              If you accept the notion that there is a

25  variance between the two, as Judge Williams -- I'll
```

1   quote you what Judge William says.  His quote was,

2   "Grannies with cooking vlogs do and should not expect

3   losses from Maui to Maine."  So, because we go on an

4   internet site and we tell these people these are the

5   statements we think about, you can't haul us into every

6   court in the United States.  I mean, Exxon is all over

7   the United States.  So, if Exxon believes, why don't we

8   take them up to Maine, why don't we take them to North

9   Carolina, why don't we take them over here to Oregon,

10  it's kind of getting back to the example the Court gave

11  regarding shooting the gun from Louisiana to Texas.

12  What Exxon basically wants to do is say, "I can sit in

13  Louisiana and I can shoot a gun all across the 50

14  states.  I can shoot it in Puerto Rico, I can shoot it

15  in the Virgin Islands, wherever they have a federal

16  court, I can haul these people into that federal court

17  and expect them to defend themselves in that case

18  because they went on the Internet."

19          And that's why the Courts have drawn the

20  distinction between the two is because it makes

21  personal jurisdiction non-existent, it becomes

22  academic, because I can sue you anywhere.  And I would

23  like to cite the Court to the *USPlabs* case.  It's on

24  page 8 and 9 of our response, Docket 49, and it's out

25  of the Northern District of Texas.  I can't remember

1  whether it was Barbara Lynn or whether it was Jane

2  Boyle.

3          THE COURT:  I want to find that case before we

4  go on.

5          MR. NELSON:  Okay.  It is cited on page 8 and

6  page 9 of Docket 49.

7          THE COURT:  And what page?

8          MR. NELSON:  Page 8 and page 9, I refer to it,

9  if I remember correctly, Your Honor.

10          THE COURT:  *USPlabs* case, all right.  It's a

11  Northern District case from 2012.

12              Okay, go ahead, go ahead.

13          MR. NELSON:  And the facts of this case are:

14  There is a company in Texas that makes health

15  supplements that competes with a company in Nevada that

16  makes health supplements.  And the company in Nevada

17  goes on the television station and tells them, "Don't

18  buy their health supplements from that company in Texas

19  because they have rat poison in it and it will kill

20  you."  And if you don't think that isn't deleterious

21  to your business, I don't think I know what would be.

22              Anyway, they went off and sued them in the

23  Northern District of Texas.  The judge came back and

24  said, it was a passive internet site.  They took this

25  conference that they had on the television and they put

94

 1  it on the internet on YouTube, and they said, but the

 2  guy didn't say he got his sources in Texas.  He only did

 3  it for  the people in Nevada.  And the Court in the

 4  Northern District said, look, this is a passive internet

 5  site.  If we allow you to haul these people from Nevada

 6  back over here when the guy was telling Nevada citizens,

 7  don't take this health supplement, then you can haul

 8  them anywhere you want because the internet is

 9  omnipresent.  So anywhere they have a passive internet

10  site and anywhere they talk about something like this,

11  we can haul them there and they have to expect to be

12  held into court.

13          THE COURT:  Let me ask you, in that case, the

14  defendant in that case, were they seeking to

15  essentially take customers away from the plaintiff so

16  they could sell more of their product?

17          MR. NELSON:  They were, Your Honor.

18          THE COURT:  So they were trying affect a harm,

19  a financial harm, to the plaintiff in Texas; correct?

20          MR. NELSON:  Correct.

21          THE COURT:  I have great respect for both of

22  the judges that you mentioned.  One is an especially

23  close friend of mine, Judge Lynn.  But I haven't read

24  that opinion.  And what -- again, this is a 2012

25  opinion and we're seeing -- I'm sure I'm not -- I know

1  I'm not the only judge, especially with the advent of
2  AI and the effect of the internet on young people and
3  causing them to do things and to harm themselves and
4  lawsuits are brought because of that.

5            And sometimes the computers.  I have a
6  case where the plaintiff is from New Zealand.  And the
7  computer is in Germany, and yet the case is here.  I
8  mean, we have rules on personal jurisdictions and I
9  understand that and respect that.  But those principles
10 were established.  *International Shoe* predated the
11 internet; okay?  And it does seem to blur issues and
12 it's sometimes hard.  And even since 2012, there have
13 been changes.  We have mass communication now like
14 we've never had.  So a statement made that might have
15 been a statement to the local television station now is
16 all over the world.

17           The question is, are we keeping up with
18 technology or are our rules of procedure and
19 jurisdiction keeping up with changes in technology, and
20 what cases does either Barbara Lynn or Judge Boyle use
21 to cite in their opinion?  Do you know?  I mean, I'll
22 look at the case, but --

23           MR. NELSON:  I'm pretty sure I cited them in
24 there, Your Honor, but I believe the *Johnson v.*
25 *Huffington Post* case --

```
 1            THE COURT:  Was cited by the judge in --
 2            MR. NELSON:  No, I think it came after this
 3   case, Your Honor, because it's a -- I don't have the
 4   date here, but I think it was after that.
 5            And you also have to remember that the
 6   Walden v. Fiore case, which came after that in 2014 --
 7   this is 2012 -- they kind of spoke to the same issue.
 8   We have to ask ourselves, where did the harmful conduct
 9   occur.  Remember, Walden v. Fiore, it was a TSA agent
10   at the Atlanta airport that stopped some people that
11   were coming from the Caribbean after they had made
12   money at a gambling thing.  And these people lived in
13   Nevada.  When they went to Nevada, the TSA reported it
14   and they had problems in Nevada because they were
15   arrested for "bringing too much money back," cash.  And
16   they said, "We can sue them in Nevada in Las Vegas."
17   And the Supreme Court -- and I think it may have been
18   Gorsuch that wrote the opinion -- Gorsuch basically
19   said:  Look, where did the conduct occur that you are
20   complaining about?  Where were the effects of that
21   conduct first -- they basically said:  We're not going
22   to pay attention so much to the effects.  That's one
23   thing we'll consider.  But the real issue is where did
24   the harmful conduct occur that led to the effect?
25            THE COURT:  That's why I asked that question
```

97

1  earlier today.  Where does the tort occur.  Is it when

2  the bullet is fired on the eastern side of the Sabine

3  River, or when it hits somebody on the western side of

4  the Sabine River, two different states, Louisiana and

5  Texas?

6           MR. NELSON:  And my view of this, Your Honor --

7  and I'm not going to put any of the other people on

8  this table of my view -- I won't even put B. Terrell or

9  John Barr to that same view, Your Honor --

10          THE COURT:  I'm sure Mr. Terrell would have a

11  comment, but go ahead.

12          MR. NELSON:  But my feeling is this, Your

13  Honor:  When it comes to the Internet and because it's

14  omnipresent, or it seems like it's omnipresent, we have

15  to treat it differently.  So we have to see if it's

16  inactive or whether it's passive.

17          THE COURT:  That's the distinction you're

18  making?

19          MR. NELSON:  Yes.

20          THE COURT:  Okay.

21          MR. NELSON:  And that's the distinction, Your

22  Honor.  Because, again, the example I will give from

23  Louisiana is the guy shot the gun and went to all 50

24  states.  They hit people in every one of the 50 states.

25  Where are you going to go?  And that's why, when they

 1  do this passive, they try to look at where was the

 2  action that occurred to cause the problem.  And the

 3  action that occurred that caused the problem is where

 4  we talked at the video news conference, the offline

 5  news conference.  That's the conduct they're

 6  complaining about.  That's what Exxon is complaining

 7  about.  That's what we're talking about.

 8          THE COURT:  But it would be a little different

 9  just firing off -- I understand putting something on

10  the Internet that goes to all 50 states.  But what if

11  in one of those states the target of the comment had

12  his or her business destroyed or damaged in some way?

13  It might be a little different than just, oh, it's

14  going out all over the world.  It may, but it may not

15  hurt anybody when it goes to Nevada and Arizona,

16  whenever.  But to hear and to -- I'm hearing now

17  they've got Beaumont and some of these other cities.

18  They are all saying they're hurt.

19          MR. NELSON:  But it didn't make any difference

20  in *USPlabs* case because they weren't able to draw that

21  distinction that would justify exposing people.  And

22  look at Exxon.  They've got gas stations in every state

23  in the United States.  So why can't they bring you

24  anywhere they want to go?  In USPlabs it was

25  specifically for all intents directed --

 1         THE COURT:  Well, but this is for this -- and

 2    listen.  What I know about recycling is this:  I go to

 3    the trash dispenser and it says a hole for trash and a

 4    hole for recycling.  And sometimes I'm even confused as

 5    to which hole to use.  So that's my level of knowledge

 6    on recycling; okay?  But there is some process that I'm

 7    hearing about, and it's that process that they claim is

 8    attacked and their facilities to do that, develop it,

 9    whatever it is.  I don't even know all the facts of it.

10    But that's what they are saying.  Yeah, it may have gone

11    out to 50 states, but that bullet stuck here.

12         MR. NELSON:  But in USPlabs -- and I know you

13    will have the opportunity to read it -- in my knowledge

14    of recycling, I would like to say it's better, but it's

15    only because we only have one recycling bin in our town.

16    So I don't have to think about stuff.  I can just pitch

17    it into one.

18              But the real issue, as in USPlabs was, you

19    knew that the guy in Nevada was trying to adversely

20    affect the guy's business in Texas.  Because he said,

21    don't use this guy's product in Texas because it's got

22    rat poison and it will kill you.  And if you take a

23    look at that, they still believe that if you try to

24    distinguish between things as to where things happen,

25    you open too many doors when it comes in to passive

 1  Internet sites.  And you leave yourself exposed to the

 2  notion of, we are not going to be able to con -- we're

 3  not going to be able to control -- and that's what I

 4  think about right there.

 5          THE COURT:  Are there any other cases that you

 6  know of that cite the USPlabs case?  We'll look it up

 7  ourselves.  I was just wondering if -- I mean, I have

 8  great respect for both of those judges you mentioned,

 9  but is this a trend?  I mean, I'm not obligated to

10  follow a fellow district judge, no matter how much

11  respect I have for her.  But it's -- you know, I hear

12  the distinction you are making, but I'm just wondering

13  is that really becoming more established precedent?

14          MR. NELSON:  I was trying to see where I have

15  *USPlabs* in here, Your Honor.

16          THE COURT:  I see it on page 8 -- oh on the

17  bottom of page 8 -- well, actually, it's page 8, but

18  it's page 15 of your document.

19          MR. NELSON:  It's page 15 of the document?

20          THE COURT:  Yeah.  It's Document 49, page 15

21  of 34, but page 8 of the actual - oh, after you get

22  past the table of contents, you start numbering your

23  pages.

24          MR. NELSON:  Let's see if I can find that.

25          THE COURT:  But -- we'll look at it.  Don't

1   worry about it.  That's okay.  We'll look at that.

2                  Okay.  What else did you want to say?

3          MR. NELSON:  There was one other point I

4   wanted to make because the Court raised the issue as to

5   first to file, but I'll do that after the 12(b)(2),

6   Your Honor.

7          THE COURT:  Okay.  All right, good.  Thank you

8   very much for your comment.

9          MR. GANT:  Good afternoon, Your Honor.  Scott

10  Gant for Sierra Club.

11         THE COURT:  Yes, indeed.

12         MR. GANT:  I remembered this time.

13                 Let me pick up right where you were

14  discussing with Mr. Nelson.  He mentioned *Johnson v.*

15  *Huffington Post,* and I think he didn't have the year in

16  front of him.  That's a December 2021 case from the

17  Fifth Circuit.  So relatively recent vintage.  It is

18  also a defamation case.  It's also a case concerning

19  defamation through the Internet.  I would encourage you

20  and your staff, Your Honor, to take a look at that case

21  because we believe it's quite instructive here.

22                 And it says the following on the personal

23  jurisdiction issue, again in the context of a

24  defamation case, and discussing at length the *Calder*

25  decision by the Supreme Court upon which Exxon relies

1    heavily here with respect to personal jurisdiction.

2                    It says that, "For Texas to have --" there

3    are elipses here, but this is from Sierra Club's reply

4    brief, Document 110, page 3.  "For Texas to have

5    jurisdiction, the alleged defamatory statement had to

6    target Texas specifically and knowingly."  My friend

7    from counsel for Surfrider mentioned this particular

8    quote, but it's so important that I think it bears

9    emphasis.  But also pointing out that this is a recent

10   Fifth Circuit case concerning defamation claim.

11                   Let me now go back to --

12             THE COURT:  I have to just say something.  I

13   understand this is Exxon, and I have reason to believe

14   they have the resources to litigate a case anywhere

15   they want to litigate a case.  But what if it's a mom

16   and pop store, and for whatever reason somebody has a

17   vendetta, doesn't like the people who run this mom and

18   pop store; and because they have the power now of an

19   Internet and they have the power of mass communication,

20   they can destroy mom and pop's reputation in that local

21   community.  For whatever reason, they're vindictive,

22   whatever.  And now, in order to seek redress, they can

23   hide behind the jurisdictional skirt, use the Internet

24   to go through it, harm this -- but this person doesn't

25   have the resources to go to California or some other

1  state.  See, the rules have to apply to everybody,

2  regardless of their standing, whether it's Exxon or

3  it's just some little old mom and pop.

4         MR. GANT:  I think you've hit on a key point,

5  which is --

6         THE COURT:  Are our rules keeping up with

7  technology?  This is my concern.

8         MR. GANT:  And the Fifth Circuit, I submit,

9  answered that question in *Huffington Post.*  It was very

10  similar to your situation.  It was an individual who

11  sued Huffington Post.  He was a Texas citizen.  He

12  relied on his citizenship.  He said, like Exxon says

13  here, I'm in Texas, I'm a Texas.  You harmed me.  This

14  is where I live.  This is where the harm is.  And the

15  Fifth Circuit, I think sharing your belief, you know,

16  understanding that it has its down side, but the rules

17  need to be the same for the Exxons of the world, for the

18  Mr. Johnson and the Huffington Post case, the individual

19  Texas citizen.  The rules are the same.

20         Now, I think they were taking their

21  guidance from the Supreme Court and maybe wanted to

22  come up with a theory that due process could

23  accommodate a rule that was different, depending on the

24  resources of the plaintiff.  Maybe that's possible, but

25  that's not the jurisprudence that we have now.  That's

1   not what the Fifth Circuit or the Supreme Court has

2   said.  And in *Huffington Post* the Fifth Circuit said,

3   you know, less than four years ago.  This is about the

4   Internet and the application of the personal

5   jurisdiction principles to this environment.  And they

6   said sorry, Mr. Johnson, even though you were harmed

7   here, this is not enough.

8            THE COURT:  Okay, all right.

9            MR. GANT:  So I think some of the things that

10  you are thinking about are addressed by the Fifth

11  Circuit in *Huffington Post,* Your Honor.

12            A couple of points about first principles.

13  Personal jurisdiction is defendant-specific.  We made

14  this point in page 4 of our opening brief, citing both

15  *Calder*, a seminal Supreme Court decision on personal

16  jurisdiction and defamation; and also the Fifth Circuit

17  in *Pearson*, saying, "Each defendant's contact with the

18  forum states must be assessed individually."  That's

19  *Calder*.  And the rule that "plaintiffs may not

20  aggregate defendants' forum contacts and may not

21  establish personal jurisdiction without specifying who

22  did what," that's *Pearson*, the Fifth Circuit.

23            I submit that Exxon is not heeding those

24  admonitions from the Supreme Court and the Fifth

25  Circuit with respect to its pleading allegations on

1    personal jurisdiction.  They have engaged in what we

2    called in our brief collective pleading, where they say

3    Defendants did this, Defendants did that, without

4    identifying who did what.  And that falls afoul of the

5    pleading obligation.

6              Finally, there is a point where I think

7    personal jurisdiction dovetails with what we were

8    discussing this morning, our transfer motion.

9    Obviously, if you conclude that personal jurisdiction

10   exists with respect to all six defendants who are

11   contesting it and you keep the case here and you

12   decline to transfer it, which is of course

13   discretionary, except on the venue point where it's

14   mandatory, if it turns out that you are wrong, Your

15   Honor, then there is a risk that everything we've done

16   here for what will be two plus years at that point will

17   have to be tossed aside.  So, obviously, it's in your

18   sound discretion about how to handle this.

19             But I would submit that it's a relevant

20   consideration which courts have taken into account that

21   there is at least -- I don't think Exxon can credibly

22   dispute that there are serious questions about the

23   presence of personal jurisdiction here.  I understand

24   they say it exists, and we say it does not.  But I

25   don't think they can credibly say that there aren't

 1    serious legitimate questions that we've raised.  And if

 2    it turns out that you decide to keep the case here and

 3    you are mistaken, then there's a risk that a lot of

 4    work will be cast aside and we'll have to do it over in

 5    another venue.

 6                And in addition, personal jurisdiction is

 7    not only defendant-specific, but it's also

 8    claim-specific.  We have cited case law on page 3 of

 9    our opening brief, Document 50, footnote 4, with the

10    authority that it's also claim-specific.  So, really,

11    it's six counts times six, Defendant's 36 specific

12    counts where you have to find this personal

13    jurisdiction.  And if you're wrong, or depending on how

14    the case shakes out and they all go to trial together,

15    and one or more of us, it turns out, there is no

16    personal jurisdiction, there will have been a lot of

17    wasted resources.

18                That risk can be eliminated by

19    transferring the case to the Northern District of

20    California.  Exxon acknowledges there is personal

21    jurisdiction there.  I understand my friends at the

22    Justice Fund contest there is jurisdiction over them

23    there.  But that could be sorted out there.  And as I

24    mentioned earlier, there is clear case authority that

25    you can transfer the case without rendering any

1  determinations about personal jurisdiction.  Or even if

2  you believe the personal jurisdiction is lacking here,

3  you have the power to make the transfer, and that

4  that's the prudent and risk averse course here in light

5  of the serious questions about personal jurisdiction.

6           Otherwise, we rest on Sierra Club's briefs

7  and the other argument made by my colleagues.

8           THE COURT:  All right.

9           MR. GANT:  Thank you, Your Honor.

10          THE COURT:  Any further comments?

11          Yes, please.  Ms. Schwartz?

12          MS. SCHWARTZ:  Good afternoon, Your Honor.

13  Fallin Schwartz for Heal the Bay.  I would like to

14  acknowledge Deb Greenleaf, lead counsel for Heal the

15  Bay, and Heal the Bay's local counsel, Tommy Yeates,

16  are in the courtroom.

17          Advanced recycling is not the same as

18  plastic pollution.  If I counted correctly, in the

19  40-page Complaint, Exxon used the term "advanced

20  recycling" 93 times.  Now, I could be wrong because I

21  went to law school, so I don't have to do math.  But

22  only mentioned plastic pollution or variation four

23  times.  Clearly, ExxonMobil's Complaint is about the

24  advanced recycling.  We've all heard the term "advanced

25  recycling" numerous times today and we'll continue to

1  hear it.

2              The statement taken from -- or cited in

3  the Complaint was taken out of context.  The statement

4  was in a press release regarding the California lawsuit

5  about plastics pollution.  And you look at it at a

6  whole and it only talks about plastics pollution, not

7  advanced recycling.  Exxon falsely claims that the

8  statement is about stopping Exxon in Texas.

9              Now, if you look at what points to

10 California versus Texas for jurisdiction, well, Heal

11 the Bay was incorporated in California.  It only has an

12 office in California.  So its principal office is in

13 California.  The mission statement is to make coastal

14 waters and water sheds in greater Los Angeles safe,

15 healthy, and clean.  Heal the Bay's press release was

16 posted in California, written in California, issued in

17 conjunction with and based on a lawsuit filed in

18 California.  Now, I count that as five on the

19 scoreboard for California.

20             For Texas, Heal the Bay does not have an

21 office, no employees, no chapters, no bank accounts,

22 no mailing address, no telephone number, no targeted

23 marketing on its website or social media to Texas, no

24 contact with the Houston Recycling Consortium or Cyclyx

25 International that was also mentioned in the Complaint.

1  They didn't use any Air Tags, no interference with
2  Exxon's permits that was also claimed for the generic
3  defendants, and no knowledge of Exxon's contracts in
4  Texas.  Therefore, Texas is zero on the scoreboard.
5  The press release did not use any sources in Texas, was
6  not sent to any Texas residents or citizens, was not
7  used to solicit donations from Texas residents.  The
8  press release and link were accessible to all persons
9  who have Internet access, not just Texas residents.
10             Now, in Exxon's response, for the first
11 time, Exxon added another comment.  I thought it was
12 telling that Exxon decided to combine Baykeeper and
13 Heal the Bay in one paragraph only on the issue of
14 jurisdiction.  Once again, Exxon took the statement out
15 of context, saying that Heal the Bay admitted it was
16 quietly meeting with other U.S. NGO defendant, that
17 they were engaging in coordinated campaign against
18 Exxon to change U.S. policy surrounding plastic
19 pollution.  Again, plastic pollution, that's not the
20 same as advanced recycling.
21             But that's not the statement.  It was
22 under -- in the press release, if look at it, it is
23 Document 47-2.  It's under the section, "Who else is
24 backing lawsuits against ExxonMobil," and it talks
25 about a coordinated campaign to legally hold Big Oil

1   accountable.  And as Surfrider mentioned in their -- I

2   don't know if it was in their Motion to Dismiss or

3   their reply, but it's legally accountable, which is an

4   important distinction, as opposed to an unlawful act

5   through legal means for a conspiracy plan.

6            And I just want to point out for the

7   record that in -- well, Mr. Yeates wanted me to note

8   that for jurisdiction, you only look to where the

9   conduct occurred, not where the damages occurred.

10           Now, Exxon, in their response to the

11  Motion to Transfer Venue, noted that the California

12  case is a pollution case.  The word was plastic

13  pollution ruining California beaches.  That is exactly

14  what Heal the Bay is concerned about, and that is what

15  their statement was about.

16           And we refer to the rest of our briefing,

17  Your Honor.

18       THE COURT:  Okay, thank you very much.

19           Yes?

20       MR. MATZ:  Your Honor, I'm afraid there's one

21  of us still left.

22       THE COURT:  That's good.

23       MR. MATZ:  Good afternoon, Your Honor.  My

24  name is Joshua Matz.  I represent the Intergenerational

25  Environment Justice Fund, which I cannot say that many

1   times.  I'm just going to say Justice Fund, if that's

2   okay.

3           THE COURT:  That's fine.

4           MR. MATZ:  I appreciate it.

5               So the Justice Fund, an Australian charity

6   with no personnel and no presence in Texas, should be

7   dismissed for lack of specific personal jurisdiction.

8   To be clear, in seeking to assert personal jurisdiction

9   over the Justice Fund, ExxonMobil does not claim that

10  the fund itself made any of the alleged defamatory

11  statements or interfered with any relationships or

12  otherwise engaged in any conduct directly targeting

13  Texas.  Instead, they assert that the Justice Fund

14  should be held liable for the alleged torts that were

15  allegedly committed by the other defendants.  They

16  offered two reasons for that conclusion, neither of

17  which holds water.

18              The first, which I'll dispose of quickly,

19  is that they assert a co-conspirator theory of personal

20  jurisdiction.  They say that because they have alleged

21  everybody here was conspiring, if they can assert

22  personal jurisdiction over some of us, they've got it

23  as to all of us.  And as the parties have briefed at

24  length, that is foreclosed by published and unpublished

25  Fifth Circuit case law, as well as opinions of the

1   Texas Supreme Court, which is probably why they only

2   devote a sentence or two to the matter in their papers,

3   and then some footnotes.

4          The real theory that they appear to rely

5   on is an agency theory.  They want to allege, they

6   believe they have alleged with sufficient particularity

7   to get past the pleading requirements, that we somehow

8   turned everyone else at that table's clients into our

9   agents, which has a specific legal meaning; right?  It

10  means that we were able to control the specifics of

11  their conduct as to the specific alleged torts that are

12  at issue here; right?  Their theory, in other words, is

13  that we're subject to personal jurisdiction because we

14  had actual and ultimate control over the making of

15  these alleged extrajudicial statements outside the

16  California case, that ExxonMobil says are the subject

17  matter of the suit.

18         THE COURT:  Mr. Matz, let me interrupt you

19  just a second.  I'm trying to get a feel for exactly

20  what your client does.  I understand, for example,

21  Ms. Schwartz' client is focused on cleaning up the

22  beaches and bay areas near the Los Angeles area.

23  Theirs are more interested in the Oakland,  San

24  Francisco Bay area, and their mission statement is to

25  keep that clean and all that.

```
 1                  What is it your client does?

 2          MR. MATZ:  Yes, Your Honor.  Well, according

 3   to the Complaint, it's orchestrate international

 4   conspiracies.

 5          THE COURT:  No, no, but what does your

 6   client -- I'm asking.

 7          MR. MATZ:  Yeah, and I appreciate that, and

 8   there aren't a lot of factual allegations there.

 9   Fundamentally, what our client does -- and there are

10   some references to this in the Complaint -- is support

11   kind of environmental conservation efforts around the

12   world, including with a focus on plastics.

13          THE COURT:  How do they support?

14          MR. MATZ:  Well, it's a non-profit charity.

15   It's called The Funds, The Justice Funds.  It's

16   fundamentally -- they're a funder.

17          THE COURT:  It provides money?

18          MR. MATZ:  It provides money.

19          THE COURT:  Okay, okay, I've got it.  And do

20   they send money to these other organizations that are

21   defendants in this case?

22          MR. MATZ:  There's nothing about that in the

23   record.  What the record show -- and to be honest, I'm

24   not like hiding the ball from you.  I'm just looking at

25   the evidence that's in front of the Court, the
```

1   defendants have put in front of the Court; and, you

2   know, there hasn't really been fact finding on that.

3   In this case, the allegation is that we paid money.

4   And I'll come back to this and talk to it a bit more.

5   But we paid money to the law firm that was representing

6   the plaintiffs in this case, and that we essentially

7   organized and funded, as a third party funder, a

8   lawsuit that was occurring in California.  And that's

9   their theory.  And I'll talk about that in a little

10  bit --

11          THE COURT:  Okay, okay, all right.

12          MR. MATZ:  But that's basically what we do.

13  And for context, like my practice includes the

14  representation of any number of entities.  And there

15  are many entities, liberal, conservative, foreign,

16  domestic -- I would be surprised if Exxon is not one of

17  them -- that provide litigation funding to non-profits

18  of various kind to support causes that it believes in.

19  Like there's nothing unusual about that.

20              And so here, right, the theory is that

21  these folks' clients were agents.  Like not just that

22  we conspired with them, not just that we were broadly

23  supportive of their work, but that we literally

24  controlled them.  And not just controlled them

25  abstractly, but controlled them with respect to the

1   making of the statements that occurred outside of the

2   California litigation, allegedly, and that are the

3   subject of the litigation here today.  And the

4   defendants have given you lots of reasons why they

5   think the claims against them should be dismissed, and

6   if they prevail, then we're out, too, because any claim

7   against us is derivative.

8              But I want to focus on why, even if all of

9   their motions don't succeed, there is nevertheless no

10  specific personal jurisdiction as to the Justice Fund.

11  And there is a single reason that I'm going to talk

12  about.  And I'll unpack it a little bit, but

13  fundamentally it's one point, which is that Plaintiff's

14  allegations, at most, support the conclusion that the

15  Justice Fund plans with the non-profit defendants to

16  initiate and pursue the California litigation, but

17  offer no basis to infer that the Justice Fund somehow

18  controlled out-of-court statements that those profits

19  made outside the California litigation.

20             Now, ExxonMobil is explicit in paragraph

21  14 of its Complaint that this suit is not a suit about

22  the California case.  It can't be.  You can't sue

23  people for stuff they said in a judicial proceeding in

24  California.  Rather, they say, this suit is about these

25  alleged extrajudicial out-of-court statements.

1            THE COURT:  Right.

2            MR. MATZ:  So, if that's true, then to assert

3   personal jurisdiction over us for those statements on

4   an agency theory, were to hold up, you know, they have

5   to show that we exercised control over those

6   statements.  And I don't actually think we disagree

7   over this, and Mr. Cash will say if we do.  And if he

8   says that we disagree, then I'll explain in my reply

9   why he's mistaken, I suppose.  But I actually think we

10  broadly agree on the relevant legal principles here;

11  right?  It's not enough for them to show generalized

12  logistical or financial support for the California

13  case.

14            Yet, ultimately, that's all they offer.

15  They don't allege any direct connection at all between

16  the Justice Funds and any other defendant concerning

17  any of the statements at issue.  The Complaint does not

18  drop any direct lines, does not refer to any messages,

19  any texts, any communications, any interactions.  Nada,

20  zero, nothing, right, between us and any of their

21  claims.  Instead, they base everything on an allegation

22  that we engaged and paid for the lawyers that represent

23  the non-profits in California.  And they refer to a

24  donation that firm made to Mr. Bonta which I'll come

25  back to at the end.  And they say that because we

1    organized that suit and hired those lawyers and are

2    paying them to do the case, that you should infer that

3    we are responsible in some kind of principal agent way

4    that we control the making of these statements.  And

5    there is a defect in that premise.

6            THE COURT:  Would they pay that law firm if

7    that law firm took a position they didn't like?

8            MR. MATZ:  Well, let me talk in a minute if I

9    can.  I will answer that question.  The short version

10   is we have the right to stop paying a law firm if we

11   don't want to pay the law firm.  Now, to be clear, the

12   law firm independently represents the non-profits;

13   right?  We're just a third party funder.

14            And I'll say, just as kind of background

15   before I dive into the specifics as they are, at least

16   set forth in the record, that litigation funding

17   arrangements are common in our legal system.  I am

18   confident that parties regularly appear before Your

19   Honor whose legal fees are paid by third parties.  And

20   they are particularly common in the realm of what's

21   often called public interest litigation where funders

22   will fund law firms or non-profits to bring litigation.

23   And it is simply not understood in that world that just

24   because you fund a non-profit to bring a case, that

25   you're somehow legally on the hook for everything that

1   that funded party says inside, let alone outside the

2   proceeding.

3            And that, in turn, derives from a general

4   principle of agency law, which is that just because

5   you fund somebody doesn't mean that they are your

6   agent.  There is a lot of law that says that.  And it

7   definitely doesn't mean that if you fund a law firm,

8   the claims of that law firm are also your agents;

9   right?  In principle, the opposite is true.  Those

10  lawyers represent the other funds.  They have a

11  fiduciary duty to them.  And so if we're paying lawyer

12  bills -- and I'm the General Counsel of my firm, I

13  write engagement letters all the time.  If we have a

14  third party funding relationship, I will put language

15  in the engagement letter that says, you know, this

16  party may be paying the bills, but they do not get to

17  control the conduct of the case.  And as you'll see,

18  that language appears here as well.

19            THE COURT:  It almost sounds like *Employers*

20  *vs. Tilley,* which set aside the difference between

21  insured and insurance company, because insurance

22  companies fund a lot of litigation, as Mr. Terrell

23  shaking his head knows.

24            And anyway, I can understand what you're

25  saying.  Keep going.

```
 1            MR. MATZ:  No, I appreciate it.  And again,
 2  like our payments here, the Justice Fund's payments --
 3            THE COURT:  But the insurance companies cannot
 4  control the actions of the law firm because their
 5  obligation is not to the funder insurance company; it's
 6  to their -- it's to --
 7            MR. MATZ:  To the insured.
 8            THE COURT:  -- to the insured, which is their
 9  client.
10            MR. MATZ:  Exactly.  And the insured actually
11  has a direct cause of action against the insurance
12  agency if it violates its obligations, where as here
13  that is not the case.  Here, Justice Fund's
14  relationship as alleged is payment to the law firm
15  representing the non-profits.
16                 And, you know, so on the face of that
17  relationship, which is a commonplace relationship in
18  our legal system, it is not obvious at all.  There's
19  no reason to infer that just because we're paying the
20  lawyers who represent them in the case, that we are the
21  ultimate controllers and masterminds of some statements
22  that some of them went and made outside the litigation.
23  And that's fundamentally the theory.
24                 So, to try to bolster that theory, they
25  point principally to an opinion that was issued by the
```

1   FARA unit at the United States Department of Justice.

2   And this is at Docket 96-2.

3           THE COURT:  Okay.

4           MR. MATZ:  The FARA Unit is the Foreign Agent

5   Registration Act Unit at the Justice Department.

6           THE COURT:  Okay.

7           MR. MATZ:  I'm going to call it the FARA unit,

8   if that's okay, for short.  The FARA unit enforces FARA

9   which is a federal law, which essentially says that

10  when certain foreign actors hire domestic actors in

11  the United States to do some work for them, under some

12  circumstances they have to register that with the

13  Federal Government for transparency; right?  You want

14  to know when foreign actors are getting involved in

15  certain kinds of U.S. domestic matters.

16          THE COURT:  Sure.

17          MR. MATZ:  And so in this case a request was

18  sent to the FARA Unit for an opinion about whether the

19  California law firm had to register by virtue of the

20  relationship that it has with the Justice Fund, which

21  as an Australian entity is a foreign charity.  And the

22  FARA Unit comes back and essentially says yes.  And the

23  reason it says yes, the FARA Unit says you do have to

24  register and here's why.  You have to register because

25  the Justice Fund is a foreign entity that wants to

1    engage in political activity in the United States, and
2    the political activity it refers to is the California
3    litigation; right?  They say this foreign entity wants
4    to involve itself in a lawsuit in California to achieve
5    a kind of broader goal of it, and you're going to be
6    working with them and so you're going to have something
7    like an agency relationship with them as the law firm.
8    And so you have to register just so that we the
9    Government are aware of the fact that you have this
10   connection to a foreign entity.

11             And my friend, Mr. Cash and his colleagues
12   say:  Well, look, you know, that shows that the law
13   firm in California was our agent, and so you can infer
14   that the clients of that law firm, in making their
15   out-of-court statements, were also our agent.  And I
16   have to tell you, that strikes me as a bit of a
17   non-sequitur.  It's not obvious to me that just
18   because we're paying money to this law firm.  It's
19   other clients, whose work we may be funding, are now
20   controlled by us.  And the fair opinion makes that
21   pretty clear.  And it gets into some specifics.

22             So, in describing the arrangement that it
23   understood what exists here, the FARA Unit says -- and
24   I'm going to give you some quotes from the letter.
25   These are pages 2, 3 and 4.  It says that the

1   plaintiffs in the case, right, the plaintiffs in the

2   case, the non-profits, will get "ultimate authority to

3   determine litigation strategy."  That's on page 2.  It

4   says that they will not enter into any direct agreement

5   with the Justice Fund.  So there is no relationship

6   described there between them and us.  That's on page 3.

7   And it says that the law firm that we're funding will

8   retain full independent professional judgment in its

9   representation of the non-profits.  That's on page 4.

10          And then, and to me this is what's most

11  striking, it says that the Justice Fund -- and I'm

12  quoting -- "will not pay fees for costs with respect

13  to matters beyond the prosecution of the litigation,

14  including the potential plaintiff's public relations

15  in connection with the litigation."  That's on page 4.

16  In other words, the FARA opinion, which is the only

17  evidence that is offered beyond the allegations here,

18  specifically notes that the Justice Fund's contemplated

19  role in the California case was just about paying the

20  legal bills of the firm for its work, that we would

21  have no control over -- that we did not have

22  determination control over the litigation strategy,

23  that we did not have and direct relationship with the

24  non-profits, that the firm retained full independent

25  judgment; and specifically, that our role would not

1  cover public statements that the plaintiffs might want

2  to make about the case outside of the litigation.

3        THE COURT:  Let me ask you, is there some fact

4  issue really here?  I mentioned *Employers vs. Tilley*.

5  Under that circumstance, whether the insurance company

6  likes what the insurance defense lawyer is doing, they

7  are still on the hook to pay.  If your fund doesn't

8  like the actions of this law firm, maybe they go too

9  far or they don't go far enough, you cut off the

10  funding, now, as a practical matter, the lawyers

11  handling the case may feel some -- well, wait a minute.

12  If we take that position or go that far or don't go far

13  enough, we may lose our funding.  So there is kind of a

14  hidden hand over the law firm, notwithstanding all

15  these statements that you've stated in the agreement.

16  But, as a practical matter, there is some sort of --

17  and that's kind of a subtle fact issue here, which I'm

18  not here to decide fact issues, but it may not be quite

19  as clear.

20        Do you understand what I'm saying?

21        MR. MATZ:  I do.  It's a fair question.  But

22  for what it's worth, I think there is another step in

23  the analysis here; right?  What you're saying, and I

24  take the point, is that because the Justice Fund is a

25  third party payer to the law firm for this case, that,

1   you know, people may care a little bit about what it

2   thinks about the case.

3          But their Complaint is not about the case.

4   What you need to conclude in order to find that there

5   is specific jurisdiction over the Justice Fund, is that

6   not only did the funds have some kind of, you know,

7   let's call it weight with the law firm, but that we

8   also had weight, as it were, with the non-profit

9   plaintiffs in the case, so much so that we were

10  actually controlling their out-of-court statements in

11  a principal agent relationship.

12         And a principal agent relationship isn't

13  just about weight; right?  It's not just, oh, they

14  made -- you know, the question is not could our views

15  on this be something the plaintiffs kind of care about

16  a little bit.  The question for agency, right, are we

17  the principal or are they the agent, is did we have the

18  specific ability to control what they were saying when

19  they talked about Exxon or when they talked about

20  plastics or when they talked about any of this out of

21  court.

22         And respectfully, my submission is that on

23  the pleadings, where the burden is in fact on them to

24  establish personal jurisdiction and where they put in

25  this FARA opinion, which I actually think makes it

1  pretty clear that all of this stuff is carved out of
2  the relationship, you know, it is not reasonable to
3  infer that just because we were paying the firm that
4  was representing them in the case, that we had
5  agency-level control of their statements outside of the
6  case.
7            And I'll say that to reach that conclusion
8  would go off like a bit of a bombshell in the wider
9  legal community, because there are a lot of litigation
10 funders in the world, there are a lot of people that
11 help support other folks' litigation.  You know,
12 sometimes family members, sometimes businesses
13 indemnifying employees, insurance companies, charities,
14 big companies like Exxon, right, that fund litigation
15 in some ways.  And it simply hasn't been understood.
16 And I'm not aware of any case that would support the
17 idea that just because someone is funding a lawsuit,
18 that the plaintiffs represented by the lawyers that
19 they are paying are now agents of the funder in their
20 behavior outside the courtroom.  That would be an
21 extraordinarily disruptive holding, and it would also
22 be a holding that I think goes beyond what the facts in
23 front of Your Honor can support in terms of the
24 pleading stage obligation that the plaintiffs have.
25            THE COURT:  It might also have some ethical

1   implications for the lawyers involved.

2            MR. MATZ:  It might.  It might.  And look, you

3   know, as a matter of the rules of professional

4   responsibility, we're 1.7, which is the duty of loyalty

5   that the attorneys have, which is governed by Rule 1.8

6   which specifies when that is not waivable.  It's pretty

7   clear that even if a third party is funding a case, the

8   lawyers' ethical duties are ultimately to their clients

9   and not to the funder.  And there are ethical opinions

10  out there which indicate that if the opposite is true

11  in a relationship, that is initial; okay?

12           At the same time, what they are asking

13  Your Honor to infer is that we paid money to the

14  Justice -- I'm sorry, that the Justice Fund paid money

15  to the California lawyers to support this case, that we

16  somehow leveraged that into like micromanagerial agency

17  control of the out-of-court statements of the plaintiffs

18  in the case and did so in part through inverting the

19  relationship between the lawyers and the parties they

20  represented, so that instead of representing those

21  parties, the lawyers, I guess, were acting as our

22  agents to coerce the parties into making statements out

23  of court.

24           I have to tell you, you know, I love a

25  good conspiracy theory as much as the next guy.  But in

1    terms of what they have to show for specific personal

2    jurisdiction, is it reasonable to infer that,

3    especially where our client in that California firm

4    voluntarily went to the Federal Government, disclosed

5    the relationship, described the terms that were

6    involved, made clear what rights would exist and what

7    rights wouldn't exist, and were very specific that the

8    relationship between the Justice Fund and that law firm

9    was about paying for the case without interfering with

10   independent judgment, without a direct relationship with

11   the non-profits, without any influence or funding

12   control over out-of-court statements.  I have to say,

13   that just feels to me like an extraordinary lift for

14   them under these circumstances.

15            And, you know, they try to get around that

16   in the Complaint a little bit by suggesting that in

17   the FARA registration we didn't just say we were going

18   to  do the lawsuit, we were going to do "political

19   activities".  And they used that quote "political

20   activities" throughout their case, their Complaint.  But

21   I have to tell you, if you look at the opinion letter,

22   it defines "political activities," which is a term from

23   the FARA statute, as the California litigation; like?

24   It's very clear that the political activity that my

25   client wants to engage it here is funding this

1  California lawsuit.  And they are not really able to

2  point to anything that would cause a reasonable person,

3  in my opinion, to conclude that we were leveraging

4  funding for a law firm into micromanagerial control of

5  the out-of-court statements of plaintiffs that that law

6  firm represents.

7          They also -- an also, this is the last

8  point on the non-profits.  Then I'll say a quick word

9  on Mr. Bonta, if it's okay.  You know, the other basis

10 on which they attempt to support this inference is a

11 convoluted and, I mean, fictitious -- but we can deal

12 with that later if we have to -- account of sort of the

13 Justice Fund's motivations; right?  And in their

14 Complaint they sketch this fantastical theory about

15 economic competition and who controls the Justice Fund

16 and all of that stuff.  And what it basically amounts

17 to you is an allegation that the Justice Fund, by

18 virtue of who it's connected to, is super motivated to

19 want to target Exxon's advanced plastics recycling.

20 That's essentially what they allege.

21          But the thing is that even if that whole

22 story were true, all it really explains is why the

23 Justice Fund, as an Australian entity, would reach out

24 and support the California litigation against Exxon.

25 It really doesn't follow from their whole kind of

 1  theory that, you know, we're motivated to oppose Exxon,

 2  that we then somehow secretly leveraged that funding to

 3  puppet-sharing the out-of-court statements.

 4          THE COURT:  So that I'm clear -- and I'm not

 5  suggesting this is any basis in even allegation or

 6  fact -- but at least hypothetically, I heard earlier

 7  that this going after whatever this process is that

 8  Exxon has on recycling, if they can say, well, that's a

 9  bad process, there are other people who have a better

10  way of doing it that might benefit Exxon's competitors,

11  at least, is it beyond the realm of possibility that

12  those people could go to some organization, and I'm not

13  even suggesting your client, but some out-of-country

14  organization to fund them so that they could ultimately

15  gain an advantage competitively in this multi-million

16  dollar recycling?

17          MR. MATZ:  Yeah, well, lots of things are

18  possible.  And I'll say I generally don't know.  I'm

19  one of those lawyers who prepares for a Motion to

20  Dismiss hearing by studying the papers; okay?  And

21  because the burden is on them to establish personal

22  jurisdiction.  I've looked at what's here.  I promise

23  you, I don't have a trove of secret knowledge how they

24  did --

25          THE COURT:  But hold on, has that been -- that

1  sounds like a wild conspiracy theory, but has that been

2  even alleged and are there any facts to support such

3  as -- now, that's the question I asked.

4          MR. MATZ:  I expect Mr. Cash will say a

5  version of that and will say it very eloquently, and

6  it probably will be convincing in the moment until you

7  think about it.

8          THE COURT:  Okay.

9          MR. MATZ:  And the way that he will likely

10  present it is going to be some version of -- and this

11  is in the Complaint that Dr. Andrew Forrest is this

12  Australian billionaire and philanthropist, he had a

13  mining company, and he became very interested in the

14  carbonization efforts, and so he tried to divert this

15  company into that space, this company is called

16  Fortescue.  And these are just the allegations, not

17  like facts.  And he said that this company, Fortescue,

18  tried to lead a decarbonization effort and it wasn't

19  going well, so he tried to get a lot of other companies

20  in this space to do a levy on plastics that would

21  reduce plastics in the environment.  And that didn't

22  work.

23          And so that was what led him to think,

24  well, I want to pursue decarbonization and I'm not

25  achieving it in my business, but maybe I can fund this

1  litigation and engage in lawfair, he calls it, against

2  Exxon as a way of trying to achieve my goal, because

3  Exxon makes a lot of plastic, and a good way to get

4  them to make less plastic would be to support a case

5  like this.

6          And so they say, you know, given all of

7  that -- they seem to be suggesting, given all of that,

8  it's reasonable to infer he'd go to any length to try

9  to accomplish his goals, and the length he went to was

10  funding the California case, and then taking control of

11  these non-profit out-of-court statements and using it

12  to try to target Texas in these ways.  And I think

13  there is a basic problem with that theory at the

14  pleading stage, right, at the pleading stage.

15          And I take all of Your Honor's points, I

16  should say.  I am also often a plaintiff's lawyer.

17  And I take the concern that at the pleading stage the

18  application of *Iqbal* and *Twombly* can be in some cases

19  beyond fair, right, because -- and counsel require the

20  exercise of just judgment; right?  And Your Honor has

21  been doing this for awhile and you have instincts about

22  what's plausible and what's merely possible.

23          And I think what *Iqbal* and *Twombly* most

24  fundamentally instructs -- and you'll remember that

25  those cases were both about conspiracy theories; right?

1  This whole idea **(?)** testings arose in the context of

2  conspiracy doctrine.  What they fundamentally say is

3  look, it's the job of a district judge to sort the

4  wheat from the chaff; right?  Sometimes someone alleges

5  something and you're like, yeah, it's possible, but it

6  just isn't plausible.  It doesn't feel likely enough to

7  be kind of a map of sort of what happened; right?  It

8  really just is about conjecture and hypotheticals.

9         And I think that's what we've got here;

10  right?  They say, they allege all of these facts that

11  are meant to show that Dr. Forrest, and then down

12  through him, the Justice Fund, were motivated to want

13  to give Exxon grief around their plastic situation.

14  And they identified -- the only specific thing they

15  alleged that we did was fund -- like organize and fund

16  and help recruit folks to do this California case.  And

17  they point to the FARA letter and they point to the

18  funding and they say, look, that shows that they were

19  out to get us.

20         And the thing is that their suit is not

21  based on that California suit.  It's based on the

22  out-of-court statements by the plaintiffs in that suit.

23  So now they need to make a further leap, which is that

24  the motivations that we had to get them were so great

25  that even though there is no other allegation or

1    evidence that would otherwise support this, and even

2    though it's actually contrary to the representations

3    made to the Federal Government in the FARA letter, we

4    were still secretly puppeteering in a micromanaging way

5    the out-of-court statements of the plaintiffs.  And,

6    you know, to the extent their theory is Dr. Forrest

7    really wanted to get Exxon for its plastics recycling,

8    right, on some level it's possible that they would do

9    anything.  You know, there is nothing they would not do.

10   But that's not really how --

11           THE COURT:  So what you're basically saying

12   is, and my evaluation of this, lots of things are

13   possible.  I even came up with a hypothetical that is

14   possible.  But the question is, in my evaluation do I

15   go from it being possible to plausible?

16           MR. MATZ:  Exactly.  And then --

17           THE COURT:  And in my judgment, if it's not

18   plausible, then it doesn't fly.  If it is plausible,

19   well, we have a lawsuit and we're going forward.  Is

20   that fair?

21           MR. MATZ:  I mean, they might say something

22   about jurisdiction discovery, but basically, yes,

23   that's fair.

24           And in terms of the -- you know, if I can

25   just press on that plausibility point for a minute, what

1    the Supreme Court instructs in *Iqbal* and *Twombly* is that

2    in asking about plausibility, one of the things you

3    look at are all of the more particularized allegations

4    in the case to understand the odds of some further

5    thing being true; right?  So they say Dr. Forrest and

6    the Justice Fund had a generalized desire to sort of

7    give Exxon some grief around their plastics recycling.

8            Okay, what else did they allege?  They

9    alleged a single thing:  That we funded a law firm in

10   California and helped them organize and get plaintiffs

11   to bring this case.  And they alleged the FARA letter

12   as kind of evidence of that relationship.  And then the

13   question is, look at that letter, look what it says,

14   look at the representations that we made on pain or

15   penalty to the Justice Department of the United States

16   about how this would work; right?

17           Ask yourself, do litigation funders who

18   commit to not supporting external public statements by

19   plaintiffs in a case, who commit to the independent

20   judgment of the lawyers, who have no direct agreement

21   with those plaintiffs, the funders in that position

22   ordinarily secretly control out-of-court statements

23   that those plaintiffs happen to make in the case.

24           And my view is that, frankly, it is

25   conjecture.  It is pure -- is it possible?  Lots of

135

1   things are possible.  Is it plausible?  There is

2   nothing here that makes it plausible.  And the thing

3   that makes it implausible is the letter to the FARA

4   Unit.  That's the thing that make it implausible to

5   believe that that's what is occurring here because it

6   describes the set of relationships inconsistent with

7   what they are saying.

8            And if I can, let me just end by talking a

9   little bit about the further claim that somehow we were

10  involved with making Mr. Bonta into our agent.  And,

11  you know, again, I love -- which I understood to be your

12  theory.  You look confused.  Maybe it's not your theory

13  in which case you can just tell us and then save us the

14  time.  But, you know, they allege that at around the

15  same time that the Justice Fund was paying money to

16  the California firm to do this case, that firm, a

17  well-regarded plaintiff's firm in California, made a

18  donation, or that some of the people there made some

19  donations to the Attorney General.  And the implication

20  that they asked the Court to draw is that that shows, I

21  suppose, that somehow we were co-opting Mr. Bonta as

22  the Attorney General or turning him into our agent or

23  somehow improperly influencing him, because I suppose

24  they want you to infer that the money we gave to them

25  was a pass-through that went to the Attorney General,

1    even though there is no evidence of any of that anywhere

2    in the record or in FARA, from anything else that

3    they've been able to point to.

4              And I think the basic problem there,

5    again -- I mean, it's a plausibility issue, really,

6    which is that, like, it's very plausible to infer that

7    a well-known California law firm working on issues that

8    the Attorney General also cared about would

9    independently decide to make contributions to the

10   Attorney General.  I would be surprised if my friends'

11   clients did not make contributions to any number of

12   Attorneys General, including the one in Texas or

13   elsewhere, who raise litigation on things that they

14   like.  That's routine behavior in our legal system and

15   it's protected by the First Amendment of the

16   Constitution; right?

17             Think about cases like Citizens United,

18   the right to make contributions and engage in

19   independent expenditures on behalf of officials that

20   are doing stuff you support.  And it's especially

21   common when you ask about whose donating to Attorneys

22   General; right?  It's especially common for that to be

23   lawyers and law firms.  That's who tends to donate to

24   judges and to Attorneys General when they have

25   campaigns.

```
 1                      And so it would be quite startling to
 2    announce -- and a departure from any precedent that
 3    we're aware of.  And they do not cite in their papers,
 4    at least, any case on this point, that when a firm
 5    makes a contribution to a state attorney general,
 6    working on issues of concern to the firm and its
 7    clients, that supports an inference that the firm's
 8    clients have effectively bribed to the state official
 9    and taken control of the state officials' out-of-court
10    public statements.  It just seems to me, again, that
11    that's more in the nature of the fantastical than the
12    plausible; right?  You need to be able to show
13    something more than just routine First Amendment
14    protected activity, and they've got nothing other than
15    that.
16                      I appreciate your patience in hearing me
17    out, and thank you for your attention, Your Honor.
18              THE COURT:  Very good argument.
19                      Okay, have we finished with the
20    defendants?  Do you care to make a response?
21                      I see our friend from New Zealand here, I
22    believe.  Welcome to Texas.
23              [Pause]
24              MR. CASH:  I have a bunch of stuff to talk
25    about, so let's start with Mr. Bonta and personal
```

1  jurisdiction.

2            They like Huff Post.  So do I.  And I like

3  Huff Post for something they didn't quote, because the

4  Fifth Circuit didn't want people to come in and act

5  like it was some blanket mandate that you had to be in

6  the state or something happened to have personal

7  jurisdiction.  In fact, what the case says is:  Of

8  course, jurisdiction might exist if Huff Post aimed the

9  tort at Texas in some way, which is exactly what we've

10 been talking about, the shot across the border.

11           "A defendant who targets a Texas company

12 with tortious activity has fair warning that it may be

13 sued there."  And I love this quote.  "If you're going

14 to pick a fight in Texas, it's reasonable to expect

15 that it's going to be settled there."

16           Mr. Bonta and all of the NGOs picked a

17 fight in Texas because they came after -- and they want

18 to narrow our case.  Yes, advanced recycling is at the

19 center of our case, but they also accused us of murder.

20 They said that we're making plastics that are killing

21 people, that were hiding its toxic nature.  And we make

22 our plastic only in Texas.  We advance recycle only in

23 Texas.  So it's very much aimed at Texas.

24           Huff Post, "This targeting of the alleged

25 tortious acts at the headquarters of Texas-based

1  companies is sufficient to establish specific

2  jurisdiction in Texas."  Now, not only did they aim at

3  where our headquarters are in Texas; they aimed where

4  the business is in Texas, where the plastic business is

5  in Texas, where the recycling is in Texas, where our

6  customers and collaborators are in Texas.  So Mr. Bonta

7  and the NGOs targeted Exxon's advanced recycling

8  business here.  They targeted the plastic resin

9  production here.  And their objective is to damage or

10  destroy Exxon's plastic business.

11            And I'll get back to IEJF at some length.

12  But each of these NGOs has made the statement, they

13  want plastic gone, they want plastic production gone.

14  They want our plastic production gone.  So this isn't a

15  tortious interference.  This is tortious elimination

16  that they are after.

17            "Bonta targeted attacks on Exxon's advanced

18  recycle business."  Let's start with that.  "To this

19  day, ExxonMobil's big" -- and these are all quotes,

20  and they're not all from a press conference.  They are

21  from his world tour, from London, from New York, when

22  Mr. Bonta just decided to go out there and talk about

23  us.  And that's the other thing that's interesting,

24  Your Honor.  There is a whole plastics business; right?

25  We're not the only producer, but we're the only target.

1  And we're only here.

2              So Bonta talks about us.  "The truth is,

3  plastics produced through your so-called advanced

4  recycling," blah, blah, blah.  "The truth is Exxon

5  Mobil's advanced recycling can't process large volumes.

6  Advanced recycling is a decoy, a PR stunt, it's a sham

7  solution.  One thing ExxonMobil actually does is

8  recycle its lies."  That's coming after us right here.

9              You had used -- you had talked about the

10  bullet.  I thought about missiles.  Bonta shot at us

11  from California, shot at us from London, he shot at us

12  from New York.  But the one thing all those shots had

13  in common is where they rained.  That's why he has

14  personal jurisdiction here.  Texas was the focal point.

15              And let's look at this another way.  "A

16  plaintiff may establish personal jurisdiction by

17  demonstrating either that a publication possesses

18  adequate circulation" -- okay, and that's not what

19  we're going for -- "or that an author or publisher has

20  aimed a story at the state knowing that the effects

21  will be felt there -- the effects will be felt there."

22  Then they go on to say, "To make this second

23  alternative showing, a defamation plaintiff may allege

24  that, one, the subject matter of; and two, the sources

25  relied upon for the article were in or at least in some

1  way connect with Texas."  That makes it the focal

2  point.  What we know, that the subject matter of these

3  statements is ExxonMobil's plastic production and

4  ExxonMobil's recycling, which is in Texas.  So check to

5  No. 1.

6           But what about No. 2, the sources relied

7  upon.  Let's look.

8           Bonta, himself, in one of his many press

9  conferences on the defamation tour, talked about "the

10  Air Tag trackers in Texas."  He wanted to give special

11  thanks to those investigative reporters who put Air Tag

12  trackers in recyclable stuff in Houston and sent it

13  around.

14           THE COURT:  When is an Air Tag tracker?

15           MR. CASH:  An Air Tag, Your Honor, I've got

16  one in my golf bag because I leave it sometimes.  It's

17  a little -- it's made by Apple and you can put it in a

18  wallet, you can put it in anything, and then you just

19  track it on your iPhone.  I've got one on my dog's

20  collar.

21           THE COURT:  Okay, I got it.

22           MR. CASH:  And so that's what KHOU Houston

23  did.  So there is one of his sources regarding our

24  advanced recycling.  Texas.  But there is a bigger one.

25  And this one Bonta crows about.  "Subpoena to

1    ExxonMobil resulting in documents."  And those

2    documents  were produced from Texas.  And what does he

3    say about the subpoena?  "So we issued subpoenas,

4    multiple subpoenas, I'll say broadly, to preserve the

5    integrity of the investigation, to ExxonMobil and

6    ExxonMobil's ecosystem.  And we have received a lot of

7    information that have affirmed or amplified, provided

8    clarity to some of what we previously knew, and some

9    things we learned for the first time."  So, not only

10   does he use a Texas source, it is his only source

11   included in the information around advanced recycling.

12   So we focus a lot on ExxonMobil.

13            Then he goes on to say, "Additionally, my

14   lawsuit reveals, through some information accessible

15   only to us because of subpoenas that we served on

16   ExxonMobil, the fact that ExxonMobil" -- and here he

17   goes -- "has hidden the truth about technical

18   limitation of its so-called advanced recycling program,

19   and they deceive both the public and its own corporate

20   customers."

21            That's Bonta, that's his statement, and

22   that's him citing Texas sources, document subpoenas.

23   So Bonta's defamatory statements were both targeted at

24   Texas and they drew on sources from Texas, which make

25   Texas a focal point of the tortious activity.

1              Defamatory statements in pleadings.  You

2    asked this earlier, Your Honor, so I wanted to put this

3    slide in.  You said, well, if something is protected

4    when you file a pleading or when you say it in here, is

5    it protected out on the courthouse steps?  Both states

6    have answered that.  Under Texas law, this is *Landry*,

7    which is the Texas Supreme Court case in 2021.  What

8    the *Landry* case says is, "Under Texas law, the

9    privilege accorded a litigant which exempts him from

10   liability for damages caused by false charges made in

11   his pleadings or in the Court in the course of a

12   judicial proceeding, cannot be enlarged into a license

13   to go about in the community and make false and

14   slanderous charges against his court adversary and

15   escape liability for damages caused by such charges on

16   the ground that he had made similar charges in his

17   court pleadings."

18              So, as Your Honor rightly observed --

19   listen, they filed the lawsuit and stopped and have

20   just been quiet and been happy with that.  Fine.  We

21   don't sue them for a lawsuit.  They have every right to

22   file a lawsuit in it's a lawsuit out there.  But they

23   weren't happy with that.  They wanted to go on the

24   defamation tour.  And it's not protected when they

25   walk outside, it's not protected when they're on the

144

 1  front steps, it's not protected on Dateline, it's not

 2  protected at the seminar in New York or in London or

 3  anywhere else where Bonta isn't saying, "We're suing

 4  you," where Bonta is saying, "Look at me, look at me,

 5  look at me.  Maybe I can be the next governor of

 6  California."

 7          THE COURT:  Well, hold on, go back.

 8          MR. CASH:  Yes, Your Honor.

 9          THE COURT:  That statement said -- that's a

10  Texas Supreme Court case.  It would suggest, and you

11  can correct me if I'm wrong, that someone could go

12  outside the courthouse, go out and say:  In court we

13  made the following statements, whatever.

14          MR. CASH:  No.  They lose their protection

15  outside, Your Honor.  That's -- if you go read *Landry*,

16  that's exactly what happened --

17          THE COURT:  Yeah, but it says, "cannot be

18  enlarged to make false and slanderous charges."

19          MR. CASH:  If you say something about me in

20  court -- if these guys got up here today and say,

21  "ExxonMobil lies and lies and  lies," there's nothing I

22  can do about that.  They have every right to do that and

23  it's protected because they're talking to you.  If these

24  same guys go out on the front steps out there and they

25  say it to the press or they put it in their website, not

1  protected.  California has even stronger language.

2          THE COURT:  I'll take a look at *Landry*, go

3  ahead.

4          MR. CASH:  Okay.

5          THE COURT:  Give me the Zuckerberg case.

6          MR. CASH:  This is *Argentieri v. Zuckerberg,*

7  this is a California case from 2017, and what they say

8  is, "a litigation privilege should not be extended to

9  litigating in the press because it would serve no

10  purpose that could provide immunity to those who would

11  inflict upon our system of justice the damage which

12  litigating in the press generally causes:  Poisoning of

13  jury pools and bringing disrepute upon the judiciary and

14  the bar."

15          They are saying you aren't protected when

16  you're litigating in the press.  If you're litigating in

17  the courtroom, you're protected.  Not in the press.

18                  So, Mr. Bonta --

19          THE COURT:  Does the existence of a protective

20  order matter?

21          MR. CASH:  I'm sorry, Your Honor?

22          THE COURT:  Would the existence of a

23  protective order matter?

24          MR. CASH:  No, Your Honor.  So Mr. Bon -- one

25  of the things is it shouldn't be surprised if

 1   somebody's hailed into court into Texas.  Mr. Bonta

 2   should have been surprised if he wasn't sued here.

 3              All right, so let's talk about the NGOs:

 4   Sierra Club, Surfrider Foundation, Baykeeper, and Heal

 5   the Bay.  And one of the things that was suggested is

 6   that what we're looking for is to have minimum contacts

 7   because they are co-conspirators.  I agree that there

 8   is case law in the Fifth Circuit that says you can't

 9   take a co-conspirator's contacts and attribute them to

10   the other conspirator, but it doesn't say that about

11   partners and partnerships.

12              "What we have here is a coalition."  Not

13   my words; their words.  "What we have here is a

14   partnership."  Not my words; their words.  "What we

15   have here is a public private partnership."  Not my

16   words; their words.  There it is.  Niall McCarthy,

17   who's with the law firm that IEJF hired their agents,

18   said:  This is a public private partnership we have out

19   here.

20              And so then I just pulled -- one of the

21   things about pleadings, Your Honor, is all they do is

22   put you on notice.  We said in our pleadings time and

23   time again, "For example," and we cited some of the

24   defamatory statements.  We didn't put every one there.

25   And we learned more and more because some of the folks

1    have produced documents.  But these are just some that

2    were either the Sierra Club's statements in press

3    conferences or on their website, or attributable to

4    Sierra Club because they published them.  "Profit over

5    Planet.  Coalition of Non-profits.  Exxon profited by

6    claiming plastics are safe.  Our environment health

7    are being sacrificed.  Plastic leaks toxic chemicals."

8    Etc, etc, etc.  "We are going after Exxon to stop

9    plastic pollution at its source."  Where is the source

10   for ExxonMobil's plastic?  Texas.  And by the way,

11   Sierra Club has over 24,000 members in Texas.

12            None of their websites, none of their

13   websites are not interactive.  Okay, that was -- a big

14   deal was made about an interactive website.  And I

15   agree.  In fact, I think what it says in Huff Post is:

16   Is the website interactive?  If the answer is no, hard

17   stop.  You don't even have to do any more analysis.

18   If it's not an interactive website, the website doesn't

19   form the basis.

20            And I'll show you a slide in a little bit.

21   Every one of their websites that has the defamatory

22   statements is interactive because it has a place where

23   you click a button to donate money.  For Sierra Club,

24   you almost can't get through half a page without it

25   popping up.  You have to keep closing the "give me

1  money" sign just to be able to read what's on it.

2            Surfrider:  "Profit over Planet.

3  Coalition of Non-Profits.  Exxon concealed the harms,

4  Exxon systematically led the public to believe plastic

5  waste was easily disposable.  Plastics leak toxic

6  chemicals.  Exxon concealed the truth.  Decades of

7  deceit.  Exxon has brainwashed."  And here we go:

8  "That's why we are going after Exxon, to stop plastic

9  pollution at its source."

10            Baykeeper.  "Falsely promotes recycling.

11 Partnering with allied organizations.  They have been

12 burying the truth about plastic to make a profit."

13 That's Baykeeper.  "We pulled back the curtain.  We

14 found Exxon's plastic polymers are poisoning people.

15 Again, that's why we are going after Exxon, to stop

16 plastic pollution at the source.  Baykeeper tackles

17 pollution at the source."  And then they go on and talk

18 more about Exxon or harmful polymers.

19            Finally, even little Heal the Bay joined

20 the coalition.  "We are moving aggressively to stop the

21 harm at its source.  A decade-long campaign to bury the

22 truth."  Then they just say, "For months, Heal the

23 Bay's policy staff has been quietly meeting with our

24 peers."  It's Surfrider and Sierra Club and San

25 Francisco Bay Keepers.  "Today's action marks the first

1    step in a coordinated campaign.  This marks a more

2    aggressive approach to stop plastic pollution at its

3    source."  I like this one.  "Don't forget, Big Oil is

4    slick.  We can't believe what they tell us.  And it's

5    time to stop big plastic in its tracks."

6              So this coalition, this partnership that's

7    coming to get us all publish each other's stuff on

8    their pages.  So they don't get to say, "I'm just a

9    little guy."  You don't get to join arms with the big

10   guys, come after us, do your Hollywood Squares press

11   conference, this one, sit there, all come out together;

12   and now, when the rubber hits the road and it's time

13   for you to answer for it, it's like, "Wait, no, we

14   don't even know those guys.  Who?"  Come on.

15             All right.  These are all the websites.

16   Even Mr. Bonta has a campaign on his.  But donate,

17   donate, click here to donate, donate, donate.  So

18   they're all interactive.

19             And then one of them -- I forget which one

20   it was, Your Honor -- but in their briefing they're

21   like, "Wait, it's hyperbole."  Well, thanks for that

22   admission because hyperbole is an intentional

23   exaggeration, but not to be taken seriously.  Well,

24   unfortunately, the public takes it seriously.  So your

25   hyperbole is defamation.

1          Okay, so here's Cotchett, Pitre, &

2   McCarthy.  That's the law firm.  And they speak for all

3   the NGOs.  "Deceptive right recycling myth was pushed

4   by ExxonMobil."  So IEJF wants to say, well, we're not

5   responsible for what the other ones say.  Well what

6   about your law firm you sent the check to?  You're

7   their client.  And I'll show you that in a minute.

8   You're their client.  So they're saying:  Your lawyers

9   are saying Exxon's known since the 70s these products

10  weren't recyclable.  Exxon ignored all the red flags.

11  So I think the joint public private partnership is

12  going to be a tremendous benefit.  But unless you stop

13  the problem, where?  At it's source, i.e., the

14  production of single use plastics.

15          So the NGOs seek to attack plastic

16  pollution at its source.  Jurisdiction might exist if

17  they aim that tort at Texas.  Well, we're the source.

18  And guess what?  The source is here and they are aimed

19  right at us.  They targeted the Texas company, they

20  picked a fight down here, and now we're asking that the

21  Court keep them down here.

22          And I would ask -- you know, it's an

23  interesting argument they make.  Gee, Judge, if you're

24  wrong -- you know, if you're wrong, we'll have to do it

25  over again.  You know, they invite you to take the easy

1  way out.  Just send it out to Cali.  Well, that's not

2  fair.  We got attacked here, our intervenors are here,

3  our customers are here, they targeted us here.  So

4  they've got to come here.

5            So that's the NGOs.  Same thing.  They

6  fired from Cali, but they hit us here.  So the Court

7  certainly has personal jurisdiction over each of the

8  U.S. NGOs.

9            Which takes us to IEJF.  And my friend is

10  right.  We have not said that they said anything.  We

11  have not said that they have offices here.  None of

12  that.  Our theory against them is 100 percent agency,

13  and he is correct.  So, if none of their agents are

14  here, they're not here.  So he and I completely agree

15  on that.

16            We agree on something else.  This was in

17  their brief.  "It may be possible in certain

18  circumstances to impute the contacts of an agent to the

19  principal for purposes of specific jurisdiction."  I

20  agree, it may be.  So let's look.  Is this one of those

21  circumstances?  To give you a little bit better idea of

22  who's who, I'm not even going to go all the way back to

23  Andrew Forrest, whose a big iron ore guy, and iron ore

24  competes with plastic, and so he and Exxon have gone

25  head to head for years.  But he made a charity called

1    Minderoo, and Minderoo --

2           THE COURT:  How does iron ore compete with

3    Exxon?

4           MR. CASH:  Well, Your Honor, plastic is

5    replacing re bar in some places, plastic is replacing --

6    it's a competitor.  And so we got -- so then Minderoo,

7    which is another charity, basically spins off another

8    charity, which is IEJF.  And IEJF is very targeted.

9    They are after plastics.  That is their focal point.

10   They are after plastics.

11           This was the analogy I thought of.  When

12   Tony wants somebody hit -- IEJF doesn't want there to

13   be plastics.  When Tony wants somebody hit, he doesn't

14   do it himself.  He goes to Silvio, gives Silvio the

15   money, and tells Silvio, "You go find a hit man."  And

16   Silvio goes and gets Ralphie and Chrissy and Bobby, and

17   they go do the dirty work.

18           So what do we have here?  Okay, single-use

19   plastic.  This is what was submitted by the law firm

20   and IEJF.  They were touting, "Oh, we were so honest,

21   we went."  Well, yeah, you went to the Federal

22   Government because you're required to if you're a

23   foreign agent.  So they had to go find out if they

24   needed to.  "We provide funding to support research and

25   litigation aimed at combating the harms of single-use

1   plastic."

2              So now let's go to the DOJ documents,

3   because you got to see some of them, if but there were

4   some parts you didn't see.

5              All right.  Foreign organization is going

6   to be IEJF.  Law firm is going to be Cotchett.

7   According to a November letter, IEJF, first overseas

8   project is to litigate against entities responsible

9   for, I'm sure that's pollution, resulting from, I'm

10  sure that's single-use plastic.  IEJF has retained

11  Cotchett to file a lawsuit against companies

12  responsible.  Now, they only filed a lawsuit against

13  us.  However, IEJF would not be the plaintiff in the

14  lawsuit.  Instead, Cotchett and IEJF intend to enlist

15  as plaintiffs non-profits that have a similar mission.

16  And IEJF report already having engaged in discussions

17  with some such non-profits to assess their goals.  So

18  we know IEJF went out and talked to the non-profits;

19  right?  It says they have already engaged in

20  discussions with some of the non-profits.

21              Now, the U.S. Law Firm's relationship with

22  IEJF qualifies as agency under FARA.  Pursuant -- now

23  listen to this part because this is the part he didn't

24  read you when he said, Judge, it's implausible.  It's

25  implausible that we have any control.  U.S. Law Firm's

1  relationship with IEJF --

2           THE COURT:  Is this a DOJ document?

3           MR. CASH:  Yes, Your Honor.

4           THE COURT:  Okay, go ahead.

5           MR. CASH:  "As agency under FARA, pursuant to

6  the fee agreement" -- this is their fee agreement --

7  "Cotchett has agreed to initiate and prosecute the

8  proposed lawsuit" -- here's the part -- "under the

9  direction and control of IEJF that is intended to

10 further IEJF's interests."  It doesn't say anything

11 about the non-profits' interests.  IEJF's interests.

12 "This conduct qualifies as registrable activities under

13 FARA for multiple reasons.  First, by dispersing funds

14 of the United States to investigate and prosecute a

15 lawsuit proposed by IEJF to achieve getting rid of

16 plastics objectives.  For IEJF, as the fee agreement

17 indicates, Cotchett would be collecting, dispersing,

18 and dispensing money for or in the interest of foreign

19 principle.  Cotchett would engage in political

20 activities for or in the interest of foreign

21 organization, IEJF, as your advisory opinion request

22 indicates.  IEJF intends a lawsuit to serve as the

23 vehicle to achieve its objectives and bring positive

24 change, not to redress cognizable legal harm as a named

25 party to a lawsuit."

1           And then here, at the bottom, where it

2    says, "Attorneys and IEJF acknowledge that other

3    non-profits will enter into separate agreements with

4    the attorneys to prosecute this action.  IEJF will fund

5    this litigation as long as it deems appropriate."

6    Power of the purse.  After earlier they said that they

7    were going to direct and control.  Remember, I showed

8    you that part.

9           THE COURT:  Where are these documents located?

10          MR. CASH:  Your Honor, they are attached to

11   both our Complaint and I believe to our brief.  And I'm

12   sorry, I don't have the exact page.  I apologize for

13   that.

14          And then, Your Honor, to be fair, to be

15   fair, we are not saying that Mr. Bonta was their agent.

16   It is a coincidence that the Court should see that in

17   June of 2024, when Mr. Bonta was not in a campaign

18   against anybody, $97,000, almost 98, went to Cotchett.

19   And then turn around, same month, and 40 of it goes out

20   the door to Bonta's campaign against nobody.  So that

21   just is what it is.

22          At the end of the day, Your Honor, like

23   we agree, it may be possible in certain circumstances

24   to impute the contacts of an agent to the principal for

25   purposes of specific jurisdiction.  Is this one of

 1  those circumstances?  I would suggest this is one of
 2  those circumstances, Your Honor.
 3          This Court has personal jurisdiction over
 4  every defendant at that table, Your Honor, and we'd ask
 5  that the Court exercise it and that we move forward
 6  with the merits of this law suit.
 7          Thank you.
 8      THE COURT:  All right, very good.
 9          Let's do a little logistical conference
10  here.  I saw there are some folks wanting to make a
11  brief response.  With the time remaining, we will take
12  a break.  And if we need to go a little bit later than
13  usual, we will accommodate that.  The Court is not
14  available tomorrow.  We can't just hold over until
15  tomorrow.  I just want everybody to know that.
16          I may be different than most federal
17  judges, but I don't put a lot of time restraints on
18  people.  Sometimes I think I might help their cases if
19  I did because sometimes lawyers step right in it, you
20  know.  And the old saying, "quit while you're ahead,"
21  and I can't help them once they do it.  But that has
22  not happened here.
23          But also, I do believe in due process,
24  and that was said earlier, and giving everybody an
25  opportunity to be heard.  And just saying you have 10

1  minutes to describe your entire case, that's just

2  because the Court maybe has the power to do that, and

3  that's not seeking justice and doing right by people,

4  the clients or their lawyers.

5          But we do have a little -- how are we

6  doing, what else do we need to cover, and how much time

7  do we need to accommodate everybody?  Did you think

8  about that?

9      MR. CASH:  There is still the immunity and

10 11th Amendment for Mr. Bonta; right?  And there's still

11 the 12(b)(6)es; right?  Those are all still live.  Is

12 there any --

13     MR. GANT:  Scott Gant from Sierra.

14     THE COURT:  Yes.

15     MR. GANT:  My guess is we'll just have a very

16 limited presentation, maybe not from everyone, on the

17 other Rule 12 issues.  I haven't caucused with

18 everyone, but that's my strong suspicion.  I'm seeing

19 nodding heads, so --

20     THE COURT:  So, if we take a little 15-minute

21 break now, let you have briefly to respond, how much

22 time do you think y'all are going to need to knock out

23 the rest of this issue today?

24     MR. GANT:  My guess is we could finish about

25 5:00.

1          MR. CASH:  About what?

2          MR. GANT:  5.

3          MR. CASH:  I think so.  I know my response to

4   the immunity and 11th Amendment are short, and I think

5   Kathryn is going to address the 12(b)(6) motion, so --

6          THE COURT:  You want a little more time, I can

7   tell in your eyes, okay.

8          MS. GONSKI:  I will do everything I can to be

9   done by 5, Your Honor.

10         THE COURT:  That's fair enough, that's fair

11  enough.

12             Okay, let's take a 15-minute break for

13  everyone.  I think we need that, and we'll see you in

14  15.

15         *[Recess]*

16             I realize that when people drive up to our

17  beautiful federal courthouse here and they see those

18  Greco Roman columns out there, they might mistake them

19  for the Golden Arches of McDonald's, and they think,

20  hmmm, just drive up and say, "I'll take a 12(b)(1), a

21  12(b)(2), a 12(b)(3), a 12(b)(6), and throw in a

22  12(b)(c)."  Sure, drive up to the window, please.  And

23  they're a little disturbed when some nice person is not

24  there to hand it to them at that moment.

25             While you all were lollygagging around

1  and enjoying yourselves on your break, my judicial

2  assistant had 30 orders from 30 different cases for me

3  to sign, and they were all time-sensitive matter, so I

4  hope you enjoyed your break.  That's all I have to say.

5       MR. SETRAKIAN:  Judge, we appreciate you

6  carving out so much time to hear these motions.

7            Will Setrakian for A.G. Bonta.  The way

8  that it's going to go procedurally, we're going to --

9  at least some of us will offer brief rebuttal on

10  personal jurisdiction.

11       THE COURT:  Sure, sure, sure.

12       MR. SETRAKIAN:  Then we'll fly through the

13  other issues.  So, on personal jurisdiction, I think I

14  have three brief points to make in rebuttal.

15            First, I just want to re-emphasize what

16  we said in our papers and your argument, which was that

17  these comments were aimed at California, A.G. Bonta's

18  comments, or at least aimed nationwide.  They described

19  the filing on a California lawsuit on behalf of the

20  people of California, A.G. Bonta's bosses.  The missile

21  image that my friend displayed, ballistic missiles

22  firing in Texas, I think that misstates what happened.

23  And to use their metaphor, there was a missile fired

24  everywhere, California, wherever A.G. Bonta's comments

25  were, broadcast on national media, they were sent

1    around the country.  The only thing that makes Texas

2    special, as our briefing demonstrated, is that where

3    ExxonMobil felt the harm.

4           THE COURT:  Did Mr. Bonta, Attorney General

5    Bonta make any comments about any of the competitors of

6    Exxon?

7           MR. SETRAKIAN:  Not to my knowledge, and

8    certainly not of the ones noticed in the Complaint, as

9    far as I know.

10           THE COURT:  Okay.

11           MR. SETRAKIAN:  And I'll also submit that the

12    plaintiffs, the ultimately unsuccessful plaintiffs, in

13    any of the Fifth Circuit cases we cited could have

14    generated an identical image.  The plaintiff in *Johnson*

15    *v. Huffington Post,* who as allegedly defamed as a white

16    nationalist, could have made the same image:  "Hey,

17    look, Huffington Post, shot a missile into Texas by

18    discussing me, a Texas resident."  And in all of those

19    cases, including *Walden v. Fiore* from the U.S. Supreme

20    Court, the Court found no specific personal

21    jurisdiction.

22           Second, my friends on the other side

23    argue over personal jurisdiction because of the sources

24    of some of A.G. Bonta's comments.  Now, I was surprised

25    to see this argument because it did not appear in the

1  briefing.  The case cited called *Herman v. Cataphora,*

2  that was not cited in the briefing.  I admittedly

3  cursively reviewed the papers over the break and I did

4  not see any reference to the sources, **(?)** jurisdiction.

5  I think that argument thus was forfeited.  I wasn't

6  ready.  I'm not prepared to address it.  But that is

7  not a problem for me because the issue again was

8  forfeited, and so it cannot inform this Court's

9  decision.

10            Finally, very briefly, I just wanted to

11 make a policy observation.  My friends on the other

12 side cited comments A.G. Bonta made about subpoenas

13 that were issued as part of this investigation.  That

14 is commonplace for Attorneys General who are announcing

15 the results of investigations, mentioning the fact that

16 subpoenas were used to gather evidence made.  That, it

17 seemed to establish personal jurisdiction wherever any

18 of these subpoenas were sent, the Attorneys General in

19 all 50 states and the District of Columbia would be

20 subject to jurisdiction all across the country anytime

21 they announce the results of an investigation.

22            I can answer any questions.  Otherwise,

23 I'll move us along the carousel of counsel.

24            THE COURT:  All right.  Well, that's fine.

25            MR. SETRAKIAN:  Thank you, Your Honor.

```
 1              THE COURT:  Thank you.
 2              MR. GANT:  Scott Gant for Sierra Club, Your
 3    Honor.  A few quick points in response to Exxon's
 4    arguments regarding personal jurisdiction.
 5                   Mr. Cash, would you please bring up the
 6    slide.  We discussed it at the break.  I asked him to
 7    put up the slide for Sierra Club that he used.
 8              THE COURT:  Sure.
 9              MR. GANT:  And Mr. Cash also agreed to provide
10    us with copies of the slides they used today after
11    today's hearing.
12              MR. GANT:  Okay.  Thank you.  There it is.
13                   So, first, I read this quickly when it
14    was flashed on the screen before.  I'm looking at it
15    quickly again now.  With respect to Sierra Club, as I
16    mentioned earlier --
17              THE COURT:  I think we're off the --
18              MR. GANT:  Well, I'll make the point and
19    then --
20              THE COURT:  Well, if you want it -- there it
21    is.  Okay, go ahead.
22              MR. GANT:  I didn't see earlier and I don't
23    see now with a quick scan, any mention of advanced
24    recycling.  I made this point earlier with respect to
25    Sierra Club that you really -- again, I made this point
```

1  earlier.  This is a defendant specific and claim

2  specific inquiry with respect to personal jurisdiction.

3  Exxon is making a big point, well, our advanced

4  recycling is here, therefore your statements are

5  directed here.  Now, that's wrong for many reasons, but

6  it also fails the premise out of the gate that we made

7  any statements about advanced recycling.  I don't see

8  that appearing anywhere here.  So that's the first big

9  point.

10            Second point.  Mr. Cash made an argument

11  about interactivity and said, well, Sierra Club is

12  soliciting funds on its website, therefore it must be

13  subject to jurisdiction under the Fifth Circuit case

14  law.  Again, I refer you to Huffington Post, and we

15  actually made this point in our reply brief.  On page 2,

16  footnote 1, we made the point that Huffington Post

17  rejects the notion that using your website to raise

18  funds subjects you to jurisdiction on its own.  And let

19  me read a quick quote from Huffington Post, which is at

20  page 320 from Huffington Post, Fifth Circuit.

21            "the only reason to hail Huff Post into

22  Texas is that Texans visited the site, clicking ads and

23  buying things there.  But as far as Johnson, the

24  plaintiff has alleged, those visits reflect only Huff

25  Post's universal accessibility, not its purposeful

1    availment of Texas.  Accessibility alone cannot sustain

2    jurisdiction.  If it could, lack of personal

3    jurisdiction would be no defense at all."

4            Same point here, countervailing this

5    notion that raising funds on the Sierra Club website is

6    enough to subject us to jurisdiction.

7            Finally, on the point about partnership

8    and coalition, there was -- and if you have that slide

9    accessible, I would be grateful if you could put it up.

10           So Exxon conceded there is no such thing

11   as conspiracy, personal jurisdiction.  So, instead,

12   Mr. Cash said, well, if it's a partnership or a

13   coalition, then this is kind of a back door or a

14   substitute for conspiracy.  Now, that's what I was

15   looking for.  The source here is paragraph 49 of

16   Exxon's Complaint.  That paragraph makes extremely

17   clear, what it's talking about is a so-called

18   partnership or coalition to file the California

19   lawsuits.  Let me read verbatim from paragraph 49.

20           "Indeed, there can be no question that

21   Cotchett, the plaintiff's law firm, through its NGO

22   lawsuit, and Bonta through his lawsuit, are working

23   together."

24           This language about partnership or

25   coalition, to the extent that it's made -- and by the

1  way, I didn't see any statements made by Sierra Club

2  calling it that.  I saw him attributing that to the

3  lawyers for Sierra Club and others.  But even leaving

4  that aside, this is about filing the lawsuit.  And one,

5  that's protected.  And two, going to the point we

6  discussed earlier, there is a failure to disaggregate

7  problem.  They're saying there's a coalition or a

8  partnership to file a lawsuit, which is protected

9  activity.  And then they want to use that to bootstrap

10  some kind of collective personal jurisdiction over the

11  defendants.  That's inconsistent with the case law.

12          Unless you have questions for me, Your

13  Honor, I'll pass the baton.

14          THE COURT:  No, that's fine.  Thank you.

15          MR. GANT:  Thank you.

16          MR. HEMPHILL:  Your Honor, Jim Hemphill for

17  the Surfrider Foundation.  I would just like to echo

18  what Mr. Gant said about no statements up there.  Some

19  of these statements we're seeing for the first time in

20  connection with Surfrider, still none about advanced

21  recycling.  So I kind of made that a point in my

22  initial presentation.  I'm still not saying anything

23  about advanced recycling.

24          And I think that when counsel for

25  ExxonMobil talks about, well, we do plastics here, we

1   do, we create the plastics here, we do advanced

2   recycling here, we do all of these things here, that is

3   a clever, but still fairly transparent repackaging in

4   an attempt to say, if the harm is suffered in the

5   state, then there is jurisdiction over the defendant in

6   the state, and that is not the law.  There has to be

7   more than harm, there has to be a targeting, a knowing

8   and intentional targeting of the state by a defendant

9   for there to be personal jurisdiction.  And we think

10  that's completely absent here.

11          THE COURT:  So, in answer to my question

12  earlier about firing of the gun across the Sabine

13  River, does a tort occur where the injury is?

14          MR. HEMPHILL:  A tort can occur where the

15  injury is if the conduct is directed specifically to

16  that venue, and I think that's the question.

17  Certainly, if there's an intentional shooting from

18  Louisiana into Texas --

19          THE COURT:  Or negligent.

20          MR. HEMPHILL:  Or negligent, aimed at Texas,

21  then yes.  But the analogy here in a defamation case

22  with an out-of-state defendant is you have to look at

23  the content of the statement, and was that statement

24  specifically, knowingly, aimed directly at the forum

25  state.  And the way we answer that is we look at the

167

1  content, the subject matter, the crux of the statement,

2  and the sources.  And I think, as I said before and I

3  won't repeat, when we were talking about the statements

4  that Surfrider made -- and I believe all of the

5  additional statements that were shown on that slide

6  were also from the same press release, which, again,

7  never was distributed into Texas at all.  Those are

8  statements about the California allegations and the

9  California lawsuit under California law, and it was not

10  specifically into Texas.

11         THE COURT:  Well, maybe not aimed at Texas.

12  Let me refine my hypothetical.  Let's say you've got

13  two individuals.  The guy in Louisiana is named Cain

14  and the guy in Texas is named Abel, and he's after him.

15  And he intentionally pulls that trigger to shoot Abel.

16              Where did that tort occur?

17         MR. HEMPHILL:  I think the tort -- under that

18  hypothetical, I think you can make the argument that,

19  for personal jurisdiction purposes, the actor, the

20  defendant, the one who pulled the trigger, would be

21  subject to personal jurisdiction in either Louisiana

22  or Texas because there was more literally an aiming of

23  the tortious conduct at Texas, either intentionally or

24  negligently.  I don't think we have that here.

25         THE COURT:  Okay.  I appreciate that.  Thank

 1  you.

 2           MR. HEMPHILL:  Thank you.

 3           THE COURT:  Anything else?

 4              Okay.

 5           MR. MATZ:  Your Honor, if I just --

 6           THE COURT:  You're ready to go to the next

 7  subject?

 8           MR. MATZ:  I was going to talk about this one,

 9  but --

10           THE COURT:  Okay, go ahead.

11           MR. MATZ:  The good news about the next one is

12  I'm probably going to rest on my papers for at least

13  the opening part.  So this is on the specific

14  jurisdiction.  I'm Joshua Matz for the Justice, the

15  Justice Fund.  I had three quick points.

16              The first is about the line between what's

17  possible and what's plausible, which I thought was

18  nicely illustrated by their choice to center their

19  presentation on a fictional screenplay about a mob boss

20  that sends agents to kill people.  You know, this case

21  is not a screenplay; right?  And *Iqbal* and *Twombly*

22  require more than that.  They require that you show

23  that it is plausible that you we did the thing that

24  supposedly ties us to jurisdiction in Texas, especially

25  when you're talking about an entity that's literally on

1  the other side of the world and thinking about what

2  that means in terms of being caught up in a case.

3           And the thing that they have to show

4  that's plausible -- and this is my second point -- they

5  need to show it's plausible that we controlled, that

6  the non-profits were our agents in the making of the

7  out-of-court statements.  He put up on the screen, as

8  though it were a confession, the statement in our

9  brief that sometimes agency can support personal

10  jurisdiction.

11           And, of course, we agree with that.  The

12  Supreme Court said that in the **(?)** case and in the

13  *Walden v. Fiore* case.  That's black letter law right

14  there.  Sometimes, if you act through an agent, the

15  agent's conduct as it relates to the subject of the

16  lawsuit can create jurisdiction.

17           So the real question here is whether the

18  conduct at issue in the lawsuit, which is conduct

19  outside the California case, right, these out-of-court

20  statements or the ones that are at least described as

21  out-of-court statements, whether we controlled those,

22  and controlled them in a fine-grained way, not that we

23  thought they'd be nice, but that we were involved in

24  the making or directing the making of them, that we

25  controlled the non-profits' making of them.

170

1          And this leads to the third point, which
2    is on that front they've just got nothing.  They've got
3    nothing.  You know, they point to -- the sort of one
4    thing they point to is a letter -- a sentence in the
5    FARA letter, on page 7 of the letter, in which the DOJ
6    characterizes the agreement as one in which the
7    California firm would initiate and then prosecute the
8    case under the direction and control of the Justice
9    Fund.  And even reading that for all it's worth, it
10   doesn't suggest that we have anything to do with
11   statements that the parties in the case made outside of
12   the case.
13          And even giving that sentence full
14   attention, which is the only thing that they actually
15   put in front of Your Honor here, the reality is it's
16   inconsistent with the actual engagement letter that he
17   then put up on the screen next, which did not include
18   any term suggesting that kind of direction or control
19   over the case.  And as I noted earlier, that would be
20   inconsistent with the rest of the FARA opinion, which
21   is very clear that, as to the out-of-court public
22   statements that these non-profits are making, our
23   funding to the firm to support the case has nothing to
24   do with that.
25          And with that I'll just quickly mention,

1   as we pivot to the 12(b)(6) portion of our case, that

2   we are prepared, at least as to the opening

3   presentation, to rest on our papers for that.

4           THE COURT:  All right, thank you very much.

5                 All right, next.

6           MR. SETRAKIAN:  Afternoon, Your Honor.  At

7   this point I'm going to quickly discuss A.G. Bonta's

8   immunity arguments in his Motion to Dismiss.  I trust

9   this will not take too much of the Court's time.

10          THE COURT:  Let me ask you one question.  Is

11  A.G. Bonta above the law?

12          MR. SETRAKIAN:  No, Your Honor.  A.G. Bonta is

13  not above the law.

14          THE COURT:  So, if he commits a tort in his

15  individual capacity, he could be held personally

16  liable?

17          MR. SETRAKIAN:  If A.G. Bonta commits a tort

18  in his individual capacity, of course, he can held

19  individually liable.

20          THE COURT:  Okay, keep going.

21          MR. SETRAKIAN:  Now, before I dive into

22  official immunity, I wanted just to close one loop on

23  personal jurisdiction regarding the analogy of aiming

24  the gun across the river from Louisiana to Texas.

25                 My friend on my side's answer may be

 1   correct as to that case of someone shooting a physical

 2   gun from one state to another.  But, as to defamation

 3   broadcast nationally, it is our position that there

 4   would only be jurisdiction in Louisiana where the

 5   speaker uttered the phrase, assuming that is what

 6   happened in *Johnson*.  The plaintiff, Texas resident,

 7   alleged he was injured by a rhetorical gun that was

 8   fired from another state.  But there was no

 9   jurisdiction in Texas because the only connection to

10   Texas was that was where he was when he was struck by

11   the rhetorical bullet.

12                Let me turn now to official immunity.

13   Now, before getting into the specific bodies of law,

14   California and Texas, I'm going to briefly preview A.G.

15   Bonta's -- or review A.G. Bonta's authority.  The

16   California A.G., of course, runs the D.O.J. and

17   enforces state law.  But he also has a common law duty

18   to tell his constituents what he is doing on their

19   behalf.  And recognize that this duty benefits those

20   who agree with the A.G. and those who do not, because

21   it insures that the A.G. is transparent about how he is

22   conducting the public business.  The statements

23   identified here fulfilled this duty.  A.G. Bonta

24   explained his office was suing ExxonMobil and he gave

25   that suit's grounds.

```
 1              Now, let's turn to why that protects A.G.
 2   Bonta under either California or Texas law, under both.
 3   Under California law, an official acts in his
 4   employment scope if he does work he was employed to do
 5   or acts intimate to those duties.  Here, like I said,
 6   A.G. Bonta was explaining the work his office was
 7   doing, giving the grounds in a suit he was filing on
 8   the people's behalf.  And it does not matter if he
 9   allegedly also harbored a politicking interest while
10   making those statements.
11              So, for example, California Courts have
12   immunized an elected attorney who spoke at a democratic
13   club dinner about litigation that his office had
14   initiated, even though he used "florid language" to
15   describe the suit.  And why?  Well, because he had the
16   authority to give his opinion regarding the
17   justification for and the merits of that litigation.
18   That's the Tutor-Saliba case.
19              And California's Supreme Court immunized
20   an A.G. who, at a press conference, read a list of
21   individuals allegedly involved in organized crime and
22   was sued by one of the listed individuals for allegedly
23   defaming him.  Now, the plaintiff there argued that the
24   A.G.'s speech was politically motivated, that he's
25   acting as a candidate, not as a law enforcement
```

1  official.  That allegation may sound familiar, but the
2  California Supreme Court deemed it without merit
3  because the remarks concerned law enforcement issues.
4  That's *Kilgore v. Younger* case, again in our briefing.
5  Those suit cases match what A.G. Bonta did here.

6          And finally, I want to note the underlying
7  policy, that immunity here protects office-holders and
8  citizens alike from the threat of suit constraining
9  officials' ability to do their jobs, including
10 describing the job that they are doing.

11         And I think as one sort of example of how
12 an Attorney General's comments describing his work
13 could lead to lawsuits, you hear the lawsuit alleges
14 deceptive trade practices, false statements, things
15 like -- deceptive trade practices and things of that
16 nature.  But when you asked my friend on the other side
17 what's the California lawsuit about, he said, "They are
18 suing us because they say that we lied."  That is a way
19 to, in a common parlance, explain what the allegations
20 are in that suit.  Now, the legal term is deceptive
21 business practices.  But a more colloquial way to
22 express the same sentiment is to say that we're saying
23 that the defendant in this suit has lied to you.

24         Let me see.  Okay, one point on a
25 pro-incumbent imbalance that my friend on the other

 1  side expressed could arise if A.G. Bonta were

 2  immunized, but a challenger for the Attorney General's

 3  seat were not similarly (?). Government immunity

 4  treats some defendants differently.  It's a bedrock

 5  immunity principle.  One could always ask why an

 6  immunity-receiving defendant did not have to face suit

 7  when someone similarly situated, except by virtue of

 8  not having the immunity, did have to face suit.  But

 9  that policy critique of immunity has no place in this

10  Court's decision on the Motion to Dismiss.

11          But, to give a policy rationale, in case

12  the Court would like one specific to the official

13  context, I think it would be reasonable for a state

14  legislature or a court to say that an elected official

15  facing constraints on what he can and can't say

16  relating to his business may have downstream costs on

17  the public; versus an individual who faces defamation

18  liability, you know, there's the usual trade-off

19  imposing defamation liability on anyone, but those

20  trade-offs may be less severe for an individual.

21          Let me turn now to Texas law just briefly.

22          First, I want to note one thing about

23  Texas law's application.  My friends on the other side

24  argue that Texas' statutory immunity covers only Texas

25  officials.  If the Court is inclined to adopt that

1   reading, that would counsel strongly, we submit, in

2   favor of applying California law because it would show

3   that Texas law does not contemplate this situation.

4   Adopting the position that Texas law applies and thus

5   that office holders from other states have no immunity

6   for even conceitedly official conduct will create

7   nonsensical results for foreign office-holders in Texas

8   and risk the same for Texan office holders elsewhere.

9            I mean, just to put a pin on that, you

10  know there's been a lot of discussion in the pleadings,

11  and I expect there will be when my friend argues about

12  whether A.G. Bonta actually was acting officially, or

13  whether he was trying to fundraise or trying to

14  campaign.  But under my friend's reading of Texas law,

15  none of that would matter.  They could sue a California

16  official, a Maine official, a Tennessee official, for

17  conceitedly official conduct.  Say a governor is signing

18  a bill that interferes with allegedly Texas' contract;

19  and if that governor showed up in his personal capacity

20  and said, "Well, I was signing a bill," they'd say,

21  well, unfortunately for you, Texas Statutory Immunity

22  does not cover you.  You can stand suit just like any

23  person off the street.

24           I think the Court recognizes the violence

25  that would do to our federalist system, and the risks it

1   would expose Texas office holders to, if they were sued

2   in foreign jurisdictions.

3              Just briefly to cover Texas law, in Texas

4   the official conduct inquiry looks for a connection

5   between an employee's job duties, it can be alleged

6   tortious conduct.  As already said, A.G. Bonta was

7   describing litigation advanced by his office placing

8   him neatly within that framework.  That entitles him

9   to dismissal under Texas law for a statutory and a

10  common-law reason.

11             Looking at the statute, Texas law requires

12  someone suing a Government official who acted in the

13  "general scope of his employment," to sue that official

14  in his official capacity.  Personal capacity suits must

15  be immediately dismissed.  And this procedure does

16  apply in federal court and so should be applied here.

17             Turning to common law, Texas offers

18  immunity if the actions were discretionary, were within

19  the scope of an employee's authority, and were taken in

20  good faith.  Here, the acts were discretionary.  No one

21  ordered A.G. Bonta to make these statements there

22  within the scope of his authority, the A.G.'s authority

23  to bring lawsuits and comment on them.

24             And he acted on good faith.  Under Texas

25  law, this requires showing that a reasonably prudent

1   employee couldn't believe his conduct was justified.

2   And there's a pleading requirement to plead in good

3   faith, that I think my friends on the other side have

4   not satisfied, at least in this situation of their

5   Complaint.  Per *Hunt v. Texas,* a case from this

6   judicial district, a Complaint cannot base itself on

7   just a plaintiff's perceptions, as opposed to a

8   reasonable supervisor, or a reasonable observer is how

9   I think about it in this context where there is no

10  supervisor.

11          And that's what happened here.  ExxonMobil

12  based its Complaint entirely on the perception that

13  A.G. Bonta, when he calls them a liar for engaging in

14  the alleged conduct, that he's defaming him because the

15  things he's saying are false.  It never considered how

16  a reasonable person may have viewed the suit by

17  considering the allegations in A.G. Bonta's state law

18  Complaint.

19          One final note on state law immunity on

20  Section 1983.  My friends on the other side cite several

21  cases, both in Section 1983 or other federal causes of

22  action.  Now, they could have tried to sue under

23  Section 1983, and they instead sued under state law.

24  Now, that choice has consequences.  Section 1983

25  concerns deprivation of federal rights, not state

 1   rights, rendering its conclusion applicable here.  And

 2   section 1983 carries with the potent defense, of

 3   course, of federal qualified immunity, something that

 4   we have not asserted in this case, but assuredly would

 5   have had ExxonMobil brought a cause of action under

 6   Section 1983.  So I think this Court should not import

 7   Section 1983 principles into this case.  Or if it does,

 8   it should also import the federal qualified immunity

 9   defense for A.G. Bonta.

10          THE COURT:  I have a -- this is more of a

11   curiosity than anything.  In politics, a lot of

12   politicians say a lot of very bad things about each

13   other, a lot of slanderous things about each other.  To

14   what extent does a politician have license to do that?

15          MR. SETRAKIAN:  I think, as relevant to this

16   case, a politician has license to do it if it comes

17   within the scope of his official duties.  I mean, I

18   think if A.G. Bonta had, to offer an example, because

19   my friends on the other side will say that that is

20   indeed what happened here.  But I think that, you

21   know, the doctrine that would be the concept you just

22   described --

23          THE COURT:  Well, he has First Amendment

24   rights.

25          MR. SETRAKIAN:  That's right.  But the concept

1  described sort of sits beneath official immunity.

2  Official immunity protects office holders --

3          THE COURT:  And the slander laws are a

4  restriction on First Amendment; wouldn't you agree?

5          MR. SETRAKIAN:  Well, if it meets certain

6  requirements set down by the U.S. Supreme Court, that's

7  right.  But official immunity is not abridging anyone's

8  First Amendment rights.  I mean, it's expanding --

9          THE COURT:  I wasn't talking about the

10  immunity issue.  I'm focused on other things.

11          MR. SETRAKIAN:  Okay.

12          THE COURT:  He's a political figure.  A lot

13  of political figures say whatever they want to say.

14  Someone could run against him and say, "He's not doing

15  enough to attack Exxon because they are a bunch of

16  thieves," or whatever they want to say about them.

17          MR. SETRAKIAN:  Of course.

18          THE COURT:  And the candidate -- he's a

19  candidate; right?  I see it all the time.

20          MR. SETRAKIAN:  A candidate in those

21  circumstances, yeah, like I discussed earlier, would

22  not have the same official immunity protections as

23  A.G. Bonta.  I mean, that's right.  I think that

24  gets --

25          THE COURT:  So it would be the advantage to the

```
 1   incumbent.  I'm not -- I'm talking --
 2              MR. SETRAKIAN:  Sure.
 3              THE COURT:  Because I have to think about the
 4   next case that comes before me.
 5              MR. SETRAKIAN:  As I mentioned earlier, you
 6   know, official immunity offers a benefit to officials
 7   that non-officials do not have.  I mean, this is the
 8   same for a police officer who deploys legal force who
 9   receives immunity in a way that someone defending their
10   home via lethal force may not.  And so that doesn't
11   make any sense, that's not fair.  Why is it the case
12   that one person gets immunity even if they're alleged
13   to have broken the law, but someone else does not
14   receive that same immunity?
15              And I think that reasoning from first
16   principles, we could reach different conclusions on
17   that.  But, I think the Supreme Court, the Fifth
18   Circuit, the legislatures of California and Texas have
19   elected an answer on those questions.
20              THE COURT:  Okay.
21              MR. SETRAKIAN:  I'm sorry, I thought Your Honor
22   had a --
23              THE COURT:  No, I understand what you're
24   saying.
25              MR. SETRAKIAN:  And so I think that this one --
```

 1  as I mentioned, on a Motion to Dismiss, I think that

 2  these genuinely very interesting questions about what

 3  the proper scope of immunity should be are not before

 4  the Court.  And instead, the question is:  Do these

 5  comments fall within these doctrines of immunity that

 6  exist?

 7          THE COURT:  Okay.

 8          MR. SETRAKIAN:  I suppose I need to close out

 9  on immunity quickly, I mean like 45 seconds, to discuss

10  the 11th Amendment.  The 11th Amendment also bars this

11  suit.  It prohibits suits against state officials that

12  effectively target the state.  Naming an official in

13  its individual capacity does not sidestep the 11th

14  Amendment.  Instead, the resolution depends on "the

15  circumstances of the case."  That's when the Fifth

16  Circuit in 2022 in the **(Stramowski)** opinion.  Here, the

17  State of California is the real party in interest, and

18  there are two reasons why.

19          First, this suit targets official conduct.

20  As I discussed, A.G. Bonta was explaining where

21  litigation his office had advanced and giving that

22  lawsuit grounds.

23          And second, A.G. Bonta would be

24  indemnified from judgment here because, again, he was

25  acting within his individual capacity.

1          So you have two separate effects on state

2   functioning, both with the ability of state officials

3   to describe their work, and a literal attack or effect

4   on the state's fisc.

5          ExxonMobil, in response, cites two cases,

6   holding that those two pillars individually do not

7   confer 11th Amendment immunity.  But that is not our

8   argument.  We argue these two facts together support

9   granting 11th Amendment immunity here.

10          One final point.  If the Court's inclined

11   to apply Texas law, recognize that there are some road

12   blocks by my friends on the other side in Texas law

13   that might not apply to A.G. Bonta as a non-state

14   official, or that good faith might not be resolvable

15   with a Motion to Dismiss.  Those road blocks do not

16   exist in the 11th Amendment context, and this Court

17   would still need to perform an immunity analysis on

18   A.G. Bonta, pursuant to the 11th Amendment.

19          I'm happy to answer any questions the

20   Court has.

21          THE COURT:  No, you've done fine.  Thank you.

22          MR. SETRAKIAN:  Thank you, Your Honor.

23          THE COURT:  All right.  Response, I think so,

24   yeah.

25          MR. CASH:  I have a PowerPoint, but in the

1  interest of time, I don't need it and I won't use it.

2  I'm just going to cut to the chase --

3          THE COURT:  Well, if it helps, you go ahead.

4          MR. CASH:  No, I'll rest on our papers on

5  everything else.  But candidates don't have qualified

6  immunity, so let's just go to that.

7              Bonta sent e-mails to Texas soliciting

8  campaign funds from Texans, using his attacks on Exxon

9  as bait.

10          THE COURT:  And under California law,

11  according to the papers, he can't do that in his

12  official capacity?

13          MR. CASH:  It is illegal.

14          THE COURT:  It's illegal.  Got that.

15          MR. CASH:  It is illegal for him to -- it is

16  not the job of the Attorney General to run for Attorney

17  General or Governor.  So he's raising campaign funds.

18  I am giving him the benefit of the doubt, saying he was

19  doing it as an individual and not breaking the law.  If

20  he's doing it as an individual and you go to his

21  private social media, it links to his campaign, which

22  links to donations, and it also contains the statements

23  against us.

24              So the statements against us that were

25  part of his campaign, which are all the statements he's

1  made because he links to them, no protection, not under

2  the 11th Amendment.  We're not suing California, we're

3  suing Rob Bonta.  And I don't want California to write

4  the check.  I want Rob Bonta to.  So we are looking to

5  him individually.  We sued him individually.  What he

6  did as a candidate cannot have immunity.  It cannot be

7  protected.  It's beyond he was politicking.  This was

8  him soliciting funds, which he's not allowed to do.

9            So the immunity argument fails, Judge.

10           THE COURT:  All right.

11           MR. SETRAKIAN:  Very briefly.

12           THE COURT:  All right, very good.

13           MR. SETRAKIAN:  Yes.  So thanks, Your Honor.

14  Will Setrakian for A.G. Bonta.

15           As our reply brief demonstrates,

16  California's Incompatible Activities Law that my friend

17  is describing applies only to those employees of the

18  executive branch who are not elected to office.  So

19  that law does not cover A.G. Bonta, him being an

20  elected official.

21           Concerning my friend's allegation that

22  A.G. Bonta harbored a campaigning interest, this is the

23  exact argument that the California Supreme Court

24  rejected in Kilgore, where someone said:  You're not

25  acting as a law enforcement official because you're

1   trying to paint yourself as a real tough guy on crime.

2   You're trying to paint yourself as a cop who's going to

3   send people to jail, and the California Supreme Court

4   was having none of it.

5           THE COURT:  Was that in campaign literature or

6   campaign e-mails, webpage, and things like that,

7   Facebook, whatever?

8           MR. SETRAKIAN:  Well, first, I think the

9   exhibits that are --

10          THE COURT:  No, in the case.

11          MR. SETRAKIAN:  In *Kilgore v. Younger,* the

12  speech was made at a press conference, comments made at

13  a press conference.

14          THE COURT:  Was he raising money for his

15  campaign?

16          MR. SETRAKIAN:  Well, in *Tutor-Saliba* I think

17  the comments happened at a dinner that I am almost

18  certain was a fundraising event given what I know about

19  the San Francisco Chinese-American Democratic Club.

20              I will note that my friends on the other

21  side have offered no California or Texas authority

22  giving a meaningful distinction to the form in which

23  remarks are made.  And to the contrary, of course, I

24  think *Tutor-Saliba* counsels the opposite.

25              And I also will say that Your Honor can

1  see the exhibits to the Complaint.  These statements

2  that A.G. Bonta issued on social media and e-mails,

3  they identify what he's discussing as the work of the

4  Attorney General's Office, and both of the pages

5  identify him as California's Attorney General.  And the

6  comments say:  Essentially, this is a suit that my

7  office has brought, my office is bringing this

8  litigation.

9           I have the sense Your Honor has another

10  question.  I'm happy to answer it.

11          THE COURT:  No, I think I understand what

12  you're saying.

13          MR. SETRAKIAN:  Thank you, Your Honor.

14          THE COURT:  It is of interest that from kind

15  of what you're saying is, okay, as long as he's an

16  official with the Government, he's immune.  There are

17  things he can do as an individual where he wouldn't be

18  immune.  But, if he still goes on his campaign webpage

19  to raise money in his political effect, but he cloaks

20  himself with "I am the Attorney General, I get to bear

21  the benefit of immunity," unless you say somebody -- I

22  don't care, you know, I'm not involved in politics.

23  But in California, if somebody's running against him in

24  California for the same position, that person could get

25  whacked with a lawsuit using the same verbiage, but

1  without -- it benefits the incumbent; does it not?

2         MR. SETRAKIAN:  I want to start by going back

3  to the duty I began my remarks by saying, which is A.G.

4  Bonta has a duty to explain to the public --

5         THE COURT:  On his campaign webpage where he's

6  raising money?

7         MR. SETRAKIAN:  That is a forum in which he

8  can make those statements, yes.  I mean, he was talking

9  about things that he did.  I also will say, I mean,

10  these decisions do not come from a campaign page on

11  which he is raising money.  It is true that one of the

12  e-mails or one of the documents, as an e-mail, gives a

13  summary of the case.  When my office brought this case,

14  it says X, Y, and Z.  And then below is Sincerely, Rob.

15  And then below that there is a link that travels to a

16  page where I understand donations can be accepted.

17         THE COURT:  Does it also contain that Exxon --

18  I forget -- is a liar or something?

19         MR. SETRAKIAN:  I'm not -- between all the

20  documents, I'm not sure.  I mean, that is, I think, a

21  fair characterization of the allegations of the suit.

22  Yes, it's saying that ExxonMobil offered deceptive,

23  made deceptive statements regarding advanced

24  recycling's efficacy.

25         THE COURT:  Okay.

1          MR. SETRAKIAN:  And then turning back to the

2    incumbent --

3          THE COURT:  I want to -- not to interfere, but

4    I want to -- factually, what is it saying there?

5          MR. CASH:  Your Honor, I think what it does is

6    it does exactly what Will said, what my friend on the

7    other side says it does.  It links to the -- it links --

8    but then it links to all of these other things that are

9    where all these statements are.  So it doesn't put it on

10   the page.  It just gives you a button to push to --

11         THE COURT:  Okay, okay.  All right, okay.

12   Interesting.

13         MR. SETRAKIAN:  I'm sorry, if I may just sort

14   of make one final sort of policy, because Your Honor

15   mentioned the pro-incumbent imbalance possibly here and

16   the policy ramifications of that, which I agree exists,

17   but I just want to counsel --

18         THE COURT:  Well, I'm not here to decide who

19   should be elected Attorney General of California at all.

20   I just want to know to what extent the immunity applies

21   and when does an elected official lose the protection

22   of that immunity.  I think that's really the question.

23         MR. SETRAKIAN:  Certainly.

24         THE COURT:  And I don't even mean it with

25   regard to A.G. Bonta.  I mean it just for anybody.

1  Because the next case that comes along may involve, I

2  don't know, somebody running for mayor or whatever.  I

3  don't know.

4          MR. SETRAKIAN:  Or a member of this state.

5  So like they're being sued in another jurisdiction.

6          THE COURT:  Yeah.

7          MR. SETRAKIAN:  And so I think that I would

8  just refer back to how it began, which is that there is

9  a duty to inform the public of how the A.G. is managing

10 their business.  And these remarks, although allegedly

11 florid, to use *Tutor-Saliba's* language, fulfilled that

12 duty.

13         THE COURT:  Okay.

14         MR. SETRAKIAN:  Thank you, Your Honor.

15         MR. GANT:  Your Honor, Scott Gant for Sierra

16 Club.  If the Court's ready, we're prepared to move to

17 the hopefully last set of discussion regarding 12(b)(6).

18         THE COURT:  Are we ready to do that, everybody?

19 Okay.

20         MR. GANT:  And what we would civically propose

21 in the interest of time is all the defendants are

22 prepared, in lieu of our opening remarks to rest on our

23 papers, hear from counsel for Exxon, and then give a

24 reply.  Is that acceptable, Your Honor?

25         THE COURT:  It's acceptable to me if you feel

1  comfortable with it.

2          MR. GANT:  We do.

3              Is that agreeable to Exxon?

4          MR. CASH:  Yes.

5          MR. GANT:  Okay, thank you, Your Honor.

6          THE COURT:  Mmm-hmmm.

7          *[Pause]*

8          MR. CASH:  We're just trying to figure

9  something out --

10         THE COURT:  All right.  This is an officials'

11  time out.

12         *[Pause]*

13         MS. GONSKI:  Your Honor, good afternoon.

14  Kathryn Gonski on behalf of ExxonMobil.

15         THE COURT:  Glad to have you.

16         MS. GONSKI:  Thank you for allowing me to be

17  here.  I've been waiting all day.  But in light of

18  today, in light of the defendants deciding to rest on

19  their papers, in light of everything we've discussed,

20  with respect to how well-aware the Court is on the

21  standard of a Motion to Dismiss at the 12(b)(6) stage,

22  we're also going to rest on our pleadings.

23             Thank you, Your Honor.

24         THE COURT:  Well now, that doesn't seem fair

25  because you came prepared for an argument.  I don't

1    want to --

2            MS. GONSKI:  And I appreciate that.

3            THE COURT:  How long have you been practicing?

4            MS. GONSKI:  I have been practicing.

5            THE COURT:  How long?

6            MS. GONSKI:  Everything I would have said in

7    my presentation, we've covered an nauseum.  We've talked

8    about --

9            MR. CASH:  He asked how long you've been

10   practicing law.

11           MS. GONSKI:  Oh, how long I've been practicing

12   law, I'm sorry.  I'm thinking about my presentation.

13   I have been practicing since 2010

14           THE COURT:  That's great.  Well, I'm glad to

15   see you're here.  I love to see lawyers in court.  I

16   appreciate that you are letting her participate in

17   this because --

18           MR. CASH:  She's the smart one, Your Honor.

19           THE COURT:  I understand that.  So many times

20   I see -- I've seen your partner getting all these

21   questions.  I want to say, will you please stop and let

22   your younger associate or partner try the case?

23   Because, obviously, she knows more about the case than

24   you do.  And I like to see lawyers get in the game.

25   And I worry when I see lawyers who don't get the

1  opportunity to make arguments in court or to present

2  evidence.  And all of you all have done a tremendous

3  job.  I'm going say that this case will not be decided

4  on, shall we say, any one lawyer not being adequately

5  prepared or the weakness.  Everyone on both sides, all

6  sides, have done a tremendous job.  And I was looking

7  forward to hearing your performance.  That's the only

8  reason why I say that.

9        MS. GONSKI:  Well, thank you, Your Honor.  And

10  I can say that if we keep the case here and if all the

11  defendants' motions are denied, I would love the

12  opportunity to come back and argue before you again.

13        THE COURT:  Okay.

14        MS. GONSKI:  Thank you.

15        THE COURT:  She may be running for something

16  someday.

17        **[Laughter]**

18        MR. NELSON:  I've just got one thing, Your

19  Honor.

20        THE COURT:  Yes, of course.

21        MR. NELSON:  This is not about this.  I know

22  you can't trust anybody who's a lawyer, but I'll try to

23  do the best I can.  My father used to say, "The last

24  man I trusted is now living with my ex-wife."

25              The only thing I wanted to say, Your

1  Honor, with regard to the first filed, we would refer

2  the Court to the **(?)** case and also to -- is it

3  pronounced **(?)**?  It was the case that you wrote.  You

4  wrote the opinion on it.

5          THE COURT:  I can't remember how to pronounce

6  it, but anyway.

7          MR. NELSON:  Well, we would just refer to

8  those two, and then the other case we refer to is

9  *Columbia Pictures v. Schneider,* 435 F.Supp 742.

10          And that's all I wanted to say, Your

11  Honor, because my counsel in California is going to ask

12  why I didn't make the argument, and now I can tell him

13  I did.

14          MR. CASH:  Your Honor, one thing, and I'm not

15  going -- our paperwork talks about the first filed.

16          THE COURT:  Go ahead and get on the

17  microphone.  It would be a little better.

18          MR. CASH:  Mike Cash, again, Your Honor.

19          I'm not worried about responding to the

20  first filed.  We filed papers on it and there are two

21  separate lawsuits, so it doesn't matter which one was

22  filed first.  They're about different things.

23          But one housekeeping matter, Your Honor,

24  that I believe -- and I'm out on a limb on federal

25  procedure here, so somebody may have to help me.  But

1   I believe that if you decide against Attorney General

2   Bonta on his immunity, he has an immediate appeal that

3   the others wouldn't --

4           THE COURT:  Oh, I know it states the case.

5           MR. CASH:  So we might need a separate order

6   for him so that it's not one big order trying to be

7   appealed.  If that's the way you go, there could be a

8   separate order so that that could be appealed

9   immediately.

10          THE COURT:  And you'd want to go forward with

11  the case as it gets to the other defendants?

12          MR. CASH:  Sure.

13          THE COURT:  Or wait?

14          MR. CASH:  You know, we didn't talk about that,

15  but I think at this point I just want to -- I think if

16  you put it all in one order, then the Court has to

17  review everything, and I'm not going to give anybody an

18  interlocutory deal they're not entitled to.  So I would

19  just ask that Mr. Bonta's immunity argument be in a

20  separate order.  That's all.

21          THE COURT:  The only concern -- don't take

22  this is any sort of an order or anything.  If we were

23  to proceed, assuming I keep the case, et cetera, et

24  cetera, I guess these other defendants, with A.G.

25  Bonta taking it up, then it would take a lot of

 1   energy, resources, the Court's resources, the parties'

 2   resources, covering a lot of the same ground, and that

 3   might not be very efficient.

 4        MR. CASH:  No.  So, if the Court were -- if it

 5   were to be stayed during the interim, Your Honor, then

 6   so be it.  And that's just something I think we have to

 7   talk to the A.G. about, and I think we might have to

 8   talk to my clients about at this point.  But I just

 9   wanted to make sure -- I didn't want anything, frankly,

10   to prejudice their rights to an immediate appeal.

11        THE COURT:  Let me just -- before you go, I'd

12   like A.G.'s attorney to clarify something for me.  I

13   believe there was, in some of the papers, an e-mail

14   from A.G. Bonta's campaign, and it said, "This landmark

15   lawsuit," again reference to the California lawsuit,

16   "seeks to hold one of the largest polluters accountable

17   for decades of lies and deception that created and

18   exacerbated the global plastics crisis."

19        Now, are you familiar with that quote?

20        MR. SETRAKIAN:  Not the precise wording, but I

21   trust that Your Honor is reading it from the document.

22        THE COURT:  I am.

23        I guess, assuming -- well, maybe you can't

24   answer it now and I'll respect that if you can't.

25   Could that be deemed a slanderous statement?

1           MR. SETRAKIAN:  I would say no, Your Honor.  I

2   would say that comment, florid, to use the language of

3   California case law, as it may be, is I think a fair

4   characterization of the allegations made in the state

5   law Complaint that A.G. Bonta filed on behalf of the

6   people of California attached as one of the exhibits to

7   our Motion to Dismiss, Docket 44-4.

8           THE COURT:  Is that one of the allegation in

9   the California lawsuit, that is, that Exxon is being --

10  this lawsuit is brought in California to hold Exxon

11  accountable for decades of lies and deception that

12  created and exacerbated the global plastic crisis?

13  Is that what that California lawsuit is about?

14          MR. SETRAKIAN:  So I hesitate to go deep.  You

15  know, we have the Motion to Dismiss phase in which the

16  allegations in the Complaint must be taken as true.

17  I'll keep it for now.  The state law Complaint does

18  contain a decades-long history of statements made by

19  ExxonMobil and it's affiliates and subsidiaries.

20          THE COURT:  But does it refer to them as lies

21  and deception?

22          MR. SETRAKIAN:  I want to be extremely

23  cautious in characterizing the precise allegations in

24  this state law Complaint.  I am not sure whether it

25  uses the word "lie."  But again, this is a cause of

1  action for violation of the Unfair Competition Law,

2  including, as paragraph 1 of the Complaint says,

3  deceptive public messaging.  So lies and deception, I

4  mean, that I think is possibly florid, but a fair

5  characterization of the allegations put forth, to which

6  the Court is of course welcome to review.

7          THE COURT:  Right.

8          MR. SETRAKIAN:  You should not take my word

9  for it.

10          THE COURT:  No, sir.  And I've heard comments

11  that some of the defendants in this case are concerned

12  about the waters in the Los Angeles area or the San

13  Francisco Bay area.  But that lawsuit brought by the

14  State of California, is it against Exxon for being the

15  creator of the "global plastics crisis?"

16          MR. SETRAKIAN:  This is where I'm going to --

17          THE COURT:  Is that the subject, the scope of

18  the California lawsuit?

19          MR. SETRAKIAN:  This is where I'm going to

20  have to pause and not -- in open court, I don't feel

21  comfortable in making a direct answer to that question.

22  I think that's a fair question, in respect, I that's

23  one where I don't feel comfortable giving an answer.

24          THE COURT:  Are you involved in the California

25  lawsuit?

1          MR. SETRAKIAN:  I'm not on a trial team, no.

2    I mean, I'm obviously familiar with its allegations.

3          THE COURT:  Is your firm involved in it?

4          MR. SETRAKIAN:  Of course.

5          THE COURT:  Okay, that's what I thought.

6              Okay, well, I just was curious.  And it's

7    your position that if that statement that I read, and

8    assuming I read it correctly, is on a campaign webpage

9    that does seek donations, that is not a slanderous or

10   libelous statement?  That's your position?

11         MR. SETRAKIAN:  Well, this was, of course, an

12   e-mail to A.G. Bonta's supporters.  And yes, that's my

13   position.

14         THE COURT:  And even though it may be on his

15   campaign webpage, it's not -- he can stand behind

16   governmental immunity and be protected?

17         MR. SETRAKIAN:  I may dispute that it on a

18   campaign webpage.  But yes, governmental immunity still

19   applies.  And just to be --

20         THE COURT:  I just wanted to get clarification,

21   I just wanted to make sure.

22         MR. SETRAKIAN:  Well, I mean, if I may be

23   heard on one --

24         COURT REPORTER:  If you could back off that

25   mic.

1          MR. SETRAKIAN:  If I may just be heard on one

2    point on that, I think we provide authority for the

3    proposition that forum is not a relevant determinant in

4    whether content is protected.  Instead, the contents of

5    the statements that Tutor-Saliba is about, my friends on

6    the other side do not counter with responsive authority

7    on that one.

8          THE COURT:  I understand.

9          Again, is there anything else anybody

10   needs to bring to the court's attention?

11          Again, my compliments to everyone.  We

12   covered a lot of territory, and y'all did a splendid

13   job at presenting your respective sides to the Court,

14   and the Court appreciates it.

15          Thank you very much, and we are adjourned.

16          *[4:32 p.m. - Proceedings adjourned]*

17

18                      REPORTER'S CERTIFICATE

19

20   I certify that the foregoing is a correct transcript

21   from the record of proceedings in the above-entitled

22   cause.

23

24   /s/ Ed Reed                              9-19-25
     Edward L. Reed                           Date
25   Court Reporter

*Edward L. Reed*
EdReedCR@aol.com
409-330-1605