IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:25-CV-00011 |
| | § | JUDGE MICHAEL J. TRUNCALE |
| ROBERT ANDRES BONTA A.K.A. | § | |
| ROB BONTA, IN HIS INDIVIDUAL | § | |
| CAPACITY; SIERRA CLUB, INC.; | § | |
| SURFRIDER FOUNDATION, INC; | § | |
| HEAL THE BAY, INC.; BAYKEEPER, | § | |
| INC.; AND INTERGENERATIONAL | § | |
| ENVIRONMENT JUSTICE FUND LTD., | § | |
| *Defendants*. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

## <u>TABLE OF CONTENTS</u>

I.    FACTUAL BACKGROUND ................................................................................3

  A.  Foreign Influence .......................................................................................3

  B.  Defamation ................................................................................................5

II.   PROCEDURAL HISTORY ...............................................................................6

III.  MOTIONS ON PERSONAL JURISDICTION .................................................7

  A.  Legal Standard .........................................................................................7

  B.  Discussion ...............................................................................................10

     i.   U.S. Environmental Organizations .................................................14

        1.   Heal the Bay ..........................................................................15

        2.   Surfrider ................................................................................17

        3.   Baykeeper ..............................................................................18

        4.   Sierra Club ............................................................................20

     ii.  Bonta .............................................................................................22

     iii.  IEJF ..............................................................................................27

     iv.  Jurisdictional Discovery ................................................................28

IV.  MOTION ASSERTING IMMUNITY ..............................................................29

  A.  Legal Standard .......................................................................................29

  B.  Discussion ...............................................................................................31

     i.   Official Immunity ...........................................................................31

        1.   Choice of Law ......................................................................31

        2.   Official Immunity under Texas Law ....................................35

     ii.  Eleventh Amendment Immunity ....................................................38

V.   MOTION TO TRANSFER VENUE ................................................................40

VI.  MOTION CHALLENGING DECARATORY RELIEF ....................................41

VII. MOTIONS TO INTERVENE ...........................................................................41

  A.  Legal Standard .......................................................................................42

  B.  Discussion ...............................................................................................42

VIII.CONCLUSION ................................................................................................44

Before the Court are several motions to dismiss and motions to intervene, as well as a motion to transfer.[1] Specifically, this Order considers the following eleven motions and makes the following rulings:

| *Movant(s)* | *Motion* | *Dkt.* | *Ruling* |
|---|---|---|---|
| Heal the Bay, Inc. | Defendant Heal the Bay, Inc.'s 12(b)(2), (3), and (6) Motion to Dismiss | 47 | **GRANTED IN PART** |
| Surfrider Foundation, Inc. | Defendant Surfrider Foundation's Rule 12(b) Motion to Dismiss | 48 | **GRANTED IN PART** |
| Baykeeper, Inc. | Baykeeper, Inc's Rule 12(b)(2), (3), (6) Motion to Dismiss | 49 | **GRANTED IN PART** |
| Sierra Club, Inc. | Defendant Sierra Club's Motion to Dismiss | 50 | **GRANTED IN PART** |
| Robert Andres Bonta | Motion to Dismiss | 44 | **DENIED** |
| Intergenerational Environment Justice Fund Ltd. | Defendant Intergenerational Environment Justice Fund Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim | 51 | **GRANTED IN PART** |
| Sierra Club, Inc., Surfrider Foundation, Inc., Heal the Bay, Inc., and Baykeeper, Inc. | Joint Motion to Transfer to the Northern District of California | 46 | **DENIED AS MOOT** |
| City of Baytown, Texas | Opposed Motion to Intervene | 39 | **GRANTED** |
| City of Beaumont, Texas | City of Beaumont's Opposed Motion to Intervene | 54 | **GRANTED** |
| Chambers County, Texas | Chambers County, Texas' Opposed Motion to Intervene | 62 | **GRANTED** |
| City of Mont Belvieu, Texas | City of Mont Belvieu's Opposed Motion to Intervene | 63 | **GRANTED** |

---

[1] The Court acknowledges and commends the effort of both sides' attorneys in drafting and arguing their motions, responses, and replies.

# I. FACTUAL BACKGROUND

This case arises from a pair of environmental lawsuits in California. California Attorney General Robert Andres Bonta ("Bonta") and several environmental organizations filed separate cases against the Exxon Mobil Corporation ("ExxonMobil") for its alleged role in plastic pollution.[2] Those organizations—the Sierra Club, Inc. (the "Sierra Club"), Surfrider Foundation, Inc. ("Surfrider"), Heal the Bay, Inc. ("Heal the Bay"), and Baykeeper, Inc. ("Baykeeper") (collectively the "U.S. Environmental Organizations")—and Bonta himself made comments[3] about ExxonMobil and the ongoing California litigation. These comments, which range from calling ExxonMobil a "liar," "polluter," "source" of "wreckage," and "perpetuator" of the "myth" of plastic recycling, form the basis for this lawsuit.[4]

But, as ExxonMobil would have it, there's more to the story. For ExxonMobil, this case goes beyond defamation; it argues the defendants, once promoters of recycling, have performed an about-face at the behest of foreign influence. *Id.* at ¶¶ 2–5.

## A. Foreign Influence

The story starts in Australia. The Minderoo Foundation Ltd. ("Minderoo") was founded by Andrew Forrest ("Forrest"), an Australian billionaire. *Id.* Forest is also the founder of an Australian mining conglomerate, Fortescue Metals Group Ltd. ("Fortescue"), and remains one of its largest shareholders. *Id.* at ¶ 22. Another of Fortescue's major shareholders is Minderoo. *Id.* at ¶ 42.

In 2019, Minderoo announced a "Sea the Future" campaign to end plastic waste via a "'levy' on virgin plastic." *Id.* at ¶ 35. The levy, apparently designed by Forrest, was a "joint

---

[2] *People of the State of California v. Exxon Mobil Corp.*, CGC-24-618323 (Cal. Super. Ct.—San Francisco); *Sierra Club, Inc. v. Exxon Mobil Corp.,* 3:24-cv-07288-RS (N.D. Cal.).

[3] Surfrider itself did not make comments, but published a blog entry with quotes by the other organizations. *See infra* Part III.B.i.

[4] *See infra* Part III.B.i–iii.

agree[ment]" between plastic resin manufacturers "to artificially inflate the price of virgin plastic resign derived from fossil fuels." *Id.* (alteration added). The free market would dictate the price of *recycled* plastic (presumably a substitute for *virgin* plastic). *Id.* Therefore, an artificially-higher price for *virgin* plastic would allow the now-cheaper *recycled* plastic to eventually outcompete *virgin* plastic and further "encourage chemical (advanced) recycling." *Id.*

The problem? From ExxonMobil's description, the United States would call such a scheme "price-fixing,"[5] a possible ticket to federal prison.[6] ExxonMobil, in a meeting with Forrest, said as much. [Dkt. 1 at ¶ 36]. ExxonMobil states Forrest continued to pitch this plan to other companies, and ExxonMobil continued to object. *Id.* According to ExxonMobil, no one adopted the plan and Forrest changed strategy: warfare on plastic production. *Id.* at ¶ 38. This took several forms.

The first has to do with Minderoo. In 2021 Minderoo began publishing reports which allegedly make "several false and deceptive statements concerning ExxonMobil, plastics waste, and advanced recycling." *Id.* at ¶¶ 38–41. And in 2022 Minderoo formed the Intergenerational Environment Justice Fund Ltd. ("IEJF") as a subsidiary. *Id.* at ¶ 42. IEJF is relevant later.

Pivot to Fortescue, Forrest's mining company. It made a pledge in 2020 to "decarbonize by 2030 and transform itself into a green energy powerhouse." *Id.* at ¶ 43. A goal of this transition was to produce a surplus of renewable energy and "sell 'green hydrogen' to the world's factories and mills." *Id.* at ¶ 43. This business would compete with ExxonMobil and other American oil-and-gas companies. *Id.* Ultimately, green hydrogen was too expensive to be a viable competitor

---

[5] Price-fixing with good intentions is still price-fixing. *See U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 217 (1940) (noting the Supreme Court "has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act and that no showing of so-called anticompetitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense"). Of special note for the curious: Socony-Vacuum was a corporate predecessor of the modern ExxonMobil.

[6] *See* U.S. Dep't of Just., Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For 1 (2021), https://www.justice.gov/atr/file/810261/dl?inline= ("Violation of the Sherman Act is a felony punishable by, for corporations, a fine of up to $100 million, and for individuals, a fine of up to $1 million or 10 years' imprisonment (or both)").

4

and Forrest had to "downsize his hydrogen dream." *Id.* at ¶ 44. The fallout from the green hydrogen plan, combined with the failed plastic levy, led Fortescue "on information and belief" to instead "compete by turning the wheels of American justice to [Fortescue's own] self-interested purposes." *Id.* at ¶ 45 (alteration added).

Recall IEJF. ExxonMobil alleges that IEJF "retained" a U.S. law firm "to engage in 'political activities,'" which ExxonMobil says includes the California lawsuits. *Id.* at ¶¶ 6, 46. ExxonMobil's theory is this: IEJF hires the U.S. law firm, which then recruits the U.S. Environmental Organizations, who then "act[] for the foreign business interests" and "compet[e] in U.S. courts rather than the marketplace." *Id.* at ¶ 6. ExxonMobil argues that this triggered the U.S. law firm's registration as a foreign agent. *Id.* at ¶¶ 6, 47.

Now, how does Bonta fit into this? Answer: the four firm partners who registered as foreign agents, as well as other firm members, donated to Bonta's political campaign for California Attorney General. *Id.* at ¶¶ 7, 48. Interestingly, the firm received IEJF's legal fees and made donations to Bonta "at almost the exact same time." *Id.* at ¶ 7. And the two California lawsuits were filed at nearly the same time, with Bonta and the U.S. Environmental Organizations announcing their lawsuits together at the same press conference. *Id.* at ¶ 49. Afterwards, the Defendants published press releases, comments, and videos containing statements ExxonMobil calls defamatory.

## B. Defamation

ExxonMobil contends the Defendants' defamation targeted and harmed its advanced recycling technology. *Id.* at ¶ 103. According to ExxonMobil, advanced recycling is "a technology that supplements traditional mechanical recycling by breaking down plastics into the usable raw materials to manufacture fuels, lubricants, new plastics, and other products." *Id.* at ¶ 57. It is an "innovative" approach that "gives new life and value to plastic waste that might otherwise go to a

5

landfill." *Id.* at ¶ 10. This method "allows a wider variety of plastics to be recycled, including hard-to-recycle chip bags, motor oil bottles, and artificial turf." *Id.* at ¶ 58. ExxonMobil believes that as advanced recycling "is broadly adopted, it can greatly increase the recycling rate for plastics and promote a more circular economy." *Id.* at ¶ 11. Put another way, ExxonMobil strenuously argues that advanced recycling is *different* from plastic recycling. If advanced recycling came with a sticker, it would say "New and Improved!" This is a critical factor in the Court's analysis.

ExxonMobil says defendant's alleged defamation—discussed further below—harmed existing and future contracts. ExxonMobil has already entered contracts supporting its advanced recycling imitative. *Id.* at ¶ 62. These include contracts with Texas Gulf Coast cities and counties to provide a "destination" for community recycling programs and construction contracts for new facilities in and around Baytown, Texas and Beaumont, Texas. *Id.* at ¶¶ 66–67. The alleged defamation of advanced recycling and statements that "ExxonMobil has lied to consumers about the efficacy of its recycling practices for decades" have interfered with these contracts. *Id.* at ¶ 99. More specifically, "major international brands have refused to jointly promote advanced recycling with ExxonMobil." *Id.* at ¶ 102. "Potential customers have expressed concern and hesitancy to work with ExxonMobil and explicitly referenced" Bonta's and the U.S. Environmental Organizations' statements. *Id.* Additionally, "a number of companies have backed out of proposed transactions with ExxonMobil for advanced recycling." *Id.*

## II. PROCEDURAL HISTORY

ExxonMobil filed its Complaint on January 6, 2025, asserting claims of business disparagement, defamation, tortious interference with contract, tortious interference with prospective business, and civil conspiracy. [Dkt. 1 at ¶¶ 104–33]. ExxonMobil also requested a declaratory judgment to the effect of: "(i) advanced recycling is recognized and permitted by law

in multiple states, including Texas, and that (ii) ExxonMobil is lawfully permitted to engage in and promote advanced recycling at its Texas facility." *Id.* at ¶ 140.

This Order considers the many motions filed in late April to early May 2025. [Dkts. 39, 44, 46, 47, 48, 49, 50, 51, 54, 62, 63]. Responses and replies concerning the motions were filed shortly thereafter. [Dkts. 90, 91, 94, 95, 96, 98, 102, 103, 104, 105, 106, 107, 108, 110]. The Court held a hearing on the motions to dismiss and the motion to transfer on August 20, 2025. [Dkt. 117]. The motions are now ripe for review.

### III. MOTIONS ON PERSONAL JURISDICTION

All of the motions to dismiss assert a lack of personal jurisdiction. [Dkts. 44 at 13–17; 47 at 5.1–5.16; 48 at 6–13; 49 at 13–18; 50 at 5–8; Dkt. 51 at 12–17]. For the reasons described below, the Court dismisses, without prejudice, the claims against the U.S. Environmental Organizations and IEJF. However, the Court finds specific personal jurisdiction over Bonta.

#### A.    Legal Standard

Motions raised under Federal Rule of Civil Procedure 12(b)(2) assert as a defense a lack of personal jurisdiction. FED. R. CIV. P. 12(b)(2). "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). "This is because a federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting FED. R. CIV. P. 4(k)(1)(A)).

Accordingly, "[a] federal court sitting in diversity may assert personal jurisdiction over the defendant if (1) the state's long-arm statute permits it, and (2) exercising jurisdiction would not violate the Fourteenth Amendment's Due Process Clause." *Savoie v. Pritchard*, 122 F.4th 185, 190 (5th Cir. 2024) (Engelhardt, J.) (alteration added) (citing *Libersat v. Sundance Energy, Inc.*, 978

F.3d 315, 318 (5th Cir. 2020)). "Because Texas's long-arm statute is coextensive with the Due Process Clause of the Fourteenth Amendment, the two inquiries merge." *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019) (Smith, J.) (citing *Sangha v. Navig8 Ship Mgmt. Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018)). "Due process is satisfied where the defendant 'purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice.'" *Savoie*, 122 F.4th at 190 (quoting *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867 (5th Cir. 2001)).

"There are two types of personal jurisdiction under federal law: general and specific." *Shambaugh & Son, L.P. v. Steadfast Ins. Co.*, 91 F.4th 364, 372 (5th Cir. 2024) (citing *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 539 (5th Cir. 2019)). "General personal jurisdiction applies 'only when a defendant is 'essentially at home,' and any and all claims may be brought against a defendant wherever it is subject to such jurisdiction." *Id.* (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352 (2021)). "By comparison, specific personal jurisdiction is narrower and attaches only when there is a sufficient connection between a defendant's forum-related contacts and a plaintiff's causes of action." *Id.* (citing *Ford Motor*, 592 U.S. at 359–60). ExxonMobil relies on specific personal jurisdiction for each of the defendants.

The Fifth Circuit "engages in a three-step analysis to determine whether a court may exercise specific jurisdiction over a non-forum defendant." *Savoie*, 122 F.4th at 190. These steps are "'(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal

jurisdiction is fair and reasonable.'" *Id.* at 190–91 (quoting *Shambaugh & Son*, 91 F.4th at 372). This inquiry "'derive[s] from and reflect[s] two sets of values—treating defendants fairly and protecting interstate federalism.'" *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 318 (5th Cir. 2021) (Smith, J.) (quoting *Ford Motor*, 592 U.S. at 360) (alterations added). "Put another way, a defendant must have 'fair warning' that his activities may subject him to another state's jurisdiction." *Id.* (citing *Ford Motor*, 592 U.S. at 360). "That warning permits the defendant to 'structure its primary conduct to lessen or avoid exposure to a given State's courts.'" *Id.* (quoting *Ford Motor*, 592 U.S. at 360). "The limits on specific jurisdiction also 'ensure that States with little legitimate interest in a suit' cannot wrest that suit from 'States more affected by the controversy.'" *Id.* (quoting *Ford Motor*, 592 U.S. at 360).

The party invoking the Court's jurisdiction bears the burden of establishing that specific personal jurisdiction is warranted. *Savoie*, 122 F.4th at 190 (quoting *Danziger & De Llano, L.L.P v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 495 (5th Cir. 2022)). This showing must be made for each claim. *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006). Once that party establishes both minimum contacts and that her cause of action arises from those contacts, "the burden shifts to the defendant to show that the exercise of personal jurisdiction would be unfair or unreasonable." *E. Concrete Materials, Inc. v. ACE Am. Ins. Co.*, 948 F.3d 289, 296 (5th Cir. 2020) (citing *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 433 (5th Cir. 2014)). Five factors determine if the exercise of personal jurisdiction would be unfair or unreasonable: "'(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies.'" *McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) (quoting *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006)). However, "it is rare to say the assertion of

jurisdiction is unfair after minimum contacts have been shown." *Id.* at 759–60 (citation modified) (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)).

## B. Discussion

"'The analysis applicable to a case involving jurisdiction based on the Internet should not be different at its most basic level from any other personal jurisdiction case.'" *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 786 (5th Cir. 2021) (quoting *Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 226–27 (5th Cir. 2012)). The Fifth Circuit distinguishes between "passive" and "interactive" websites as a preliminary step. *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002). "A 'passive' website, one that merely allows the owner to post information on the internet, is at one end of the scale." *Id.* (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)). Passive websites cannot support personal jurisdiction. *Id.* An interactive website "allows for bilateral information exchange with its visitors," which can create specific personal jurisdiction. *Id.* A website is not passive (and therefore has some amount of interactivity) when it "receives purchases, allows customers to create accounts, and accepts product reviews." *Admar Int'l*, 18 F.4th at 787.

After this step comes the standard personal jurisdiction inquiry. Additional caselaw clarifies the analysis in defamation claims specifically, but the same logic applies to business disparagement and tortious interference claims. *See Nicholas Servs., LLC v. Glassdoor, LLC*, 746 F. Supp. 3d 343, 349 (N.D. Miss. 2024) (applying specific personal jurisdiction inquiry from defamation caselaw to tortious interference and breach of contract claims). Two Fifth Circuit cases are particularly relevant: *Herman v. Cataphora, Inc.*, 730 F.3d 460 (5th Cir. 2013), and *Johnson v. TheHuffingtonPost.Com, Inc*, 21 F.4th 314 (5th Cir. 2021). Both cases address specific personal jurisdiction over statements made by non-forum defendants where those statements were not sent into the forum state.

10

Consider the facts of *Herman*. The *Herman* plaintiffs were members of a steering committee for ongoing multidistrict litigation in the Eastern District of Louisiana (the "Louisiana MDL"). 730 F.3d at 462. Cataphora was a Delaware corporation with its principal place of business in California. *Id.* Cataphora and the steering committee entered into a contract for services related to the Louisiana MDL, which eventually gave rise to a breach-of-contract lawsuit in the Northern District of California. *Id.* After Cataphora won in the trial court and while an appeal was pending, Cataphora's technology counsel sat for an interview for the website Above the Law (while in California). *Id.* Referring to the *Herman* plaintiffs, the technology counsel said "[t]hese guys are the worst of hypocrites you can possibly find," who "claim to be trying to help the little guy, but what they're doing is trying to put more money in their own pockets," among additional comments. *Id.* at 462–463 (alteration added). The article "contain[ed] no mention of the [*Herman* plaintiffs] individually, but only of the [steering committee] generally of which Plaintiffs are members along with numerous other attorneys from various states." *Herman v. Cataphora, Inc.*, No. CIV.A. 12-497, 2012 WL 4210427, at *8 (E.D. La. Sept. 19, 2012), *vacated on other grounds*, 730 F.3d 460 (5th Cir. 2013) (alterations added). The *Herman* plaintiffs promptly sued for defamation in the Eastern District of Louisiana. 730 F.3d at 463. Cataphora won dismissal on personal jurisdiction grounds, and the plaintiffs appealed. *Id.*

The Fifth Circuit found that the relevant starting point was the allegedly defamatory remarks. To form the basis for specific personal jurisdiction, the statements must "'constitute personal availment such that [the defendant] could have reasonably anticipated being haled into a [Texas] court as a result of [the defendant's] statements.'" *Id.* at 464 (alterations added) (citation modified) (quoting *Clemens v. McNamee*, 615 F.3d 374, 379 (5th Cir. 2010)). When determining whether this personal availment exists, the "importance of the [statement's] 'focal point'" should be "emphasized." *Id.* at 465 (alteration added) (citing *Clemens*, 615 F.3d at 379). While "[a]

11

plaintiff's suffering damage in the forum state is part of the calculus," the focal point is indispensable. *Id.* If this focal point is *not* the forum, then the statement does not constitute personal availment; without personal availment, there is no basis for specific personal jurisdiction. *Id. See also Clemens*, 615 F.3d at 379; *Revell*, 317 F.3d at 473.

After providing this foundation, the *Herman* court began its focal point analysis. It found that it was "not immediately clear who the targets of the statements were and where the conduct [ ] described took place." *Herman*, 730 F.3d at 465 (alteration added). Even though Cataphora's technology counsel knew that the steering committee was "engaged in some activity in Louisiana," this was "not sufficient to prove the allegedly defamatory statements themselves were made in reference to that activity." *Id.* Crucially, it was not enough that the article had described the Louisiana MDL as background for the counsel's statements, because the focal point of those statements were "on the contract dispute." *Id.* Indeed, Cataphora's counsel "never mentioned Louisiana explicitly or implicitly" and "did not refer to specific actions taken in Louisiana." *Id.* Rather, Cataphora's counsel "discussed his perceptions of the Steering Committee members' behavior surrounding the [California] contract dispute." *Id.* (alteration added). At bottom, the focal point of the *Herman* statements was not Louisiana, so there was no purposeful availment to form the basis of specific personal jurisdiction. *Id.* at 466.

The Fifth Circuit also looked to Above the Law's readership. This also did not help the *Herman* plaintiffs. There was "no evidence" that the statements "were directed at Louisiana residents" or that Above the Law had "a disproportionately high Louisiana readership." *Id.*

The Fifth Circuit concluded that while the plaintiffs may have made "a *prima facie* showing" that the statements' harm would "be felt largely in Louisiana," that alone was "not enough." *Id.* Without showing that the focal point was Louisiana, the statements could not support specific personal jurisdiction in Louisiana.

12

Now consider *Johnson*, which reached the same result via a different route.[7] There, the Fifth Circuit considered a libel lawsuit involving an online article calling Johnson, the Texas plaintiff, "a 'noted Holocaust denier and white nationalist'" in the context of Johnson's meeting with two congressmen in Washington, D.C. 21 F.4th at 316. Because the defendant website was a citizen of Delaware and New York, Johnson relied on a four-part specific personal jurisdiction theory. Johnson argued that because the site 1) was "visible in Texas," 2) sold "an ad-free experience and merchandise" in Texas, 3) sold advertising space to Texans, and 4) collected visitors' location information to show relevant ads, it had "'purposefully availed itself of the privileges of doing business in Texas.'" *Id.* at 317.

The Fifth Circuit did not find any of these arguments convincing, and affirmed dismissal of the case for want of personal jurisdiction. It had essentially three categories of reasons. First, it noted that the article "ha[d] no ties to Texas," "[did] not mention Texas," "recount[ed] a meeting that took place outside of Texas," and "used no Texan sources." *Id.* at 319 (alterations added). Second, while the website was accessible in Texas, this alone is not enough; the website must actually "exploit a forum" or "produce[] the plaintiff's claim" via "its forum contacts." *Id.* (alteration added). Neither existed because the alleged libel had no nexus with advertising or merchandise. *Id.* Third, "settled principles of personal jurisdiction" required dismissal. *Id.* at 320. There was no "'fair warning' that [the defendant's] activities could furnish jurisdiction," and the defendant had no "chance to limit or avoid [its] exposure to the courts of a particular state." *Id.* (alterations added). Furthermore, under specific personal jurisdiction's relatedness prong, the "only" actions that count are "those that relate to the plaintiff's suit." *Id.* at 325. Again, there was no connection between the libel and the ads. *Id.* Lastly, the defendant must itself "create the

---

[7] *Johnson* mentions *Cataphora* once in a string cite in one of its footnotes. *Johnson*, 21 F.4th at 322 n.8.

contacts" sustaining personal jurisdiction. *Id.* at 321. The website *itself* did not "create" Texas contacts, nor did it "solicit[] Texan visits." *Id.* (alteration added).

From these cases it appears that in internet defamation/libel cases where the statement was *not* sent into the forum, there are both intrinsic and extrinsic aspects that relate to specific personal jurisdiction and must be considered. The considerations above can be sorted into these two categories. Intrinsic aspects—relating to the content and nature of the statement—includes the statement's focal point, where the conduct/activity described took place, whether the forum was mentioned, and the sources used. *Herman*, 730 F.3d at 465; *Johnson*, 21 F.4th at 319. Extrinsic elements surround the statement, having more to do with the speaker and what was done with the comment. Where was the speaker when the statement was made? Did the speaker send the alleged defamation into the forum, or otherwise know its readership would be high in that forum? These are a few examples. *Herman*, 730 F.3d at 466–465; *Johnson*, 21 F.4th at 320–25. The same framework applies for tortious interference and business disparagement claims. *See Nicholas Servs.*, 746 F. Supp. 3d at 350–51 (applying *Johnson* to tortious interference and breach of contract claims).

After a court finds it lacks personal jurisdiction, it has the discretion to dismiss the affected defendants or transfer the case. *See, e.g., Herman*, 730 F.3d at 466 (reciting law that a district court has the option to dismiss or transfer). Here, ExxonMobil did not request transfer in the event the Court found a lack of personal jurisdiction. ExxonMobil may rather have the claims dismissed than pursue them in the Northern District of California. The Court accordingly dismisses without prejudice ExxonMobil's claims against the U.S. Environmental Organizations.

### i.    *U.S. Environmental Organizations*

The U.S. Environmental Organizations made similar arguments on specific personal jurisdiction in their motions to dismiss. [Dkts. 47 at 5.1–5.16; 48 at 6–13; 49 at 13–18; 50 at 5–8].

14

Likewise, Exxon's Response used similar personal jurisdiction theories with regard to each of the U.S. Environmental Organizations. [Dkt. 96 at 14–18].

As an initial matter, the Court considers each website to be interactive because they solicit donations, emails, and subscriptions from visitors.[8] Even so, there are no grounds for finding specific personal jurisdiction over these defendants, as the Court discusses below.

### 1. Heal the Bay

First is Heal the Bay's Motion to Dismiss. [Dkt. 47]. ExxonMobil alleges that the relevant statement made by Heal the Bay is: "Instead of cleaning up the wreckage caused by Big Plastic, we are moving aggressively to stop the harm at its source." [Dkt. 1 at ¶ 93; Dkt. 47 at ¶ 5.8; Dkt. 96 at 18].[9] The Court begins with the statement's intrinsic elements. Recall *Herman*'s "focal point" discussion, where the Fifth Circuit noted it was "not immediately clear who the targets of the statements were and where the conduct [ ] described took place" and that Cataphora's counsel "never mentioned Louisiana explicitly or implicitly" and "did not refer to specific actions taken in Louisiana." *Herman*, 730 F.3d at 465 (alteration added).[10]

While it is true that the comment clearly refers to ExxonMobil from its context, the statement is still vague in two crucial aspects. First, "moving aggressively to stop the harm" does not concern recycling at all, let alone advanced recycling, which is the relevant activity

---

[8] The Court doubts the continued utility of this distinction, given that the original passive/interactive inquiry was created nearly thirty years ago in 1997. The internet and web design were far different. The passive/interactive decision characterized the internet as "a global 'super-network of over 15,000 computer networks used by over 30 million individuals, corporations, organizations, and educational institutions worldwide.'" *Zippo*, 952 F. Supp. 1119, 1123 (W.D. Pa. 1997) (quoting *Panavision Intern., L.P. v. Toeppen*, 938 F. Supp. 616, 618 (C.D. Cal. 1996)). This description seems quaint by today's standards.

[9] There are some small variations of the statement across the filings (such as a missing comma). [*Compare* Dkt. 47 at ¶ 5.8 *with* Dkt. 96 at 18. *See also* Dkt. 1 at ¶ 93 (using alterations for persuasive effect)]. This version of the statement is exactly as it appears on Heal the Bay's website in its press release. [Dkt. 47-2 at 2].

[10] *See also Johnson*, 21 F.4th at 319 (noting that the relevant article "ha[d] no ties to Texas," "[did] not mention Texas," "recount[ed] a meeting that took place outside of Texas," and "used no Texan sources") (alterations added).

ExxonMobil alleges occurs in Texas.[11] Second, it is not clear where any conduct is occurring; the phrase "at its source," for a global company like ExxonMobil, could mean anywhere in the world.

There are no extrinsic elements supporting specific personal jurisdiction either. Recall from *Johnson* that the "only" actions that count for specific personal jurisdiction are "those that relate to the plaintiff's suit." *Id.* at 325. The Complaint alleges that "[u]pon information and belief, at least some of the [U.S. Environmental Organizations] solicited residents in Texas and received donations from residents in Texas." [Dkt. 1 at ¶ 93]. The Court notes two things. First, this argument is not specific to Heal the Bay. Second, even if Heal the Bay made those solicitations, they would also have to contain the above statement to satisfy *Johnson*. Heal the Bay denies using the comment to fundraise from Texans.[12] [Dkt. 47 at 9 (citing Dkt. 47-1 at ¶ 10)]. ExxonMobil does not address this argument.

ExxonMobil makes two other arguments worth discussing. First, it contends Heal the Bay has "not denied that [it] knew that ExxonMobil is a Texas corporation or that its advanced recycling operations are Texas-based." [Dkt. 96 at 18]. But even if Heal the Bay knew ExxonMobil's Texan nature, that would not be enough under *Herman*. The fact Heal the Bay "knew" ExxonMobil "engaged in some activity in [Texas] is not sufficient to prove the allegedly defamatory statements themselves were made in reference to that activity." *Herman*, 730 F.3d at 465 (alteration added).

Second, ExxonMobil points to an alleged conspiracy between the U.S. Environmental Organizations. It states that "Heal the Bay admitted that it was 'quietly meeting'" with the other

---

[11] ExxonMobil has stressed these are very different processes; recall the paragraph discussing the differences between plastic and advanced recycling. For personal jurisdiction purposes, therefore, plastic recycling cannot be taken to refer to advanced recycling.

[12] The affidavit also states that "the press release was not sent to any Texas resident or Texas corporation." [Dkt. 47-1 at ¶ 10]. ExxonMobil's Response does not address this affidavit. [Dkt. 96].

organizations "and that they were engaged in a 'coordinated campaign' against ExxonMobil to change US policy surrounding plastic production." [Dkt. 96 at 18]. *Johnson* emphasized that the "only" actions that count for specific personal jurisdiction are "those that relate to the plaintiff's suit," and this is no less true for conspiracies. 21 F.4th at 325 (citing *Ford Motor*, 592 U.S. at 354–57). ExxonMobil does not allege any relationship between the conspiracy and Texas specifically—other than that the victim, ExxonMobil, happens to be at home in Texas—so this argument fails.[13]

The Court therefore concludes that it lacks personal jurisdiction over Heal the Bay and dismisses it from this action.[14] [Dkt. 47].

2. *Surfrider*

Next is Surfrider's Motion to Dismiss. [Dkt. 48]. Surfrider did not make any statement of its own. Rather, it published a press release containing quotes from the other nonprofits' representatives involved in the California litigation. [Dkts. 1 at ¶ 92; 48 at 7; 96 at 15]. ExxonMobil relies mostly on the alleged conspiracy between the nonprofits to support personal jurisdiction over Surfrider and does so in two senses. First, it points out that Surfrider has three chapters in Texas, but does not specify how those chapters are involved in either the alleged defamation or the conspiracy. [Dkts. 1 at ¶ 19; 96 at 15]. Surfrider itself states in its Motion that these chapters were not involved in the preparation of the press release nor have they taken any direct action against advanced recycling. [Dkt. 48 at 10]. Without a nexus between the defendant's forum contacts and the activity of which the plaintiff complains, there is no basis for specific personal jurisdiction. *Ford Motor*, 592 U.S. at 354–57.

---

[13] Again, it is not enough that a defendant knows where its victim is, as *Herman* illustrates in the defamation context. 730 F.3d at 465 ("the fact that [Cataphora's technology counsel] knew [the plaintiffs] engaged in some activity in Louisiana is not sufficient to prove the allegedly defamatory statements themselves were made in reference to that activity").

[14] Accordingly, the Court does not reach Heal the Bay's Rule 12(b)(3) and (6) arguments. [Dkt. 47].

Second, ExxonMobil argues that the Court should follow other circuits' precedents allowing "the purposeful acts of a co-conspirator in furtherance of the conspiracy" as the basis for specific personal jurisdiction. [Dkt. 96 at 17]. Even if the Court took heed of other circuits' law, it would not apply. Here none of the other U.S. Environmental Organizations have done anything amounting to "purposeful conduct directed at the forum in furtherance of the conspiracy," as the Court will discuss in further detail below. *Id.* In fact, the Court finds it lacks personal jurisdiction over any of the U.S. Environmental Organizations, so there is no personal jurisdiction to extend to Surfrider by way of the conspiracy.

For these reasons, the Court grants Surfrider's motion to dismiss on personal jurisdiction grounds.[15] [Dkt. 48].

3. *Baykeeper*

Next is Baykeeper's Motion to Dismiss. [Dkt. 49]. According to ExxonMobil, Baykeeper "effectively accuse[s] ExxonMobil of homicide." [Dkt. 1 at ¶ 92 (alteration added)]. The Complaint highlights the following comment from Baykeeper's Executive Director in the Surfrider press release:

> "The [California nonprofit] complaint alleges that Exxon has brainwashed everyone into thinking that plastic recycling works and that it's good for the planet. But when we pulled back the curtain, we found that Exxon's plastic polymers are poisoning waterways, wildlife, and people," said Sejal Choksi-Chugh of San Francisco Baykeeper. "San Francisco Bay has some of the highest levels of microplastics in the world. That's why we are going after Exxon: to stop plastic pollution at its source. This stuff is killing us a little bit more every day . . ."

---

[15] The Court does not reach Surfrider's Rule 12(b)(1) and (6) arguments. [Dkt. 48].

[Dkt. 1 at ¶ 92 (quoting Dkt. 1-9 at 3) (alteration added)].[16] Again, begin with the intrinsic elements of the quote, using *Herman*'s "focal point" analysis.[17] This statement is just as vague as Heal the Bay's. True, this quote names ExxonMobil. However, Baykeeper's quote concerns "plastic recycling," which is *not* advanced recycling, as ExxonMobil strenuously argues. Further it is not clear where that plastic recycling is occurring, neither mentioning "[Texas] explicitly or implicitly." *Herman*, 730 F.3d at 465 (alteration added).

Even if there were no intrinsic problems with the statement, extrinsic defects preclude specific personal jurisdiction. ExxonMobil does not argue Baykeeper sent the statement into Texas or otherwise knew it would have a high Texas readership. While Texans can access the website where the statement was published, this does not mean Baykeeper has "exploit[ed] a forum" or "that its forum contacts produced [ExxonMobil's] claim." *Johnson*, 21 F.4th at 319 (alterations added).

The closest argument ExxonMobil makes on extrinsic aspects is a restatement of one of its Heal the Bay arguments. It points out that Baykeeper has "not denied that [it] knew that ExxonMobil is a Texas corporation or that its advanced recycling operations are Texas-based." [Dkt. 96 at 18 (alteration added)]. This falls by the same sword as the Heal the Bay argument. Even if Baykeeper knew ExxonMobil is based in Texas, *Herman* says the fact that ExxonMobil "engaged in some activity in [Texas] is not sufficient to prove the allegedly defamatory statements themselves were made in reference to that activity." *Herman*, 730 F.3d at 465 (alteration added). This is not enough for specific personal jurisdiction.

---

[16] ExxonMobil's Complaint uses an edited version of the comment for persuasive effect. [Dkt. 1 at ¶ 92]. This version includes all of the pieces ExxonMobil highlighted as they appeared in the Surfrider press release. [Dkt. 1-9 at 3]. The Sierra Club press release contains a truncated version of the same quote. [Dkt. 1-7 at 2].

[17] *See also Johnson*, 21 F.4th at 319 (noting that the relevant article "ha[d] no ties to Texas," "[did] not mention Texas," "recount[ed] a meeting that took place outside of Texas," and "used no Texan sources") (alterations added).

Accordingly, the Court grants Baykeeper's motion to dismiss on personal jurisdiction grounds.[18] [Dkt. 49].

   4.  *Sierra Club*

The Sierra Club's Motion to Dismiss is the last of the U.S. Environmental Organizations' motions. [Dkt. 50]. ExxonMobil takes issue with two comments (numbered for ease of reference):

1. "As alleged in our complaint, Exxon profited by claiming plastics are safe and recyclable. But we know better now—our environment and health were being sacrificed just to protect Exxon's bottom line," said Allison Chin, President of the Sierra Club's Board of Directors. "Plastic Pollution has risen to be one of the defining environmental issues of our time. If we're going to clean up the mountains of plastic waste, Exxon needs to clean up its act."[19]

2. "Exxon profited by claiming that plastics are disposable, safe and recyclable. And that's simply not true," said the Sierra Club's SF Chair Martha Kreeger. "Exxon perpetuated the myth of recyclability to keep consumers buying more and more."[20]

Each comment will be assessed individually.

As the reader will likely predict, the Court starts with the intrinsic elements. Like Baykeeper's quote, the statement clearly refers to ExxonMobil. However, also like Baykeeper's, the comment only reaches plastic's recyclable nature (or, as the Sierra Club believes, a lack thereof). Again, this is *not* advanced recycling. Further, it is not clear where any activity is occurring and does not mention "[Texas] explicitly or implicitly." *Herman*, 730 F.3d at 465 (alteration added). The Sierra Club's comment therefore does not have the intrinsic elements for which *Herman* and *Johnson* search.

Turn to the first quote's extrinsic aspects. This comment was published on the Sierra Club's own blog. [Dkt. 1-7 at 1]. ExxonMobil references the Sierra Club's Texas membership and that

---

[18] Baykeeper also made Rule 12(b)(3) and (6) arguments, which the Court does not reach. [Dkt. 49].

[19] [Dkt. 1 at ¶ 91 (citing Dkt. 1-7 at 1)].

[20] *Id.* (citing Dkt. 1-8 at 4).

membership's "history of taking in-state action against ExxonMobil's Baytown Refining Complex, which now houses ExxonMobil's advanced recycling operations." [Dkts. 1 at ¶ 18; 96 at 14]. However, ExxonMobil does not tie that membership to the cause of action in *this* case, which it must to create specific personal jurisdiction. *Johnson*, 21 F.4th at 325; *Ford Motor*, 592 U.S. at 354–57. ExxonMobil merely relies on the Sierra Club's membership to assume it had a "'large circulation' in Texas." [Dkt. 96 at 14, quoting *Calder v. Jones*, 465 U.S 783, 784 (1984)]. Again, "just because a site *can* exploit a forum does not mean that it *has* or that its forum contacts produced the plaintiff's claim." *Johnson*, 21 F.4th at 319 (emphasis in original). For this to be true the Sierra Club would have to send the statement into Texas, which ExxonMobil does not argue.

Lastly, ExxonMobil claims the Sierra Club "knew ExxonMobil was a Texas corporation with Texas operations" and therefore must have "purposefully targeted its tortious conduct at Texas." [Dkt. 96 at 14]. But *Herman* squarely rejects this theory. The fact the Sierra Club "knew" ExxonMobil "engaged in some activity in [Texas] is not sufficient to prove the allegedly defamatory statements themselves were made in reference to that activity." *Herman*, 730 F.3d at 465 (alteration added). So, the first quote is out.

Now for the second. The analysis is the same for the second comment's intrinsic qualities. The statement names ExxonMobil, but only reaches plastic's recyclability (not to be confused with advanced recycling) and does not mention "[Texas] explicitly or implicitly." *Herman*, 730 F.3d at 465 (alteration added). Consequently, this statement also falls short of what ExxonMobil needs.

The extrinsic inquiry comes to the same conclusion. Unlike the first quote, this comment was published in a CBS news article. [Dkt. 1 at ¶ 91, citing Dkt. 1-8 at 4]. But this does not change anything; there is no reason to assume a "disproportionately high [Texas] readership" of CBS. *Herman*, 730 F.3d at 466 (alteration added). As with every other website the Court has considered,

CBS is accessible in Texas, but this alone is not enough for *Herman* or *Johnson*. The second comment likewise fails to justify specific personal jurisdiction.

The Sierra Club's Motion is therefore granted on personal jurisdiction.[21]

### ii. *Bonta*

Here the tide turns in ExxonMobil's favor. ExxonMobil identifies the following comments from Bonta (numbered for ease of reference):[22]

1. They lied. They deceived. They falsely advertised. Uh, they undermined the science and made, uh, claims that were counter to the truth and so, uh, we're holding them accountable for that.[23]

2. . . . and they deserve and need a judgment day, and we are going to bring it to them with our lawsuit.[24]

3. . . . they have proposed sham solutions, and it's illegal, and so we are here to hold them accountable.[25]

4. ExxonMobil . . . are [sic] one of the largest producer [sic] of polymers and one of the biggest liars.[26]

5. Like a false promise about this new, so called newfangled, advanced recycling: it's not based on truth.[27]

---

[21] The Court does not discuss the Sierra Club's Rule 12(b)(3) and 12(b)(6) arguments. [Dkt. 50].

[22] These comments are arranged in the order in which they appear in the Complaint. [Dkt. 1].

[23] *Id.* at ¶ 69 (quoting Interview by Ross Palombo with Rob Bonta, California Attorney General, at 0:24 (Sept. 16, 2024), https://www.cbsnews.com/losangeles/video/ca-attorney-general-rob-bonta-speaks-on-states-lawsuit-against-big-oil-companies/).

[24] *Id.* (quoting REUTERS, *California Sues Exxon over Global Plastic Pollution*, at 0:57 (Youtube, Sept. 23, 2024), https://www.youtube.com/watch?v=Nsy8exWEcxw).

[25] *Id.* (quoting CLIMATE GROUP, *Climate Week NYC 2024 - Rob Bonta*, at 0:30 (Youtube, Oct. 7, 2024), https://www.youtube.com/watch?v=XOGn_nFZ3Q8).

[26] *Id.* (quoting Dkt. 1-1 at 4).

[27] *Id.* (quoting Dkt. 1-1 at 3).

6. We want them to tell the truth. Stop lying, stop deceiving, and stop manipulating the public. Stop lying to consumers, stop propping up channel solutions.[28]

7. Wonderful to join @ValerieVolco at Reuters' Sustainability Summit USA 2024 to discuss California's nation & world-leading climate action including my office's first-of-its-kind lawsuit against ExxonMobil for promoting the myth of plastic recycling.[29]

8. Wonderful to join @ValerieVolcovici at Reuters' Sustainability Summit USA 2024 to discuss California's nation & world-leading climate action including my office's first-of-its-kind lawsuit against ExxonMobil for promoting the myth of plastic recycling, lying to consumers, manipulating the public and propping up sham solutions.[30]

9. The lawsuit is basically the state of California suing ExxonMobil for a decades-long campaign of deception in which they've tried to convince the world, including California, that the recycling of plastic products, including single-use plastics is sustainable. It is not. It's a lie, that's a deception, only about five percent of plastic waste in the United States is ever actually recycled. Um, ninety-five percent goes to landfill [sic], or into the environment, or oceans, rivers, uh, or is incinerated, and the idea behind it was that if the public was convinced that, uh, their single-use throwaway consumer lifestyle, uh, was supported by recycling and that it was environmentally friendly they would buy more more and more and it would drive the profits of ExxonMobil up up and up. And so, that's the idea, but it's based on a lie, it's illegal, we've sued them in court, and we're here to hold them accountable.[31]

10. We've sued Exxon Mobil for a decades-long campaign of deception to convince the public that recycling makes plastic, include single-use plastic, sustainable[.] It doesn't[.] The truth is: Only 5% of U.S. plastic waste is recycled [.] Exxon Mobil knew. And Exxon Mobil lied.[32]

---

[28] *Id.* (quoting Dkt. 1-1 at 2).

[29] *Id.* at ¶ 71 (quoting Dkt. 1-2 at 1).

[30] *Id.* (quoting Dkt. 1-3 at 1).

[31] *Id.* at ¶ 72 (quoting Interview by Rebecca Quick with Rob Bonta, California Attorney General, at 0:23 (Sept. 24, 2024), https://www.cnbc.com/video/2024/09/24/california-ag-rob-bonta-on-exxon-mobil-lawsuit-they-lied-to-the-world.html). In its Complaint, ExxonMobil stated Bonta "said [Advanced recycling is] based on a lie." *Id.* (alteration in original). Bonta did not refer to advanced recycling in that portion of the interview; he was discussing an alleged ongoing deception that plastics are recyclable. After he made this statement, the interviewer *then* asked about ExxonMobil's statement on the lawsuit, which provides the first mention of advanced recycling in the interview. This edit is, ironically, deceptive.

[32] *Id.* at ¶ 73 (quoting Dkt. 1-4 at 1) (alterations added).

11. "The plastics industry has spent decades selling and marketing single-use products while falsely promising that we can recycle our way out of the problem…California Attorney General Rob Bonta is now suing ExxonMobil…for its role in deceiving the public."[33]

12. This landmark lawsuit by the state of California seeks to hold one of the world's largest polluters accountable for decades of lies and deception that created and exacerbated the global plastics crisis. ExxonMobil, the largest promoter and producer of polymers used to create single-use plastics that become waste in California, spent years convincing the public that recycling makes plastic, including single-use plastic, sustainable. *It doesn't*. **The truth is that only 5 percent of U.S. plastic waste is recycled. The rest ends up in our environment, our waterways and oceans, our wildlife, and even our own bodies.** *Exxon Mobil knew, and Exxon Mobil lied*.[34]

13. Advanced recycling is neither advanced nor recycling. It's a new version of an old lie. . . . Advanced recycling, let's talk about it. Their plant that you referenced? Here's what that plant does. It doesn't recycle. It's an old technology.[35]

14. And look at Houston, look at Idaho, look at Salt Lake City. These are advanced recycling projects that are supposed to be the new solution. And what is happening is post-consumer plastic waste is just piling up. It is not being recycled.[36]

Rather than repeating itself *ad nauseum*, the Court analyzes at once all comments that do *not* support specific personal jurisdiction. It then considers the others individually.

First, consider the statements that do not create specific personal jurisdiction. These are comments numbered 1–4, 6–11, and 13. A few name ExxonMobil. A few others mention lying, sham solutions, or the myth that plastic is recyclable—but only one explicitly indicates advanced

---

[33] *Id.* at ¶ 74 (quoting Dkt. 1-5 at 1) (alterations in original).

[34] *Id.* at ¶ 77 (quoting Dkt. 1-6 at 2-3) (emphasis in original).

[35] *Id.* at ¶ 85 (quoting Interview by Rebecca Quick with Rob Bonta, California Attorney General, at 3:37 (Sept. 24, 2024), https://www.cnbc.com/video/2024/09/24/california-ag-rob-bonta-on-exxon-mobil-lawsuit-they-lied-to-the-world.html) (alterations added).

[36] *Id.* at ¶ 86 (quoting Dkt. 1-1 at 2).

recycling. Further, it is not clear where any activity is occurring and does not mention "[Texas] explicitly or implicitly." *Herman*, 730 F.3d at 465 (alteration added). Additionally, none of these comments were sent into Texas or published where they might have high Texas readership. Neither were they made in Texas or use Texas sources. Accordingly, they cannot support specific personal jurisdiction.

Now for the others, which are numbered 5, 12, and 14. Consider statements 5 and 14 first. They clearly concern ExxonMobil and specifically mention advanced recycling; statement 14 also names Houston. Further, Bonta also relied on Texas sources when making these statements. As ExxonMobil alleges in the Complaint, Bonta's comments (especially comment 14's reference to the "piling up" of "post-consumer plastic waste" in advanced recycling facilities) were made based on another organization's deployment of AirTags in plastic bags, themselves concealed in plastic waste, to monitor ExxonMobil's Texas-based advanced recycling processes.[37] [Dkt. 1 at ¶¶ 30, 87]. Finding specific jurisdiction based on these circumstances would be consistent with *Johnson* and *Herman*.[38] The intrinsic and extrinsic aspects of comments 5 and 14 therefore create specific personal jurisdiction over Bonta.

Comment 12 does not need the intrinsic/extrinsic analysis because it appears in a campaign email allegedly *sent directly to Texas residents*. *Johnson* and *Herman* only conducted the intrinsic/extrinsic analysis where the defendant had not sent their defamatory statements into the

---

[37] Elsewhere in the interview Bonta also thanks those who did the tracking, stating that they have "actually cited" the reporting. [Dkt. 1-1 at 1].

[38] *Calder v. Jones* also supports specific personal jurisdiction here. 465 U.S. 783 (1984) There, the defamatory article "was drawn from [forum] sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in [the forum]." *Id.* at 788–89 (alterations added). Therefore, the forum was "the focal point both of the story and of the harm suffered." *Id.* at 789. The Supreme Court accordingly found that jurisdiction was proper. *Id.* This Court must follow Supreme Court precedent and apply constitutional provisions to modern realities of the internet and digital publications. Therefore, specific jurisdiction for a suit alleging the intentional tort of libel exists when an author or publisher "aims" a story at the state knowing that the "effects" of the story will be felt there. *See id.* at 789–90.

forum. 21 F.4th 314 at 316; 730 F.3d at 462. This is because where the defendant himself sends a defamatory email into the forum, he himself has created contacts with that forum from which the plaintiff's cause of action arises—no defamation-specific analysis necessary. *Calder*, 465 U.S. at 788–89; *Keeton v. Hustler Magazine*, 465 U.S. 770, 776–77. This is enough for the first two prongs of specific personal jurisdiction. *Savoie*, 122 F.4th at 190–91 (providing the specific personal jurisdiction inquiry, where the first element is whether the defendant "'purposely directed its activities toward the forum state'" and the second is "'whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts'") (quoting *Shambaugh & Son*, 91 F.4th at 372)

As to the third element of specific personal jurisdiction, the Court's exercise of jurisdiction over Bonta would not be unfair. In the first place "it is rare to say the assertion of jurisdiction is unfair after minimum contacts have been shown." *McFadin*, 587 F.3d at 759–60 (citation modified) (quoting *Wien Air*, 195 F.3d at 215). Per *McFadin*, it is on Bonta to show unfairness, but he did not argue that specific personal jurisdiction would be unfair or unreasonable. [Dkts. 44, 106]. Even so, *McFadin*'s five factors analyzing unfairness do not indicate cause for concern. At bottom, ExxonMobil accuses Bonta of emailing defamatory comments about ExxonMobil into Texas (statement 12) and then fundraising from Texas residents, possibly through that exact email. If Bonta wants to fundraise in Texas, he can answer to courts in Texas. The outcome is the same for the other comments (5 and 14), which targeted Texas activities and used Texas sources in the process. There is nothing unfair about specific personal jurisdiction here.

Given this discussion, Bonta's motion to dismiss is denied as to personal jurisdiction.[39] The Court has specific personal jurisdiction for Bonta for the purposes of adjudicating comments 5, 12, and 14.

### iii.    IEJF

ExxonMobil's theory of personal jurisdiction was contingent on personal jurisdiction over the U.S. Environmental Organizations and Bonta. [Dkt. 96 at 18–21]. The Court does not have personal jurisdiction over the U.S. Environmental Organizations to impute to IEJF. While the Court does have personal jurisdiction over Bonta, it cannot impute that personal jurisdiction to IEJF.

In the Fifth Circuit, minimum contacts can be extended to parties in an agency relationship. *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 490 (5th Cir. 2018). Not just any relationship counts; both California and Texas law[40] require something more. In California, "[f]undamental tenets of agency theory require that an agent 'act on the principal's behalf and subject to the principal's control.'" *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1024 (9th Cir. 2017) (quoting Restatement (Third) Of Agency § 1.01 (Am. L. Inst. 2006)); *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1172–73 (9th Cir. 2022) ("'Agency requires that the principal maintain control over the agent's actions'") (quoting *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013)). Texas has similar requirements; agency exists where "'the principal has both the right: (1) to assign the agent's task; and (2) to *control* the means and details of the process by which the agent will

---

[39] The portion of Bonta's Motion asserting official immunity and Eleventh Amendment Immunity are considered below.

[40] The choice of law issue on this point was not briefed by either ExxonMobil or IEJF. However, where two states' law would produce the same decision, there is no conflict of laws. *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521, 529 (5th Cir. 2014).

accomplish that task.'" *Trois*, 882 F.3d at 490 (quoting *Indian Harbor Ins. Co. v. Valley Forge Ins. Grp.*, 535 F.3d 359, 364 (5th Cir. 2008)) (emphasis in original).

ExxonMobil does not sufficiently allege a principal-agent relationship between IEJF and Bonta. The closest tie that ExxonMobil has between the two is the fact that four law firm partners (the registered foreign agents) as well as other firm members, donated to Bonta's political campaign nearly contemporaneously with the receipt of IEJF legal fees. [Dkt. 1 at ¶¶ 7, 48]. There is nothing in the Complaint to suggest that IEJF retained the ability to "assign [Bonta's] task" or "control the means and details" of how Bonta would achieve it. *Trois*, 882 F.3d at 490 (alteration added) (emphasis removed). So-called fishy business is not enough to create an agency relationship. Without an agency relationship, the Court cannot find specific personal jurisdiction over IEJF.

The IEJF's motion to dismiss for lack of personal jurisdiction [Dkt. 51] is therefore granted.[41]

### iv.  *Jurisdictional Discovery*

ExxonMobil requested jurisdictional discovery in the event the Court found lacking evidence of conspiracy or allegations against the U.S. Environmental Organizations. [Dkt. 96 at 20–21]. *Johnson* addressed this issue. "To merit jurisdictional discovery, [the plaintiff] must show that it is 'likely to produce the facts needed to withstand dismissal.'" *Johnson*, 21 F.4th at 326 (alteration added) (quoting *Davila v. United States*, 713 F.3d 248, 264 (5th Cir. 2013)). "[The plaintiff requesting jurisdictional discovery] must make clear which 'specific facts' [it] expects discovery to find." *Id.* (quoting *Bell Helicopter Textron, Inc. v. Eurocopter, LLC*, 729 F. Supp. 2d 789, 797 (N.D. Tex. 2010)) (alterations added). The Court "will not authorize 'a jurisdictional

---

[41] This Order does not address IEJF's Rule 12(b)(6) argument. [Dkt. 51].

fishing expedition' based on a plaintiff's general averments that more discovery will prove our jurisdiction." *Id.* (quoting *Bell Helicopter*, 729 F. Supp. 2d at 798). ExxonMobil does not allege "specific facts," but describes only the types of information discovery might uncover and urges that the Court not rely on the defendants' affidavits. [Dkt. 96 at 20–21]. This is not enough, especially when ExxonMobil's allegations "cannot sustain [the Court's personal jurisdiction] as a matter of law." *Johnson*, 21 F.4th at 326 (citing *Seiferth*, 472 F.3d at 277).

Accordingly, the Court denies jurisdictional discovery as to the U.S. Environmental Organizations and IEJF.

## IV.  MOTION ASSERTING IMMUNITY

Bonta's Motion also asserts official immunity and Eleventh Amendment immunity from suit. [Dkts. 44 at 17–27; 106 at 10–16]. ExxonMobil opposes these arguments. [Dkt. 95 at 6–23].

### A.  Legal Standard

Federal Rule of Civil Procedure 12(b)(1) allows challenges of the Court's subject matter jurisdiction.[42] FED. R. CIV. P. 12(b)(1). In weighing a 12(b)(1) motion, "a district court may dismiss a case under Rule 12(b)(1) based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *T&W Holding Co., L.L.C. v. City of Kemah*, 160 F.4th 622, 626 (5th Cir. 2025) (citation modified). "'A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case.'" *Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 307 (5th Cir. 2021) (quoting *Home Builders Ass'n v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)). "A dismissal for lack of jurisdiction under Rule 12(b)(1)" is only justified where "it appears certain that the plaintiff cannot

---

[42] While some Rule 12(b)(6) motions assert official or sovereign immunity, Bonta does not bring his Motion under Rule 12(b)(6)—he brings it under Rule 12(b)(1). [Dkt. 44 at 12]. The Court therefore uses the 12(b)(1) framework.

prove any set of facts in support of her claim that would entitle plaintiff to relief." *Robledo v. United States*, 147 F.4th 515, 519 (5th Cir. 2025) (citation modified).

Unlike a standard 12(b)(1) motion, the present motion implicates two potential burdens. Typically under the Rule 12(b)(1) "the burden of proving subject matter jurisdiction lies with the party asserting jurisdiction, and it must be proved by a preponderance of the evidence." *T&W Holding Co.*, 160 F.4th at 626 (citation modified). In Texas, common-law "official immunity is an affirmative defense that must be pleaded and proved to shield an employee from personal liability; otherwise, the defense is lost." *City of Houston v. Rodriguez*, 704 S.W.3d 462, 469 (Tex. 2024).

The parties disagree as to which burden applies here. Bonta argues the 12(b)(1) standard controls, which places the burden on ExxonMobil. [Dkt. 44 at 24 ll. 24–26]. ExxonMobil argues that because official immunity is an affirmative defense under Texas law, the burden is Bonta's. [Dkt. 95 at 13]. So, who is right? To answer that question, the Court considers *Erie Railroad Co. v. Tompkins*. 304 U.S. 64 (1938).

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). "When a party has alleged a direct conflict between the Federal Rules and state law, however, an additional step precedes the *Erie* analysis." *All Plaintiffs v. All Defendants*, 645 F.3d 329, 333 (5th Cir. 2011) (citing *Hanna v. Plumer,* 380 U.S. 460, 469–70 (1965)). "'The initial step is to determine whether, when fairly construed, the scope of [the Rule] is sufficiently broad to cause a direct collision with the state law or, implicitly, to control the issue before the court, thereby leaving no room for the operation of that law.'" *Id.* (citation modified) (alteration in original) (quoting *Burlington N. R.R. Co. v. Woods,* 480 U.S. 1, 4–5 (1987)). If a court finds a direct collision, it "must apply the Federal Rule as long as that Rule is a valid exercise of Congress's rulemaking authority." *Id.* (quoting

*Burlington N. R.R.*, 480 U.S. at 4–5)). *See also Berk v. Choy*, 607 U.S. --- 2026 WL 135974 (U.S. Jan. 20, 2026) (same).

Though neither party appears to have realized it, Bonta and ExxonMobil have alleged such a direct conflict here. This leads to the next step: validity under the Rules Enabling Act. Rule 12 is "'a valid exercise of Congress's rulemaking authority' under the Rules Enabling Act." *Klocke v. Watson*, 936 F.3d 240, 247–48 (5th Cir. 2019), *as revised* (Aug. 29, 2019) (quoting *All Plaintiffs v. All Defendants*, 645 F.3d 329, 333 (5th Cir. 2011)). Importantly, the Supreme Court has "rejected every statutory challenge to a Federal Rule" it has received, including one decided just recently. *Berk*, 607 U.S. ---, 2026 WL 135974, at *6 (U.S. Jan. 20, 2026). Given Rule 12's validity, its burden governs. ExxonMobil bears the burden.

## B.  Discussion

Bonta asserts two kinds of immunity in his 12(b)(1) Motion: official immunity and Eleventh Amendment immunity. [Dkts. 44 at 17–27; 106 at 10–16]. The Court accordingly separates its analysis.

### i.  *Official Immunity*

Bonta argues his statements should be afforded official immunity. [Dkt. 44 at 17–25]. ExxonMobil disagrees. [Dkt. 95 at 13–29].

#### 1.  *Choice of Law*

First, a preliminary point on conflict of laws. In diversity cases, "[f]ederal courts apply the forum state's conflict[]-of-law[s] rules to determine what law governs state-law claims." *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010) (alterations added) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "Texas courts initially determine whether there is a conflict between Texas law and the other potentially applicable law." *Id.* (citing *SAVA gumarska in kemijska indusria d.d. v. Advanced Polymer Sciences, Inc.*, 128 S.W.3d 304, 314 (Tex.App.—

Dallas 2004, no pet.)). If there "are no differences between the relevant substantive laws of the respective states," or if the "result would be the same," Texas law applies. *R.R. Mgmt. Co. v. CFS Louisiana Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005) (citing *Vandeventer v. All Am. Life & Cas. Co.*, 101 S.W.3d 703, 711 (Tex.App.—Fort Worth 2003, no pet.)); *SAVA*, 128 S.W.3d at 314. *See also In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521, 529 (5th Cir. 2014). Otherwise, Texas follows the "most significant relationship" test from the Restatement (Second) of Conflict of Laws to choose the applicable tort law. *Nix v. Major League Baseball*, 62 F.4th 920, 932 (5th Cir. 2023) (citing *Hughes Wood Prod., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000)).

Consider Texas law. In Texas, the "common-law affirmative defense of official immunity" shields "officers 'when they are performing (1) discretionary duties, (2) in good faith, and (3) within the scope of their authority.'" *Rodriguez*, 704 S.W.3d at 468 (quoting *City of Houston v. Sauls*, 690 S.W.3d 60, 70 (Tex. 2024)). The Texas Tort Claims Act (the "TTCA") "alters the common-law scheme by requiring plaintiffs to choose between suing the governmental unit under the Act and suing a responsible employee in an individual capacity." *Garza v. Harrison*, 574 S.W.3d 389, 399 (Tex. 2019) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(a)–(f); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 656 (Tex. 2008)). Dismissal upon a public employee's motion is proper when the suit "(1) is based on conduct within the general scope of the employee's employment and (2) could have been brought under the Act against the governmental unit."[43] *Id.* at 400 (citation modified).

Essential to both Texas common-law official immunity and the TTCA is that the employee was within the scope of her employment. The definition is "nearly identical" under both concepts.

---

[43] "Unlike official immunity, which is an affirmative defense that bars a governmental employee's individual liability, [the TTCA] essentially prevents an employee from being sued at all for work-related torts and instead provides for a suit against the governmental employer." *Garza*, 574 S.W.3d at 399–400.

*Wilkerson v. Univ. of N. Texas By & Through Bd. of Regents*, 878 F.3d 147, 161 n.14 (5th Cir. 2017) (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994); TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(5); *Laveriev. Wetherbe*, 517 S.W.3d 748, 752–53 (Tex. 2017)). The term means "(1) the performance for a governmental unit of the duties of an employee's office or employment, which (2) includes being in or about the performance of a task lawfully assigned to an employee by competent authority." *Garza*, 574 S.W.3d at 400 (citation modified). Moreover, "[c]onduct falls outside the scope of employment when it occurs 'within an independent course of conduct not intended by the employee to serve *any* purposes of the employer.'" *Id.* (alteration added) (emphasis in original) (quoting *Alexander v. Walker*, 453 S.W.3d 789, 792 (Tex. 2014)). Campaign-related activities are not within a public employee's authority or scope of employment. TEX. GOV'T CODE § 556.004. *See also* § 556.007 (providing for a public employee's termination for violation of certain provisions of § 556.004); TEXAS ETHICS COMMISSION, ETHICS ADVISORY OPINION NO. 550 (2019) (elaborating on prohibitions on elected officials' use of government resources for political purposes).

California's law is similar. Statutory official immunity applies to statements made "in the proper discharge of an official duty." CAL. CIV. CODE § 47(a). "The privilege protects any statement by a public official, so long as it is made (a) while exercising policy-making functions, and (b) within the scope of his or her official duties." *Fitzgerald v. City of Fresno*, No. 1:21-CV-01409-AWI-SAB, 2022 WL 1204707, at *6 (E.D. Cal. Apr. 22, 2022) (citing *McQuirk v. Donnelley*, 189 F.3d 793, 801 (9th Cir. 1999); *Sanborn v. Chron. Pub. Co.*, 18 Cal. 3d 406, 412–13 (1976); *Maranatha Corr., LLC v. Dep't of Corr. & Rehab.*, 70 Cal. Rptr. 3d 614, 622 (2008)). Policy-making functions mean "the official must reach a basic policy decision, as distinct from an operational decision, after balancing risks and advantages," as distinguished from ministerial or

operational duties. *Id.* (citing *McQuirk*, 189 F.3d at 801; *Neary v. Regents of Univ. of Cal.*, 230 Cal. Rptr. 281, 284–84 (1986)).

The California Tort Claims Act (the "CTCA") also prohibits "a cause of action against a public employee . . . for injury resulting from an act or omission in the scope of his employment as a public employee" where the plaintiff has not first "presented [her claim] to the state" through means dictated by statute. CAL. GOV'T CODE §§ 911.2, 915(b), 950.2 (alterations added) (providing the timing and manner of claim filing, and barring claims that do not comply); *Roger v. Cnty. of Riverside*, 257 Cal. Rptr. 3d 566, 577 (2020) (discussing the claim presentment requirement in a defamation case). "The filing requirement does not apply to either non-pecuniary actions such as injunctive, specific, or declaratory relief, or causes of action based upon federal law." *Robinson v. Alameda Cnty.*, 875 F. Supp. 2d 1029, 1044 (N.D. Cal. 2012) (citing *Canova v. Trustees of Imperial Irrigation Dist. Emp. Pension Plan*, 59 Cal. Rptr. 3d 587, 592 (2007)); *Howard Jarvis Taxpayers Ass'n v. Coachella Valley Water Dist.*, 329 Cal. Rptr. 3d 373, 404 (2025).

Both statutory official immunity and the CTCA apply only to public employees acting within the scope of their employment. "Generally, California courts determine that a public employee is acting in the course and scope of his employment when 'he is engaged in work he was employed to perform, or when the act is an incident to his duty and was performed for the benefit of his employer and not to serve his own purposes or convenience.'" *Wilson-Combs v. Cal. Dep't of Consumer Affs.*, 555 F. Supp. 2d 1110, 1118 (E.D. Cal. 2008) (quoting *Burgdorf v. Funder*, 54 Cal. Rptr. 805 (1966)). A public employee in California may not engage in certain activities that are "clearly inconsistent, incompatible, in conflict with, or inimical to his or her duties as a state officer or employee." CAL. GOV'T CODE § 19990. This includes the "use of state resources, their titles, or their positions when fundraising." *Progressive Democrats for Soc. Just. v. Bonta*, 73 F.4th 1118, 1120 (9th Cir. 2023) (citing CAL. GOV'T CODE § 19990(a)–(b)).

The two sets of laws are strikingly similar. While they differ in form, they do not differ in substance; they both extend immunity to public employees performing official duties, and neither includes campaigning within those official duties. Accordingly, there is no conflict and no need for a Second Restatement analysis. The Texas law applies.

### 2. Official Immunity under Texas Law

Here, the Court only considers Texas common-law official immunity. As ExxonMobil correctly argues, the TTCA "only applies to employees of 'this state' and 'political subdivisions of this state'" meaning "employees of Texas or its subdivisions, not the California attorney general." [Dkt. 95 at 26 (quoting TEX. CIV. PRAC. & REM. CODE §§101.001(2)–(3); *Jaxson v. Becker*, No. 01-93-00892-CV, 1994 WL 192338, at *2 (Tex. App.—Houston [1st Dist.] May 19, 1994, no writ))]. Bonta argues that this weighs in favor of applying California law. [Dkt. 106 at 11 ll. 13–14]. Not so fast. When a court is faced with a statute that by its own terms limits itself to in-state actors and activities, that court may apply the state's common law. *See Highway Equip. Co. v. Caterpillar Inc.*, 908 F.2d 60, 64 (6th Cir. 1990); *Peugeot Motors of Am., Inc. v. E. Auto Distribs., Inc.*, 892 F.2d 355, 358 (4th Cir. 1989). *See also* Robert A. Sedler, *Functionally Restrictive Substantive Rules in American Conflicts Law*, 50 S. CAL. L. REV. 27, 35 (1976) ("in [a] conflicts situation, where the statute is construed as constituting a functionally restrictive substantive rule, the common law rule is applicable to the decision of the case") (alteration added).[44] So it would seem that per a conflict-of-laws twist, Texas common law controls.

The Texas "common-law affirmative defense of official immunity" shields "officers 'when they are performing (1) discretionary duties, (2) in good faith, and (3) within the scope of their authority.'" *Rodriguez*, 704 S.W.3d at 468 (quoting *Sauls*, 690 S.W.3d at 70). Texas courts distinguish discretionary duties from ministerial ones. "A duty is discretionary if its performance

---

[44] The Court could not locate a Fifth Circuit precedent addressing this issue.

involves personal deliberation, decision, and judgment" and ministerial if "the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Sauls*, 690 S.W.3d at 70 (citation modified). The good-faith inquiry states an officer's actions "must be justified with reference to what a reasonably prudent officer, possessed of the same information and under the same or similar circumstances, could have believed." *Id.* at 75. It is "'one of objective legal reasonableness, without regard to whether the government official involved acted with subjective good faith.'" *Id.* at 73 (quoting *Chambers*, 883 S.W.2d at 656). Good faith "protects 'all but the plainly incompetent' and is akin to the deferential abuse-of-discretion standard." *Id.* at 75 (quoting *Chambers*, 883 S.W.2d at 656 (Tex. 1994)). Alternate courses of action do "not necessarily negate[]" good faith. *Id.* (alteration added).

The public employee must be within the scope of employment to qualify for immunity under Texas common law. "Scope of employment" means "(1) the performance for a governmental unit of the duties of an employee's office or employment, which (2) includes being in or about the performance of a task lawfully assigned to an employee by competent authority." *Garza*, 574 S.W.3d at 400 (citation modified). Additionally, "[c]onduct falls outside the scope of employment when it occurs 'within an independent course of conduct not intended by the employee to serve *any* purposes of the employer.'" *Id.* (alteration added) (emphasis in original) (quoting *Alexander*, 453 S.W.3d at 792). A public employee's scope of employment does not include campaigning; certain electoral activities, if conducted using state resources, can result in the employee's termination. TEX. GOV'T CODE §§ 556.004, 556.007; TEXAS ETHICS COMMISSION, ETHICS ADVISORY OPINION NO. 550 (2019) (extending Texas statutes to elected statewide officials).

The Court found specific personal jurisdiction as to comments 5, 12, and 14. Of those, statements 5 and 14 came from a Reuters interview. [Dkt. 1 at ¶ 69 (quoting Dkt. 1-1 at 3); *Id.* at

¶ 86 (quoting Dkt. 1-1 at 2)]. When read in context, Bonta is speaking as California Attorney General about the lawsuit his office filed against ExxonMobil. [*See generally* Dkt. 1-1]. He routinely uses "we" and "us" to refer to investigations, subpoenas, and the lawsuit's ultimate filing. *Id.* at 1–2. Moreover, he discusses other cases filed in his official capacity as California Attorney General. *Id.* at 2 (". . . our suit against BP and ConocoPhillips [among others] for climate change deception") (alterations added). Bonta also said "[w]e are the only public entity to sue a petrochemical company that produces [plastic] polymers." *Id.* (alterations added). Statements 5 and 14 appear among these other quotes.

As to the first immunity factor, discretionary duties, Bonta asserts he "was not ordered or instructed to speak publicly about California's lawsuit against ExxonMobil—instead, he exercised personal deliberation and judgment in speaking to the press." [Dkt. 44 at 24 ll. 3-5]. ExxonMobil does not contest this in its Response. [*See generally* Dkt. 95].

The second immunity factor considers the officer's objective good faith. Good faith "focus[es] on the objective facts and information the officer knew and perceived." *Sauls*, 690 S.W.3d at 74–75 (alteration added). This stands separately from *subjective*, which looks to "whether the officer had subjectively considered and assessed certain factors." *Id.* at 75. ExxonMobil argues it "has alleged that Bonta *actually knew his defamatory statements were false* and that he made them as part of a concerted attack on ExxonMobil." [Dkt. 95 at 27–28 (emphasis in original)]. At first blush this seems subjective and therefore irrelevant to good faith, which is objective. However, it is a factual claim about what Bonta *objectively* knew. If ExxonMobil is correct, Bonta did not act with good faith. "[A] reasonably prudent officer, possessed of the same [knowledge of his statements' falsity] and under the same or similar circumstances, could [not] have believed" his actions justified. *Id.* at 75 (alterations added). Bonta's official immunity therefore rises and falls based on whether his statements were objectively false. Because 12(b)(1)

motions can only be granted where "it appears certain that the plaintiff cannot prove any set of facts in support of her claim that would entitle plaintiff to relief," the Court cannot grant Bonta's 12(b)(1) motion in this instance. *Robledo*, 147 F.4th at 519 (citation modified).

Now consider the remaining statement. Comment 12 was made in an election email sent to Texas residents. [Dkt. 1 at ¶ 77 (quoting Dkt. 1-6 at 2-3)]. Bonta argues the email was official because it "informed recipients of his office's activities and its management of the public business, even if it 'allegedly acted partly to serve his own interests.'" [Dkt. 44 at 23 ll. 14–16 (citation modified) (quoting *Carter v. Diamond URS Huntsville, LLC*, 175 F. Supp. 3d 711, 751 (S.D. Tex. 2016); *Laverie*, 517 S.W.3d at 753)]. In other words, Bonta believes his email was official communication that just so happened to include a campaign contribution link. It is the link's presence that changes things. Here, the contribution request betrays the email's true nature: a campaign promotion. Campaigning is not within Bonta's scope of employment.

The outcome may be different for statements made in press conferences; an elected official can make statements communicating his office's activities, with an unspoken expectation that later on he will receive campaign donations as a result. This is consistent with Texas law. *See generally Carter*, 175 F. Supp. 3d at 752 (finding official immunity under the TTCA even where the official "acts partly to serve his or her own interests") (citing *Tipps v. McCraw*, 945 F. Supp. 2d 761, 766 (W.D. Tex. 2013)). It is a different matter entirely to make those statements and simultaneously request campaign contributions. Quote 12 is therefore beyond the bounds of Bonta's scope of employment and is not subject to Texas common-law official immunity.

Bonta's 12(b)(1) Motion to Dismiss for official immunity is therefore denied. [Dkt. 44].

### ii. *Eleventh Amendment Immunity*

The Eleventh Amendment to the United States Constitution provides "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or

prosecuted against one of the United States by Citizens of another State." U.S. CONST. AMEND. XI (alteration added). The Eleventh Amendment gives states, state agencies, and state officials acting in their official capacities immunity from suits brought by citizens of other states. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984); *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). A lawsuit "against a state official in his individual capacity may not in all instances implicate the Eleventh Amendment." *Henley v. Simpson*, 527 F. App'x 303, 305 (5th Cir. 2013) (citing *Hudson v. City of New Orleans,* 174 F.3d 677, 687 n.7 (5th Cir. 1999)). In fact, "the general rule" is that a public official does not get Eleventh Amendment immunity "from an action against him in his individual capacity." *Id.* at 306 (citing *Modica v. Taylor*, 465 F.3d 174, 183 (5th Cir. 2006); *Stramaski v. Lawley*, 44 F.4th 318, 322 (5th Cir. 2022). However, there is an exception to this general rule "'where the state is the real and substantial party in interest,'" in which case "the Eleventh Amendment may bar the suit.'" *Stramaski¸*44 F.4th at 322 (quoting *Modica*, 465 F.3d at 183). This determination "depends on the circumstances of the case." *Id.*

Relevant to a case's circumstances is the distinction between indemnification and a draw on the state's coffers. "'The Eleventh Amendment does not come into play in personal capacity suits, and the existence of an indemnification statute promising to pay judgments when an officer is sued in his individual capacity does not extend the Eleventh Amendment's protections around the officer.'" *Id.* at 323 (citation modified) (quoting *Hudson*, 174 F.3d at 687 n.7). By contrast, the Eleventh Amendment *does* encompass "situations in which the individual [is] simply a nominal defendant and the judgment sought would expend itself on the public treasury or compel the State to act." *Id.* at 325 (alteration added) (citation modified) (citing *Henley*, 527 F. App'x at 306).

Some examples illustrate the difference. A case in the former category includes one where "the defendant retaliated specifically against [the plaintiff] for complaints she was making about a possible delay in being paid." *Id.* (alteration added). This type of case will not typically involve "a

challenge to a state policy simply being implemented by a supervisor employee." *Id.* An example of a "public treasury" case is one implicating a "'State's compensation policy and whether the state employees' caring for, and training, service canines resulted in an accrual of overtime hours.'" *Id.* There, "the policy promulgated by the state itself violated federal wage and hour laws." *Id.* (citing *Henley*, 527 F. App'x at 307–08).

The Court has already denied Bonta's 12(b)(1) motion to dismiss for official immunity. Because it is not clear Bonta was acting in his official capacity, the Court cannot grant his Eleventh Amendment arguments on that ground. Therefore, the only relevant question is whether the State of California is the "real and substantial party in interest" such that this case qualifies for the exception.

Under the above caselaw, California is not the target of this lawsuit and the Eleventh Amendment does not apply. This case concerns an *individual's* behavior—specifically actions for which the Court denied official immunity. Additionally, this case is not aimed at changing the way California operates, compelling California to act, or accomplishing a California policy change. This makes the present case more like the retaliation claim than the wage-and-hour suit. Under these circumstances Eleventh Amendment immunity is not implicated.

The Court accordingly denies Bonta's (12)(b)(1) Motion to Dismiss based on Eleventh Amendment immunity. [Dkt. 44].

### V.  MOTION TO TRANSFER VENUE

Only the U.S. Environmental Organizations joined in the Motion to Transfer Venue. [Dkt. 46]. Because the Court has found it lacks personal jurisdiction over these defendants and has dismissed them, that motion is moot and the Court denies it as such.

## VI.  MOTION CHALLENGING DECARATORY RELIEF

Bonta's Motion also requests dismissal of ExxonMobil's request for declaratory relief. [Dkt. 44 at 27]. Bonta's argument is that "ongoing litigation in California addresses the issues sought to be resolved by declaratory judgment." *Id.* at 27 ll. 24–25. He does not elaborate. Neither does his Reply mention this argument. [Dkt. 105 at 16 ll. 15–18].

Wright & Miller provides hornbook law on this topic. Another suit "does not bar declaratory relief if the issues in the declaratory action will not necessarily be determined in the other suit." 10B FED. PRAC. & PROC. CIV. § 2758 (4th ed.).[45] Here, ExxonMobil requests "a declaration that (i) advanced recycling is recognized and permitted by law in multiple states, including Texas, and that (ii) ExxonMobil is lawfully permitted to engage in and promote advanced recycling at its Texas facility." [Dkt. 1 at ¶ 140]. In relevant part, Bonta's California lawsuit concerns the way ExxonMobil promoted advanced recycling in California, alleging ExxonMobil did so deceptively. [Dkt. 44-4 at ¶¶ 240–350]. While there is a small amount of overlap insofar as promotion of the advanced recycling technology goes, Bonta's California lawsuit will not necessarily resolve the issues presented here.

The Court therefore denies this portion of Bonta's Motion to Dismiss. [Dkt. 44].

## VII.   MOTIONS TO INTERVENE

Three Texas cities and one Texas county filed motions to intervene under Federal Rule of Civil Procedure 24(b)(1). [Dkts. 39, 54, 62, 63].[46] Bonta, the sole remaining defendant in this case, filed a Response in opposition. [Dkt. 90]. The would-be intervenors filed a Reply. [Dkt. 103].

---

[45] The Court was unable to locate Fifth Circuit precedent on this topic, specifically where the other court is a *federal* court.

[46] The last-filed Complaint in Intervention lists all four intervenors and is therefore the one the Court considers for inclusion on the docket. [Dkt. 65].

### A.  Legal Standard

Federal Rule of Civil Procedure 24(b)(1) allows a court to permit an intervenor who files a "timely motion" and "has a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1). The Fifth Circuit "has accepted that the 'claim or defense' portion of Rule 24(b) is to be construed liberally." *United States ex rel Hernandez v. Team Fin., L.L.C.*, 80 F.4th 571, 577 (5th Cir. 2023) (citation modified) (citing *Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006)). "[A]mong other factors," district courts consider "whether the intervenors are adequately represented by other parties and whether they are likely to contribute significantly to the development of the underlying factual issues." *League of United Latin Am. Citizens v. Clements*, 884 F.2d 185, 189 (5th Cir. 1989) (alteration added) (citing *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 472 (5th Cir. 1984)). "When a proposed intervenor possesses the same ultimate objectives as an existing litigant, the intervenor's interests are presumed to be adequately represented absent a showing of adversity of interest, collusion, or nonfeasance." *Id.* (citing *Kneeland v. Nat'l Collegiate Athletic Ass'n,* 806 F.2d 1285, 1288 (5th Cir. 1987); *Bush v. Viterna,* 740 F.2d 350, 355 (5th Cir. 1984)). This presumption of adequate representation "may be rebutted on a relatively minimal showing," but mere speculation of inadequacy is not enough. *Id.* (citing *Moosehead Sanitary Dist. v. S.G. Phillips Corp.,* 610 F.2d 49, 54 (1st Cir. 1979)). Ultimately, "[i]ntervention under Rule 24(b) is left to the sound discretion of the district court." *Hopwood v. State of Tex.*, 21 F.3d 603, 606 (5th Cir. 1994) (alteration added).

### B.  Discussion

The City of Baytown, Texas ("Baytown") is a "Texas Gulf Coast community" currently "working closely with ExxonMobil as it operates and constructs advanced recycling facilities to recycle plastic at its Baytown refining complex." [Dkt. 39 at 2]. Moreover, Baytown has been working with ExxonMobil to use its advanced recycling technology as part of its waste

management and community recycling programs. *Id.* at 4–5. In fact, this is a first for Baytown—it has never had a plastics recycling program. *Id.* at 3.

The City of Beaumont, Texas ("Beaumont"), also a "Texas Gulf Coast community," has also worked with ExxonMobil to expand advanced recycling operations at ExxonMobil's Beaumont facility. [Dkt. 54 at 2, 3]. As was the case with Baytown, Beaumont also considers advanced recycling a key component of its waste management planning. *Id.* at 7. Like Baytown, Beaumont previously has never had a plastics recycling program. *Id.* at 3.

Chambers County, Texas ("Chambers County") is in a similar position. Unlike Baytown and Beaumont, it "had plastic recycling program [sic] at one time, but its recycling vendor went out of business and the program was dropped." [Dkt. 62 at 3]. ExxonMobil's investment in its Baytown facility's advanced recycling allows Chambers County to explore plastics recycling again. *Id.* This advanced recycling effort is "the backbone" of Chambers County's "comprehensive solid waste management programs." *Id.* at 7.

Lastly, the City of Mont Belvieu, Texas ("Mont Belvieu") is no different from Chambers County; it had a recycling program, lost it, and now has regained it through ExxonMobil's advanced recycling investments. [Dkt. 63 at 3]. Moreover, advanced recycling is allegedly a key component of its waste management program. *Id.* at 7.

Under Rule 24(b)(1), the party seeking to intervene must file a "timely motion." FED. R. CIV. P. 24(b)(1). Baytown filed its Motion to Intervene approximately three months after the Complaint was filed. [Dkt. 39]. Beaumont's, Chambers County's, and Mont Belvieu's motions followed shortly thereafter. [Dkts. 54, 62, 63]. The Court considers all four of these motions timely.

The second part of the Rule 24(b)(1) asks whether the intervenor "has a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1). ExxonMobil alleges the defamation in this case affected its business relationships concerning

43

advanced recycling. As parties on the other end of ExxonMobil's business relationships, each of the intervenors have their own damages flowing from the alleged defamation. Each claims the alleged defamation has disrupted its waste management and community recycling programs—some of a local government's most essential services. [Dkts. 39 at 4–5; 54 at 7; 62 at 3, 7; 63 at 3, 7]. This has implications for both factual development and adequate representation. ExxonMobil cannot provide facts on how these programs have been impacted, so intervention will contribute significantly to factual development on damages. Separately, ExxonMobil cannot adequately represent their interests; they are governmental bodies with affected recycling and waste management programs. While these interests may be related to ExxonMobil's advanced recycling business, they are far from the same.

For these reasons, the Court grants the motions to intervene. [Dkts. 39, 54, 62, 63].

## VIII.   CONCLUSION

In accordance with the above, the Court therefore **ORDERS** that:

1. Heal the Bay, Inc.'s 12(b)(2), (3), and (6) Motion to Dismiss [Dkt. 47] is **GRANTED IN PART**;

2. Surfrider Foundation, Inc.'s Rule 12(b) Motion to Dismiss [Dkt. 48] is **GRANTED IN PART**;

3. Baykeeper, Inc.'s Rule 12(b)(2), (3), (6) Motion to Dismiss [Dkt. 49] is **GRANTED IN PART**;

4. Sierra Club, Inc.'s Motion to Dismiss [Dkt. 50] is **GRANTED IN PART**;

5. Robert Andres Bonta's Motion to Dismiss [Dkt. 44] is **DENIED**;

6. Intergenerational Environment Justice Fund Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim [Dkt. 51] is **GRANTED IN PART**;

7.  Sierra Club, Inc.'s, Surfrider Foundation, Inc.'s, Heal the Bay, Inc.'s, and Baykeeper, Inc.'s Joint Motion to Transfer to the Northern District of California [Dkt. 46] is **DENIED AS MOOT**;

8.  City of Baytown, Texas's Opposed Motion to Intervene [Dkt. 39] is **GRANTED**;

9.  City of Beaumont, Texas's Opposed Motion to Intervene [Dkt. 54] is **GRANTED**;

10. Chambers County, Texas's Opposed Motion to Intervene [Dkt. 62] is **GRANTED**;

11. City of Mont Belvieu, Texas's Opposed Motion to Intervene [Dkt. 63] is **GRANTED**;

The Clerk is **INSTRUCTED** to **TERMINATE** Heal the Bay, Inc., Surfrider Foundation, Inc., Baykeeper, Inc., Sierra Club, Inc., and Intergenerational Environment Justice Fund Ltd. as defendants in this action.

The Clerk is further **INSTRUCTED** to **ACCEPT** the City of Baytown, Texas, City of Beaumont, Texas, City of Mont Belvieu, Texas, and Chambers County, Texas Complaint in Intervention [Dkt. 65] and make same a part of the record in this matter.

**SIGNED this 13th day of February, 2026.**


_Michael J. Truncale_
Michael J. Truncale
United States District Judge

45